# JUNE, 1917

## SAN ANTONIO & ARANSAS PASS RAILWAY COMPANY v. MRS. LULA BLAIR.

Application No. 9822.    Motion No. 3947.    Decided June 27, 1917.

**1.—Constitutional Law—Supreme Court—Writ of Error—Act of 1917.**

The designation by the Supreme Court of three members each from a different Court of Civil Appeals, to act as a committee of judges in passing on applications for writs of error to the Courts of Civil Appeals (Act of March 15, 1917, Laws, 35th Leg., ch. 72, p. 142) will not leave those courts unable to perform their functions. The remaining two judges constitute a majority of the court and a quorum to transact its business. City of Austin v. Nalle, 85 Texas, 520. (Pp. 437, 438.)

**2.—Same.**

The statute for relief of the crowded dockets of the Supreme Court (Act of March 15, 1917, Laws, 35th Leg., p. 142) and providing for its designation of a committee of judges of the Courts of Civil Appeals to pass upon applications for writs of error to such courts did not create a new court. It simply added certain duties to the justices of courts already existing, to be discharged only in their capacity as such justices. (P. 437.)

**3.—Same.**

The Legislature being empowered by the Constitution to confer on Courts of Civil Appeals "such other jurisdiction, original or appellate as may be prescribed by law," could impose on justices of such courts additional judicial duties which have relation simply to a method of appeal of causes determined by those courts. (P. 438.)

**4.—Same.**

The writ of error is a mode of securing revision of causes on appeal. Its allowance may involve the exercise of judicial power; but nothing in the Constitution forbids the exercise of such power by justices of the Courts of Civil Appeals in allowing appeals from those courts to the Supreme Court. In the absence of prohibition the Legislature may confer on judges the authority to perform judicial acts necessary to the due administration of the law, as it empowers judges to perform certain judicial acts in chambers or in vacation; or as, in the Federal practice, the Chief Justice of a State Supreme Court is authorized to allow a writ of error for the review of its decision by the Supreme Court of the United States. (P. 438.)

**5.—Same.**

The Constitution not only fails to declare the mode by which the jurisdiction of the Supreme Court may be made to attach, but directly authorizes the Legislature to limit and change the jurisdiction itself. It is equally competent for it to establish the mode by which that jurisdiction may be invoked. (P. 439.)

**6.—Same.**

There is no vested right in the mode of appeal by allowance of writ of error by the Supreme Court. That method was the creation of the former statute; and the jurisdiction of that court is to be exercised under such limita-

tions and regulations as the Legislature may provide.  The manner and mode by which it is acquired is matter for legislative control in the absence of constitutional direction.  (P. 440.)

### 7.—Same.

An Act of the Legislature is to be held valid unless forbidden by the Constitution in express terms, or by necessary implication.  The Act of March 15, 1917, Laws, 35th Leg., p. 142, was a valid and constitutional exercise of legislative power.  (P. 441.)

### 8.—Dissenting Opinion.

Mr. Justice Hawkins, concurring in the present order refusing the application for hearing, as being determined by the previous action of the majority of the court setting in operation the Act of March 15, 1917, from which he had dissented, files his opinion expressing his dissent to that action on the ground of the unconstitutionality of such statute.  (P. 441.)

The application of the San Antonio & Aransas Pass Railway Company for a writ of error in this case having been refused by the committee of judges from the Courts of Civil Appeals selected by the Supreme Court to pass on such applications, in accordance with the Act of March 15, 1917, petitioner moved in the Supreme Court for a hearing on its application by that body, asserting the invalidity of the law under which its application had been referred to and passed on by judges of the Courts of Appeals.

*Boyle, Storey, Ezell & Grove, Williamson & Klinglemann,* and *Proctor, Vendenberge, Crain & Mitchell,* for petitioner.

*C. L. Bell, C. C. Harris,* and *Arnold, Cozby & Peyton,* for Mrs. Blair, appellee.

MR. CHIEF JUSTICE PHILLIPS delivered the opinion of the court.

This motion assails the constitutionality of the recent Act of the Legislature (Acts of 1917, chapter 76, p. 142), authorizing the Chief Justice of the Supreme Court, or any two of the justices thereof, to designate a committee of three of the justices of the Courts of Civil Appeals, empowered to pass upon petitions for writs of error seeking a review of causes by the Supreme Court, except in certain classes of cases, referred to them by the Supreme Court, and grant or refuse the writ, or dismiss the petition, in accordance with the practice of the Supreme Court.  It is urged that on account of the invalidity of the Act we should consider the petition for writ of error in the case, it having been previously by us referred to the committee of judges and passed upon by them adversely to the plaintiff in error.  A number of similar motions have been filed in other cases.

The Act became immediately effective upon its approval by the Governor.  Its administration was inaugurated by the court's designation, on March 28, 1917, of three justices selected from different Courts of Civil Appeals to serve in the capacity authorized until its further orders, and the reference to them of pending petitions for writs of error, except

in the classes of cases exempted from the Act's operation. The Act was set in motion because of the court's view that it was constitutional and valid, the various grounds urged against it in all these motions having then been fully considered. Had we not determined it to be a valid Act, we would not have proceeded under it. It was intended, therefore, that our action in inaugurating it should serve as in effect a judgment in respect to its validity, and should be so understood.

In view of these motions it is but proper, however, that we should state the grounds which in our opinion sustain the Act. We have not the time now, in the closing hours of the term, nor the inclination to pursue the subject at length. The validity of the Act may be established upon principles so plain and unmistakable that any extended discussion of the question is, in our judgment, unnecessary.

It should be stated that Mr. Justice Hawkins did not agree with the majority of the court in their determination of the validity of the Act. He accordingly dissented from the court's action in proceeding under it, announcing that he would later file an opinion expressing his views. He has not completed his opinion, but will file it when finished. Because of the court's previous settlement of the question, he concurs in its present action in overruling this and other like motions, referring, however, to his opinion, to be filed, for a statement of his position.

The Act, as is revealed upon its face, had for its purpose relieving this court, for a season, from the necessity of reviewing the large number of petitions for writs of error presented to it, so as to enable it, during such period, to devote its time to its cause docket and bring an end to its congested condition. For a number of years the petitions for writs of error filed annually in the court, seeking revision of judgments of the Courts of Civil Appeals, have been in excess of 500 in number, gradually increasing each year. Each requires deliberate and accurate consideration. To keep abreast of them, practically the whole time of the court has been required throughout each term. The result was an enforced neglect of causes in which writs of error had been granted and which were pending for submission and decision. Postponement of the decision of those causes by the condition thus brought about amounted in many instances to a denial of justice. By giving the petitions for writs of error its constant attention, the court had been able to keep that docket fairly cleared. But this was true only because it had given them nearly its whole time in each term. Had its time been given in equal degree to the decision of pending causes, the congested condition of the latter docket might have been obviated; but it recognized that in that event the petitions for writs of error would accumulate so rapidly as to result in a similar congestion in respect to them.

It is sometimes overlooked that with the inauguration of the Courts of Civil Appeals as a part of our judicial system, the jurisdiction of the Supreme Court was fixed in the Constitution for the review, originally, of causes determined by but three of such courts, and only three of those courts were originally established. The Courts of Civil

Appeals have, however, been trebled in number. There are now nine of them. In the meantime, the jurisdiction of the Supreme Court has remained substantially unchanged,—to no appreciable extent diminished in respect to the time necessarily required for its proper examination of causes presented to it on petition for writ of error. With the jurisdiction of the Supreme Court, in other words, originally adjusted so as to enable it to properly review causes emanating from but three appellate courts, it has of late years, with substantially no change in its jurisdiction, been charged with the duty of reviewing causes emanating from nine appellate courts. It was the realization of this that has caused it during this latter period to chiefly give its time to the consideration of causes presented on petition for writ of error in an effort to dispose of them as currently filed, leaving it, as already stated, no sufficient time for the decision of pending causes.

This was a condition imperatively demanding relief in the interest of an efficient administration of the law. To relieve it in a practical and inexpensive way by making use of the existing judicial machinery of the State was the design of this Act. The thought of its framers doubtless was that under its operation for a short period the Supreme Court could clear its docket and be in position to resume the consideration of cases on petition for writ of error. For that reason the operation of the Act is in effect limited to the time necessary for that purpose.

The invalidity of the Act is asserted both as it affects the duties and powers of the Courts of Civil Appeals, and as it relates to the exercise by the Supreme Court of the jurisdiction with which it is invested by law.

The effect of the Act upon the Courts of Civil Appeals and their justices will be first considered.

It is claimed that the use for the purposes of the Act of three justices from three different Courts of Civil Appeals will leave the courts of which they are members unable to perform their functions. This question was settled in City of Austin v. Nalle, 85 Texas, 520. It was there held that under the statute prescribing that "a majority of the several Courts of Civil Appeals shall constitute a quorum for the dispatch of business," a lawful Court of Civil Appeals is constituted by two members present and acting.

The Act, as it plainly shows, does not create a court. It simply defines and adds certain duties to those of the justices of the Courts of Civil Appeals already existing. The duties thus added are those which the justices are to discharge as justices of such courts and only in their capacity as such. The Constitution,—section 6 of article 5,— after defining the jurisdiction of the Courts of Civil Appeals, provides that "said courts shall have such other jurisdiction, original or appellate, as may be prescribed by law." Under this provision the Legislature has without challenge conferred other jurisdiction upon those courts, namely, jurisdiction of causes not arising within their districts,

but transferred to them under order of the Supreme Court from other districts. If the Legislature may bestow, generally, upon the Courts of Civil Appeals other jurisdiction than that specifically conferred by the Constitution, no sound reason can be advanced for denying it the right to equally impose upon the justices of them additional judicial duties which have relation simply to a method of appeal of causes determined by those courts.

The Constitution declares that the judicial power of the State shall be vested in the courts named in section 1 of article 5 and in such other courts as may be provided by law. But this does not mean that no judge may be empowered by law to perform a judicial act having direct and proper relation to the exercise of the jurisdiction of the court of which he is a member. At an early time it was recognized that rights would suffer if judges were deprived of all authority to act except as courts. As the result, their exercise of judicial power in vacation and at chambers became an established practice. The writ of error has always been treated by this court as but a mode of securing revision of causes as upon appeal. Lucketts v. Townsend, 3 Texas, 119; Magee v. Chadoin, 44 Texas, 488. Granting that the allowance of the writ involves the exercise of judicial power, where is the constitutional provision which denies to the justices of the Courts of Civil Appeals the authority to allow an appeal from those courts to the Supreme Court? Not only is no such inhibition to be found, but the Constitution is utterly silent in respect to any method to be employed for the obtaining of a review by the Supreme Court of causes determined by those courts. Nothing is better settled than that in the absence of constitutional provision to the contrary, the Legislature may confer upon judges the authority to perform judicial acts necessary to a due administration of the law. As related to the revision of causes, a familiar instance of the exercise of such power by a judge, as distinguished from a court, is that authorized by the Federal statute which empowers the chief justice of a State Supreme Court to grant a writ of error in a certain class of cases as a means for their review by the United States Supreme Court. See Gleason v. Florida, 9 Wall., 779; Butler v. Gage, 138 U. S., 52. No doubt has ever existed, as we are aware, as to the authority of the chief justice of a State Supreme Court to so allow the writ, notwithstanding provisions of State Constitutions which vest in the State Supreme Court, as distinguished from its judges, the judicial power which it is to exercise. His act in such instances is valid simply for the reason that it is the exertion of a part of the judicial power reposed in the court, by a constituent member of the court acting for that purpose in a capacity not forbidden by the organic law of the State. If such a power may be constitutionally exercised by a judge of the Supreme Court of a State as applied to causes reviewable by the United States Supreme Court, it is difficult to perceive why it may not be also validly exerted by justices of the Courts of Civil Appeals as applied to causes not final in those courts.

Attention has already been directed to the fact that the Constitution has made no provision whatever in respect to the method by which the appellate jurisdiction of the Supreme Court is obtained over causes which it is empowered to review. It is the absence of any such constitutional provision that determines the validity of this Act. The Constitution merely declares that its appellate jurisdiction "shall extend to questions of law arising in cases of which the Courts of Civil Appeals have appellate jurisdiction *under such restrictions and regulations as the Legislature may prescribe.*" Article 5, section 3. Not only is no method provided by which its appellate jurisdiction may be called into exercise, but it is to be further noted that the Constitution does not irrevocably define and fix any certain appellate jurisdiction for the court, except that it "shall extend to questions of law arising in cases of which the Courts of Civil Appeals have appellate jurisdiction." A subsequent part of section 3 in terms conferred upon it appellate jurisdiction over three certain kinds of cases, but that jurisdiction was to subsist only "until otherwise provided by law." To restrict is to limit, as said by Chief Justice Gaines in Maddox v. Covington, 87 Texas, 454. The clause, "under such restrictions and regulations as the Legislature may prescribe," means under "such limitations and regulations" as that body may enjoin. Hence, it is within the power of the Legislature to limit and to change the appellate jurisdiction of the court. Maddox v. Covington.

It would seem as scarcely open to debate that if the Legislature is thus authorized to limit and change the jurisdiction itself of the court,—its very power to hear and determine causes, it is equally competent for it to establish in all its particulars the mode under which its jurisdiction is to be invoked and by the observance of which it may be obtained.

The Constitution will be searched in vain for any provision which ordains the method by which a cause decided by a Court of Civil Appeals shall gain entrance into the Supreme Court; or which gives to the Supreme Court the authority of determining its right to entrance there. Neither the right of appeal to the Supreme Court nor the manner of its exercise is mentioned in the Constitution.

With this true, it is not to be questioned that the Legislature has the authority to establish the manner in which the appeal shall be taken, and, in doing so, declare where shall rest the authority of determining the right to have it allowed. Titus v. Latimer, 5 Texas, 433.

To fix any given mode for an appeal is but to prescribe a regulation by means of which jurisdiction to hear the appeal may be acquired. To vest in the appellate court itself, or in some other authority, a discretionary power of deciding whether the appeal shall lie, is equally only a regulation of the manner in which the appeal is to be taken,—a part of the mode enjoined for the appeal, and to be observed if the appellate jurisdiction is to be lawfully obtained. With the Constitution declaring that the Supreme Court shall possess and exercise appel-

late jurisdiction only *under such limitations and regulations as the Legislature may prescribe,* to do either, therefore, is only to do that which the Legislature is empowered to do by express provision of that instrument.

The Legislature inaugurated the writ of error practice as the method whereby the appellate jurisdiction of the Supreme Court might be acquired. It also lodged in the Supreme Court the authority of determining the merits of the grounds advanced for the issuance of the writ, and hence, when it should be allowed. But there is no vested right in that mode of appeal. These provisions of the law did not come from the Constitution. They are the creatures of the Legislature. What the Legislature may create, it may alter. Unless granted by the Constitution, the right of appeal itself is but a privilege; it is not an irrevocable right. It pertains merely to the remedy, and may be modified by the Legislature at discretion. If, for illustration, instead of adopting the writ of error practice in respect to the review by the Supreme Court of causes from the Courts of Civil Appeals, the Legislature had established the giving of bond, with the approval of which the Supreme Court should have nothing to do, as the mode of appeal from those courts, it can not be doubted that such an act would have been valid. With the right of appeal in such cases not a constitutional right, but a creation purely of the statute law and subject to the limitations of that law, with it thus pertaining merely to the remedy which the Legislature has full authority to restrict, to change and to regulate, neither can it be doubted that it would have been competent, as a mere question of legislative power, for the Legislature to have given to the Courts of Civil Appeals, themselves, the authority of determining when an appeal from their judgments should lie.

Such an authority is not novel in the legal procedure of the country, whatever may be the divergence of views in respect to the wisdom of it. In a number of jurisdictions the right of appeal has had a like restriction imposed upon it. In 3 Corpus Juris, page 1080 (notes), will be found a collection of cases instancing such a limitation upon the right as found in the legislation of different States. In Tennessee, for illustration, it was provided by the Code at the time of the decision of Sigler v. Vaughan (1883), 11 Lea, 131, that it was within the discretion of the chancellor to grant an appeal from the overruling of a demurrer by the chancery court. In Alabama, it was likewise ruled in Griffin v. Bank, 9 Ala., 201, that an appeal from an interlocutory decree dissolving an injunction in the chancery court, must be taken before the chancellor. In Connecticut, it was determined in Montville Street Railway Company v. New London, etc., Co., 68 Conn., 418, 36 Atl., 811, that an appeal from the decision of a single judge of the superior court must be allowed by him.

There is, of course, an obvious difference between jurisdiction,—the power of a court to hear and determine causes, and the doing of those things necessary to call that power into play. To confer jurisdiction

upon a court is not to give it authority to determine the mode of resort to its jurisdiction, or the power of deciding how, when, and in what manner its jurisdiction may be obtained. Some means must be provided as the instrumentality of bringing the cause under the power of the court in order for the court to have and exert power over it. Such means are purely remedial in their nature. They pertain merely to the manner or mode by which jurisdiction is acquired, not to its exercise after it is acquired. They are essentially matters of legislative control in the absence of some express constitutional direction upon the subject. This was clearly recognized by the court in Schleicher v. Runge, 90 Texas, 456, where it was said:

"Under amended section 3 of article 5 of the Constitution, as we have seen, this court is to exercise its appellate jurisdiction under such restrictions and regulations as the Legislature may prescribe. When, therefore, the *Legislature* prescribed that the petition for the writ of error should be filed with the clerk of the Court of Civil Appeals within thirty days from the overruling of the motion for a rehearing in that court, we think that it was intended that a compliance with that requirement should be as a condition precedent to exercise of the jurisdiction."

An Act of the Legislature is not to be lightly struck down. It is to be held valid unless forbidden by the superior law of the Constitution either in express terms or by necessary implication. As before stated, the Constitution does not purport to deal with the question of the regulation of appeals to this court from the Courts of Civil Appeals except in its remission of the entire subject to the legislative authority. The Act is, in our opinion, a valid Act, and the motion is accordingly overruled.

## IN RE SUPREME COURT DOCKETS RELIEF ACT OF 1917.

### DISSENTING OPINION.

Mr. JUSTICE HAWKINS.

House bill No. 39, entitled "An Act to relieve the crowded condition of the dockets of the Supreme Court," etc., hereinafter called relief Act, was passed by the Thirty-fifth Legislature, and approved March 15, 1917, effective immediately. Acts 1917, chapter 72, page 142. Shortly afterward, treating said statute as valid, and without then writing upon the subject, our Supreme Court, *acting as a court,* this writer dissenting, undertook to put it into operation, thereby, in effect, upholding its constitutionality. San Antonio & Aransas Pass Ry. Co. v. Blair, opinion by our Chief Justice Phillips, filed June 27, 1917; Bacon v. Bates, 57 Texas, 409; Railway Co. v. Shannon, 100 Texas, 389, 100 S. W., 138; Henderson v. Beaton, 52 Texas, 29; concurring opinion in Terrell v. Middleton, 191 S. W., 1140; People ex rel. Morgan v. Hayne, 83 Cal., 111, 7 L. R. A., 348; Smith v. Odell (Wis.), 1 Pinn, 449; In re Letcher (Mo.), 190 S. W., 20. Indeed, the first mentioned opinion, after referring to the motion in that case and to somewhat

similar motions in numerous other cases in this court, as assailing the constitutionality of said Act, very plainly declared:

"The Act was set in motion because of the court's view that it was constitutional and valid, the various grounds urged against it in all these motions having been fully considered. Had we not determined it to be a valid Act, we would not have proceeded under it. It was intended, therefore, that our action in inaugurating it should serve as in effect a judgment in respect to its validity, and should be so understood."

The manner and form in which said attempt to put said Act into operation was made, and in which various proceedings thereunder have been conducted by the "designated justices of Courts of Civil Appeals" with the sanction and approval of the Supreme Court, and by that court itself, likewise constitute practical constructions of said Act, most of which, it seems, are to be adhered to, controlling and directing its operation and effect.

From said opinion in the Blair case, the following explanation is taken:

"It should be stated that Mr. Justice Hawkins did not agree with the majority of the court in their determination of the validity of the Act. He accordingly dissented from the court's action in proceeding under it, announcing that he would later file an opinion expressing his views. He has not completed his opinion, but will file it when finished. Because of the court's previous settlement of the question, he concurs in its present action in overruling this and other like motions, referring, however, to his opinion, to be filed, for a statement of his position."

The term of our court having ended, I come now, in the spare time of vacation days, to a fulfillment of my said promise.

The cardinal vices of said relief Act are twofold:

First. Its utter and reckless disregard of elementary and fundamental constitutional limitations and restrictions, relating to:

(a)   The separation of the legislative and the judicial powers of government.

(b)   The investiture, delegation and exercise of legislative power.

(c)   The investiture, delegation and exercise of judicial power.

Second. In depriving litigants of cherished valuable and Constitution-given rights relating to:

(a)   The authoritative action by the Supreme Court itself, in contradistinction to the action of any other court, tribunal or aggregation of individuals, upon cases within the appellate jurisdiction of the Supreme Court.

(b)   The decision of such causes by the Supreme Court, *as a court,* in contradistinction to action by two members thereof acting merely as justices.

(c)   The services of chief justices and associate justices of Courts of Civil Appeals.

And, following in that motley train, comes a whole brood of lesser evils.

Before setting out the text of said relief Act I call special attention to the following features of the situation:

1.   Said relief Act transfers from the law-making department, consisting of the House of Representatives, the Senate, and the Governor, and delegates (a) to the Supreme Court, *as a court,* and (b) to a majority of the justices of that court, as justices, and (c) contingently, to an uncertain and shifting aggregation of justices of Courts of Civil Appeals powers which are distinctly and purely legislative, and which have been vested by the Constitution of Texas in the law-making department alone: towit, the power of determining, to a great extent, what cases shall and what cases shall not be reviewed by the Supreme Court.

2.   It transfers from the Supreme Court, *as a court,* (a) to a majority of the justices of that court, acting otherwise than as a court, and (b) contingently, to said aggregation of justices of Courts of Civil Appeals, powers which are distinctly judicial, and which have been vested by the Constitution in the Supreme Court alone: towit, the power to pass upon appeals to that court.

3.   It combines, contemporaneously, in one set of persons, and, contingently, in another set of persons, both legislative and judicial powers, as aforesaid, in contravention of the express declaration of said Constitution that each such power shall be confided to a separate body of magistracy.

4.   It contemplates and authorizes that some three "designated justices of Courts of Civil Appeals," hereinafter called designated justices, not constituting a court, or even an organized tribunal or board, and not acting within the jurisdiction of, or in the exercise of judicial power conferred by the Constitution or laws upon, the courts of which they are members, and not in the exercise of powers conferred by the Constitution upon them as justices of those courts, and not acting under the solemnities of any oath pertaining to their duties in the premises, and not acting according to any unvarying statute or fixed rule, but acting merely as a nondescript aggregation of individuals, and as they, in the particular case, and at the time, may see fit (a) shall pass upon all referred applications for writs of error in cases which will aggregate perhaps about ninety-five per cent of all cases appealed from our nine Courts of Civil Appeals, determining, *finally,* therein, whether the particular case shall or shall not be admitted into the Supreme Court for actual review upon its merits and final decision by that court, and (b) shall pass, also, and finally, upon the merits of all appeals in which they refuse writs of error, amounting in practice to about eighty per cent of all referred cases, all such actions of such designated justices, whether dismissing or refusing or granting the writ of error, to be without any official record thereof and without any provision for enforcing such action in any cause.

5. It deprives litigants in the Supreme Court of the services and judgment of all members of that court (a) in passing upon applications for writs of error in all cases referred to such designated justices, and (b) in passing finally upon the merits of all causes in which writs of error are refused by such designated justices, such latter class of cases comprising an overwhelming majority of all causes within the continuing appellate jurisdiction of the Supreme Court. And, even though no application in any case be so referred, said Act may, and at the option of any two members of the Supreme Court, will, in all but three classes of cases, substitute, in lieu of the action of the Supreme Court, *as a court,* upon the application, the final action of any two members of that court, acting in term time or in vacation, as justices only, and not as a court.

6. The operation of the Act, in so far as such designated justices are concerned, is wholly contingent upon the exercise by (a) the chief justice, or (b) any two justices, of the Supreme Court, of the option therein conferred upon that court and justices thereof.

7. It almost constantly disrupts and disturbs some three Courts of Civil Appeals, and, indirectly, throws additional cases upon the dockets of all other Courts of Civil Appeals.

8. It compels some three justices of as many Courts of Civil Appeals to leave their own courts to which they were elected, and generally even their own supreme judicial districts, and to forego the exercise of the high judicial powers conferred by the Constitution upon those courts, and the discharge of duties for the performance of which they were sworn, and, at the State Capitol, to exercise extraneous powers and discharge different duties imposed upon them by the Legislature only, in cases not then within the jurisdiction of any Court of Civil Appeals.

9. It deprives litigants in those bereaved courts, indefinitely, and possibly continuously for an entire term or more, of the services and judgment of such designated justices, respectively.

10. The duties of such designated justices, as prescribed by said relief Act, are being performed by them under appointments or designations not made as required by the express provisions of the Act.

11. In the absence of any provision of the Constitution, or of said Act, or of any other statute therefor, a majority only of said designated justices are acting, from time to time, and are exercising, finally, all of the powers conferred upon them by said Act, in numerous causes in which some third designated justice happens to be disqualified by reason of the fact that the appeal is from a decision of the Court of Civil Appeals of which he is a member.

12. In the absence of any constitutional or statutory authority therefor, all decisions and actions of such designated justices are being reported, from week to week, to the Supreme Court, in the form of mere unsigned memoranda, and are being announced by that court, in open court, and are being recorded in its minutes, as the official "Actions of

the Committee of Judges of Courts of Civil Appeals on Referred Applications." Aside from the record, it is, unfortunately, a fact that such actions of the designated justices are being announced from week to week, by various newspapers, as the actions of the Supreme Court.

The precedents in constitutional and statutory construction thus set will, I doubt not, long prove to be radically, though insiduously, pernicious in both theory and practice; and the actual operation of the statute, as so construed and applied, almost certainly will entail many grave and untoward consequences, extending through coming years. Especially is that to be apprehended in cases in which referred applications for writs of error have been or shall be refused, by only two, or even by three, designated justices; and the general danger is aggravated by the lack of statutory provision for preserving, or even for making an official record or report of their action upon or in relation to such referred applications, or for enforcing the findings or actions of such designated justices.

Never before, in the history of this State, have there arisen in court such important issues so radically affecting our judicial system. The resulting situation is, in my estimation, one of surpassing gravity.

Legislators derive all their powers from the people, through the Constitution; how, then, can they disregard it without destroying the very foundation of their authority? Vattel, p. 31; Kilbourn v. Thompson, 103 U. S., 190

"The difference between a free and an arbitrary government I take to be—that in the former, limits are assigned to those to whom the administration is committed; but the latter depends upon the will of the departments, or some of them. Hence, the utility of a written Constitution." Nelson, J., in Kamper v. Hawkins, 1 Va. Cases, 23.

But of what benefit are limitations and restrictions in a written Constitution if they are not to be observed and enforced?

"Written Constitutions are the product of deliberate thought. Words are hammered and crystallized into strength, and if ever there is power in words it is in the words of a written Constitution. Behind the words is the power of a free people operating through the medium of a constitutional convention, called together for the purpose of framing a fundamental and inviolable system of government. Of all governmental instruments it is the most solemn and powerful. Its grants are unalterable, its delegations of power unchangeable and its commands supreme. Until the people themselves shall annul or change their Constitution, all must obey its mandates. . . .

"The Legislature can not for any purpose cross the line which separates the departments and secures the independence of the judiciary. It is not the length of the step inside the sphere of the judiciary that summons the courts to assert their constitutional rights and demands of them the performance of their sworn duty, for the slightest encroachment is a wrong to be at once condemned and resisted. As Daniel Webster said, and Mr. Calhoun substantially repeats, the 'encroachment must

be resisted at the first steps.'" State ex rel. Hovey v. Noble, 118 Ind., 350, 4 L. R. A., 101.

"The creation of a thousand forests is in one acorn, and Egypt, Greece, Rome, Gaul, Britain, America, lie folded already in the first man. Epoch after epoch, camp, kingdom, empire, republic, democracy, are merely the application of his manifold spirit in the manifold world." Emerson's Essay on History.

So I see in said relief Act the vital germ which already has broken down constitutional barriers upon legislative authority, and has worked a clear usurpation of supreme judicial power, and materially has disturbed the constitutional operations of the Supreme Court and of Courts of Civil Appeals, and which, if it has not already done so, soon may convert all our courts into mere legislative dependencies instead of a co-ordinate department of government, and, in due progression, trample upon our Bill of Rights and all the liberties and privileges of the individual.

"If the Legislature may infringe this Constitution, it is no longer fixed; it is not this year what it was the last; and the liberties of the people are wholly at the mercy of the Legislature." Roane, J., in Kamper v. Hawkins, 1 Va. Cases, 20.

The transcendent issue which lies wrapped up in said relief Act is this: Shall plain provisions of the Constitution of Texas be ignored? The vital spirit of that issue sits, seen or unseen, at the hearthstone of every citizen of this State.

The supreme mission of the Supreme Court of Texas has been, while administering justice between litigants, ever to uphold the fundamental principles upon which our State government was founded; to keep visible the established lines of demarcation between the powers of the three co-ordinate departments, and to stay the encroachments of any one upon another; to maintain the essential elements of enlightened jurisprudence as written in our State Constitution; to preserve to the keeping of *the courts, all the judicial power,* except as otherwise expressly provided by the Constitution; and fearlessly to retain and justly to exercise, *as a court,* in all the causes and matters properly within its own clear and continuing jurisdiction, not a part only, but all and every applicable portion, of that exclusive supreme judicial power which has been vested in it, *as a court;* and all this, not for the sake of the judiciary or of that particular court, but because it is a function and duty of that court to do so, and because an actual separation of the three great powers of government is essential to real liberty, and because an independent judiciary constitutes the true cornerstone of all government among freemen.

For years I have earnestly advocated the adoption of such amendments of our Constitution, and such valid legislative and other measures as, together, would enable our Supreme Court to get and stay abreast of its work; nevertheless, upon questions as to the validity of said relief Act that intense desire of mine must yield to the applicable and

plain provisions of the Constitution; and upon questions involving constructions of said Act that desire must yield to the phraseology of the Act itself. Cost what it may, I will not sacrifice the Constitution—our social compact—upon the altar of but seeming temporary expediency. It was for use in just such emergencies that the Constitution was adopted.

I regret that these constitutional questions arise under a statute which directly affects the full exercise of the judicial power of the court of which I am a member; but in the premises I am no more free to withhold a candid expression of my matured judgment than if those questions related solely to any other constitutional court.

"The question which faces us is not one of discretion, but of imperative duty. The duty of maintaining the separation of the departments of the government and the integrity and existence of the courts as established and organized by the Constitution is one of the most important that the judiciary is required to perform. It is the duty of the courts to uphold the Constitution as it is written, and to yield no part of their right or authority. Judges are chosen for the purpose of maintaining the limitations of the Constitution, without which free government can not exist. As was said by the Court of Appeals of New York:

" 'If this provision were intended solely for the protection of the judges they might waive it, but we do not think it was so intended. It was, in our judgment, like the whole judicial system of the State, intended for the benefit of the people, and to secure to litigants a forum in which they might have their controversies adjudged. The jurisdiction which the Constitution preserves in the courts named is inalienable, and carries with it the corresponding duty on the part of these courts to exercise it when called upon in proper form to do so.' Alexander v. Bennett, 60 N. Y., 204." State ex rel. Hovey v. Noble, 118 Ind., 350, 4 L. R. A., 101, by Chief Justice Elliott.

Consequently, but with due and respectful deference to the joint committee of distinguished lawyers who stood sponsor to the Legislature for the constitutionality of said relief Act, and to the legislative department, and to my associates, whose determination of the issues herein discussed is by section 2 of article 5 of our Constitution made binding, I consider it my unquestionable duty to express here, in permanent form, and once for all, my deep-rooted and settled convictions (a) that, for various reasons, said statute is unconstitutional, and, therefore, void; (b) that even though it be held to be constitutional and valid, it well may be doubted whether, as it stands, or in connection with kindred previous and contemporary legislation, it is intelligible and workable; and (c) that even if it is both valid and workable, the practical construction which the Supreme Court has so placed upon it, in several material particulars, is seriously erroneous.

A statement and discussion of at least some of the grounds supporting those conclusions will, I trust, at least make plain my own attitude:

in the premises, and may also serve, in future years, as a marker, along the new and rugged way, for a wholesome return to the beaten paths and established principles so plainly blazed out and defined by our organic law, and heretofore generally recognized and followed by the Legislature and by all the courts of this State.

The multiplicity, complexity and inter-dependency of the questions and legal principles which are involved, and the fact that one who writes a dissenting opinion is at the laboring oar, and, unlike the majority of the court, is not in a position to rest his judgment upon a mere *ex cathedra* statement of his views, account for, and possibly, in some degree, excuse the length to which this opinion may run, and also some repetition. The situation, as I view it, certainly calls for something more than mere quotation of the Constitution.

Said relief Act is as follows:

"An Act to relieve the crowded condition of the dockets of the Supreme Court by further regulating the mode in which and the conditions on which judgments of the Courts of Civil Appeals may be brought before the Supreme Court for revision, granting additional powers to the chief justice and associate justices of the Supreme Court and of the Courts of Civil Appeals as incidental to the offices held by them; providing for compensation of certain justices of the Courts of Civil Appeals while acting as herein provided, and declaring an emergency.

"Be it enacted by the Legislature of the State of Texas:

"Section 1. It is made a condition of obtaining a review upon writ of error by the Supreme Court of any final judgment of any Court of Civil Appeals that good cause therefor first be shown in an application for such writ, as heretofore required, the sufficiency of such cause to be determined as herein provided.

"Sec. 2. Provided, the chief justice of the Supreme Court or any two of the justices thereof are empowered as soon as this Act shall become a law, by a writing to be recorded in the minutes of the Supreme Court, to designate three of the justices of the Courts of Civil Appeals to act as hereinafter provided. The powers given to the chief justice, or associate justices, of the Supreme Court, may be exercised from time to time as long as reason therefor may exist, and the personnel of the designated justices of the Courts of Civil Appeals may be changed as often as may be found advisable, by relieving one, or more, and designating another, or others, in order to interfere as little as possible with the work of the Courts of Civil Appeals, such action to be in writing and recorded, as before; and not more than one justice shall be designated to serve at any one time from any one of these courts.

"Sec. 3. It shall be the duty of the justices of the Courts of Civil Appeals so designated, upon receiving notice thereof, to assemble together at the capital of the State and to take up, consider and act upon such applications for writs of error, whether then pending or afterwards filed as may be referred to them by (the) Supreme Court

or any two justices thereof, by granting, refusing or dismissing the same in accordance with the practice of the Supreme Court heretofore prevailing; and such designated justices may make such orders and give such directions incidental to the consideration and disposition of applications, as are sanctioned by such practice.

"Sec. 4. The granting of an application shall admit the cause into the Supreme Court to be proceeded with by that court as heretofore provided by law. The refusal or dismissal of an application shall have the effect of denying the admission of the cause into the Supreme Court, except that motions for rehearing may be made to such designated justices in the same way as such motions to the Supreme Court have been heretofore allowed; provided, that the refusal or dismissal of any application shall not be regarded as a precedent or authority in any other cause; and, provided, that no one of such justices shall participate in acting upon an application in a cause decided during his incumbency by the court of which he is a member.

"Sec. 5. The Supreme Court shall still have power to act upon applications for writs of error, when deemed expedient, and the same power is hereby conferred upon the justices of that court, action by any two of whom shall be sufficient. And in any cause in which the judges of the Courts of Civil Appeals shall have disagreed or which the Courts of Civil Appeals shall have held differently upon the same question of law from the holding of another Court of Civil Appeals or of the Supreme Court, or shall have declared void a statute of the State, the application for writ of error shall be passed upon by the Supreme Court.

"Sec. 6. The powers herein conferred upon the chief justice and associate justices of the Supreme Court and of the Courts of Civil Appeals are declared to be incidental to the offices held by them respectively.

"Sec. 7. Justices of the Courts of Civil Appeals shall be entitled to have their actual and necessary expenses incurred in going to, remaining at and returning from the capital in the discharge of the additional duties hereby imposed upon them, paid out of the State Treasury from warrants drawn by the Comptroller, based upon itemized accounts of such expenses, verified by the certificate or affidavit of the claimant.

"Sec. 8. The great delays, often amounting to a denial of justice, in the disposition of business in the Supreme Court, owing to the accumulation of more work than can be done by the judges thereof, create an imperative public necessity and an emergency for the suspension of the constitutional rule requiring bills to be read on three several days in each house, and for putting this Act in force from and after its passage, and it is accordingly so enacted."

The Constitution of Texas provides:

"The powers of the government of the State of Texas shall be divided into three distinct departments, each of which shall be con-

fided to a separate body of magistracy, towit: Those which are legislative to one. those which are executive to another, and those which are judicial to another; and no person or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others except in the instances herein expressly permitted." Sec. 1, art. 2.

"The legislative power of this State shall be vested in a Senate and a House of Representatives, which together shall be styled 'the Legislature of the State of Texas.'" Sec. 1, art. 3.

"No law shall be passed except by bill." Sec. 30, art. 3.

Following up the above mentioned sharp distinction in classification of governmental powers, article 5, the present judiciary article of our Constitution, as amended in 1891, in making a careful distribution of judicial power, provides:

"The judicial power of this State shall be vested in one Supreme Court, in Courts of Civil Appeals, in a Court of Criminal Appeals, in District Courts, in County Courts, in Commissioners Courts, in courts of justices of the peace, and in such other courts as may be provided by law. . . . The Legislature may establish such other courts as it may deem necessary and prescribe the jurisdiction and organization thereof, and may conform the jurisdiction of the district and other inferior courts thereto." Sec. 1, art. 5.

"The Supreme Court shall consist of a chief justice and two associate justices, any two of whom shall constitute a quorum, and the concurrence of two judges shall be necessary to the decision of a case." Sec. 2, art. 5.

"The Supreme Court shall have appellate jurisdiction only, except as herein specified, which shall be co-extensive with the limits of the State. Its appellate jurisdiction shall extend to questions of law arising in cases of which the Courts of Civil Appeals have appellate jurisdiction under such restrictions and regulations as the Legislature may prescribe. Until otherwise provided by law the appellate jurisdiction of the Supreme Court shall extend to questions of law arising in the cases in the Courts of Civil Appeals in which the judges of any Court of Civil Appeals may disagree, or where the several Courts of Civil Appeals may hold differently on the same question of law, or where a statute of the State is held void. The Supreme Court and the justices thereof shall have power to issue writs of habeas corpus as may be prescribed by law; and, under such regulations as may be prescribed by law, the said courts and the justices thereof may issue the writs of mandamus, procedendo, certiorari, and such other writs as may be necessary to enforce its jurisdiction. The Legislature may confer original jurisdiction on the Supreme Court to issue writs of quo warranto and mandamus in such cases as may be specified, except as against the Governor of the State. The Supreme Court shall also have power, upon affidavit or otherwise as by the court may be determined, to ascer-

tain such matters of fact as may be necessary to the proper exercise of its jurisdiction." Sec. 3, art. 5.

"The Court of Criminal Appeals shall consist of three judges, any two of whom shall constitute a quorum; and the concurrence of two judges shall be necessary to a decision of said court." Sec. 4, art. 5.

"The Court of Criminal Appeals shall have appellate jurisdiction co-extensive with the limits of the State in all criminal cases of whatever grade, with such exceptions and under such regulations as may. be prescribed by law. The Court of Criminal Appeals and the judges thereof shall have the power to issue the writ of habeas corpus, and, under such regulations as may be prescribed by law, issue such writs as may be necessary to enforce its own jurisdiction. The Court of Criminal Appeals shall have power, upon affidavit or otherwise, to ascertain such matters of fact as may be necessary to the exercise of its jurisdiction." Sec. 5, art. 5.

"The Legislature shall as soon as practicable after the adoption of this amendment divide the State into not less than two nor more than three supreme judicial districts and thereafter into such additional districts as the increase of population and business may require, and shall establish a Court of Civil Appeals in each of said districts, which shall consist of a chief justice and two associate justices, who shall have the qualifications as herein prescribed for justices of the Supreme Court. Said Courts of Civil Appeals shall have appellate jurisdiction co-extensive with the limits of their respective districts, which shall extend to all civil cases of which the District Courts or County Courts have original or appellate jurisdiction, under such restrictions and regulations as may be prescribed by law. Provided, that the decisions of said courts shall be conclusive on all questions of fact brought before them on appeal or error.

"Each of said Courts of Civil Appeals shall hold its sessions at a place in its district to be designated by the Legislature, and at such time as may be prescribed by law. . . . Said courts shall have such other jurisdiction, original and appellate, as may be prescribed by law." Sec. 6, art. 5.

Concerning District Courts and district judges and their powers, our Constitution provides, among other things:

"Said courts and the judges thereof shall have power to issue writs of habeas corpus, mandamus, injunction and certiorari and all writs necessary to enforce their jurisdiction." Sec. 8, art. 5.

And in providing for County Courts and county judges, and defining their powers, it declares:

"And the County Court, or judge thereof, shall have power to issue writs of injunction, mandamus and all writs necessary to the enforcement of the jurisdiction of said court, and to issue writs of habeas corpus in cases where the offense charged is within the jurisdiction of the County Court or any other court or tribunal inferior to said court." Sec. 16, art. 5.

That Constitution provides, also: '

"No person shall hold or exercise, at the same time, more than one civil office of emolument except that of justice of the peace, county commissioner, notary public, and postmaster, unless otherwise specially provided herein." Sec. 40, art. 16.

"All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Sec. 13, art. 1.

"No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Sec. 19, art. 1.

Said provisions in our organic law fairly contemplate and require, among other things:

1. That, except as therein provided, the Legislature, only, shall exercise legislative power; it can not be delegated.

2. That, with the exceptions therein specifically mentioned, all the "judicial power" of this State shall be vested in *courts, as courts;* it can not exist elsewhere.

3. That, as constituting such distinct exceptions, only certain carefully enumerated powers shall vest in justices and judges of certain enumerated courts other than Courts of Civil Appeals, to be exercised in the capacities of justices or judges, in chambers or in vacation, and not as a court.

4. That the appellate jurisdiction of the Supreme Court is, indeed, largely the subject of legislative control; but the *judicial power* of that court, having been conferred thereon by the Constitution itself, can not be shifted elsewhere by even the Legislature.

This vital distinction is of paramount and controlling importance; but it is one which said relief Act seems wholly to have disregarded. And upon that rock of our Constitution said opinion of the majority of our Supreme Court in the Blair case must suffer ultimate shipwreck. Calling our granite Capitol a kite will not make it fly. "There is no magic in mere words to change the real into the unreal." Neither the lapse of time nor practice of courts or judges can vindicate the exercise of judicial power under an unconstitutional statute. Titus v. Latimer, 5 Texas, 433; Rochelle v. Lane, 105 Texas, 350, 148 S. W., 560.

5. That the Constitution itself having expressly defined the appellate jurisdiction of the Supreme Court, subject only to such changes as the Legislature may see fit to make therein, in conformity with the terms and provisions of that instrument, any and all such changes must be made, directly, by the Legislature itself, in the exercise of its own judgment and discretion. And such power may not be exercised, even by the Legislature, except through a statute which specifies, unconditionally, what classes of cases shall, or shall not, fall and lie within that jurisdiction,—a statute which operates alike, at all times, upon all cases of the same class and character.

6. That any and all such cases as shall so fall and lie within the

appellate jurisdiction of the Supreme Court, whether such jurisdiction shall then exist (a) by virtue of the enumeration in the Constitution of the three classes of cases mentioned in said section 3 of article 5, or (b) by virtue of some statute specifically enlarging or diminishing that jurisdiction (and, as a corollary, that *all questions involved in ascertaining or determining that jurisdiction*) shall be passed upon and decided by the Supreme Court itself, *as a court,* the concurrence of two justices thereof being sufficient, however, to control the action of that court.

7. That each court in our judicial system, as occasion therefor may arise, shall exercise all of the jurisdiction and all of the judicial power conferred, and shall perform all of the duties imposed upon it by the Constitution and laws, and that each justice and each judge of any such court, as occasion may require, shall, himself, exercise all powers and perform all duties so conferred or imposed upon him as such justice or judge; and, as a corollary, that every justice or judge of any court shall be and remain, as far as reasonably may be possible, and with rare exceptions, in attendance thereon, during its terms, contributing his entire working time and energies to the consideration and proper disposition of cases coming before such court, and to matters, if any, properly coming before him as such justice or judge of such court.

8. That no justice of any Court of Civil Appeals shall, at the same time, hold any other office of emolument.

9. That, inasmuch as Courts of Civil Appeals exist by virtue of express provisions of the Constitution and statutes, with certain definitely prescribed judicial powers and duties, the Legislature, whether acting directly or through delegated authority, has no power to invade those courts and take therefrom duly elected or appointed qualified and acting justices thereof, and impose upon them, either as such justices or as individuals, additional conflicting powers, and require of them, at the State Capitol, which in all instances save one is far removed from the location of their respective Courts of Civil Appeals, the exercise of powers and the discharge of duties which in nowise are related to the constitutional or statutory jurisdiction or powers or duties of Courts of Civil Appeals, or of members thereof, and which materially interfere with the proper exercise of powers and the efficient discharge of duties which the Constitution and laws have imposed upon them as members of those high appellate tribunals, such legislative action constituting an unwarranted invasion of their rights and privileges as members of those courts.

10. That the Legislature shall not deny to litigants in the Supreme Court the exercise, by that court, in their cases, of the supreme judicial power which exists in that court only, nor deliberately, and for extended periods of time, deprive litigants in any Court of Civil Appeals of the services and judgment of the chief justice or of an associate justice of that court.

The above mentioned plain and undeniable features of the funda-

mental law of the land—embodying basic principles of our entire judicial system—should be kept in mind in studying said relief Act, and by them its validity should be tested; and, if it be found or held valid in the light of those principles, its terms and provisions should be construed and applied.

For the sake of perspective, certain salient features of said relief Act are outlined, just here, consideration of details being reserved, for convenience, to subsequent portions of this discussion.

A.   Its purpose is "to relieve the crowded condition of the dockets of the Supreme Court," and to prevent "delays, often amounting to a denial of justice, in the disposition of business in the Supreme Court, owing to the accumulation of more work than can be done by the judges thereof." Caption; sec. 8.

B.   Toward that highly laudable objective it moves along converging lines, as follows:

. (1)   "By further regulating the mode in which and the conditions on which judgments of the Courts of Civil Appeals may be brought before the Supreme Court for revision." The "mode" of the appeal to the Supreme Court, so further regulated, is the long established statutory appeal by means of a petition or application for a writ of error, Revised Statutes, article 1540 et seq., not embracing presentation of cases upon "certified questions." Rev. Stats., art. 1619. The newly added and more onerous *condition precedent* for obtaining a "revision" (caption), or a "review" (sec. 1) by the Supreme Court, of any such appealed case,—or, in other words, for securing "the admission of the cause into the Supreme Court" (sec. 4), for consideration and review by that court, upon its merits,—is that such application shall first be *granted.* Secs. 1 and 4.

(2)   By creating two additional instrumentalities or agencies which may pass upon all but an excepted few applications for writs of error, "dismissing" or "refusing" or "granting" same, the exercise of that power by one of those new agencies being contingent upon the authorized reference of the application. Caption; sec. 3. Under the terms of the relief Act, the power of dismissing, refusing, or granting such applications, which heretofore has been restricted to the Supreme Court, *as a court,* now may be exercised (a) by that court, as heretofore, or (b) by any two justices of that court, acting as such justices, and not as a court, in term time or in vacation, or (c) with certain stated exceptions, and contingently, by any three "designated justices of Courts of Civil Appeals," acting otherwise than as a court, in term time or in vacation. Secs. 5 and 3.

C.   The powers of said three several and distinct instrumentalities or agencies in relation to dismissing, refusing, and granting "applications" upon which they, respectively, are authorized to act (excepting the power to act upon motions for rehearing thereon, which seems to be restricted to such "designated justices of Courts of Civil Appeals" in cases so referred to them, sec. 4) are, for the most part, co-ordinate,

being largely incidental in nature and character, and having, in most respects, precisely similar legal and practical effects, viz:

(1)   Dismissal or refusal of an application for a writ of error has the primary effect of "denying the admission of the cause into the Supreme Court," except that when such dismissal or refusal is by designated justices of Courts of Civil Appeals a motion for a rehearing may be filed and they may act thereon; and has, also, the ultimate effect of finally disposing of the appeal.  Thereunder what, under our Constitution, is *legislative* power is to be exercised by each of said three instrumentalities or agencies, in determining whether a particular cause shall or shall not be admitted to the Supreme Court "for revision" upon its merits.  Const., art. 5, sec. 3; and *judicial* power is to be exercised by each of those instrumentalities or agencies (a) in passing upon the regularity of the appeal; (b) in determining jurisdiction; (c) in passing upon the merits of the appeal, especially when the application for a writ of error is "refused," thereby making final and irremediable disposition of the appeal, and thus, in most instances, disposing, finally, of the case.  Here is found, I think, a distinct blending of legislative power with judicial power—both to be exercised by the same instrumentality or agency, or persons, at the same time, in the same cause.  Caption; secs. 1, 2, 3, 4 and 5.  But see Const., art. 2, sec. 1.

However, "the refusal or dismissal of any application shall not be regarded as a precedent or authority in any other cause," sec. 4; whereby such action is denuded of an important element of supreme judicial power and authority.  And no provision is made for enforcement of any act of such designated justices—another element of the exercise of supreme judicial power being thus denied.

(2)   "The granting of an application shall admit the cause into the Supreme Court" for decision upon its merits.  Caption; sec. 4.

D.   Designated justices of Courts of Civil Appeals, acting together, upon referred applications, and any two of the justices of the Supreme Court, acting together, may act contemporaneously, or at different times, in term time or in vacation, upon different applications for writs of error, in cases of the same class, and even in the same case; and, during term time the Supreme Court may act, as formerly, upon any unreferred application.  Referred applications may include any application not falling within one of the three enumerated classes of cases upon which the Supreme Court must act as a court.  Secs. 5 and 3.

E.   It is made the duty of the designated justices to act upon all such referred applications, regardless of whether they were or were not pending when said Act took effect.  Sec. 3.  At that date there were pending upon the docket of the Supreme Court three hundred fifty-two applications for writ of error, and, of them, probably ninety-five per cent, or nearly so many, were so referable; and of the applications in those cases the designated justices have had referred to them and have disposed of two hundred forty-one, dismissing twenty, granting

forty-one, and refusing one hundred eighty. Of applications filed since said Act became effective, ninety have been referred to and acted upon by the designated justices. Unquestionably, therefore, the contemplated practical effect of said Act was and is to transfer from the Supreme Court to such designated justices, in all referred cases, the exercise of either all, or a material portion, of the supreme judicial power of the State, which the Constitution vests in the Supreme Court as a court.

In other words, under and in accordance with the terms and provisions of said relief Act, a citizen of Texas may be deprived of his property without any hearing whatever by the Supreme Court of his timely and proper appeal (1) in a case which duly had reached the Supreme Court and was there pending upon its application docket, and was clearly within the appellate jurisdiction of that court in strict conformity with the Constitution and laws of this State, when said relief Act took effect, and (2) in a case in which the application was filed after the taking effect of said relief Act, but in strict conformity with all applicable provisions of pre-existing laws, not one of which has been expressly repealed, and all of which appear to be in full force and effect, at least except in so far as their operation is stopped, stayed, or changed, if at all, by said relief Act.

The principal thought which runs like a thread through said entirely novel and unprecedented relief Act seems to be that the Supreme Court now has, and in future almost certainly will have, upon its application docket and its cause docket more cases than can be disposed of by that court in due or reasonable time, creating a necessity for a legislative agency of three additional men to perform nearly all of the work of that court upon its application docket, leaving that court free to devote almost all of its time to its submission docket.

An incidental purpose seems to be to confer upon any two justices of the Supreme Court certain powers not conferred upon but actually withheld from them by our Constitution. Art. 5, sec. 3; art. 2, sec. 1. I allude to (a) the legislative power of determining what cases shall, and what cases shall not, be reviewed by the Supreme Court, *as a court,* and to (b) the judicial power of passing upon appeals, especially in cases wherein the application is dismissed or the writ of error is refused. Said incidental but extremely important and unconstitutional purpose and effect of said Act seems to be regarded by my associates as too unimportant for specific mention.

In working our said main design, said relief Act creates a new and purely legislative agency which is *not a court,* and upon it confers the same legislative power which the Constitution restricts to the Legislature, art. 5, sec. 3, and art. 3, sec. 1, and also much of the supreme judicial power which the Constitution restricts to the Supreme Court. Art. 5, sec. 3. It confers, also, like legislative power upon the Supreme Court, *as a court,* and upon any two justices thereof, as justices; and upon the latter it confers, also, judicial powers which have been intentionally denied by the Constitution. Art. 5, sec. 3.

F.   An unusual and very remarkable feature of said relief Act is that the assistance which the three additional men are to render the Supreme Court in clearing its dockets is to be rendered, not in examining certain cases and reporting conclusions to the Supreme Court for ratification and adoption, or modification, or rejection, by that court, but in *doing, finally,* in probably ninety-five per cent of all cases appealed from all nine Courts of Civil Appeals, a very large share, and in *doing,* finally and irremediably, in probably seventy per cent of all cases appealed from said Courts of Civil Appeals, *absolutely all,* of the work which heretofore has been done in such cases by the Supreme Court, although all of that work still remains within the exclusive final appellate jurisdiction of that court by virtue of pre-existing and continuing laws.   In short, instead of *assisting in doing* the constitutional and statutory work of the Supreme Court, subject to its approval and adoption, such additional men are to *do, absolutely,* about three-fourths of the work which, for years, has been done by that court—exactly the same character of work upon which, for many years, that court has expended, faithfully, just about three-fourths of its entire working time and energies.   One practical effect of the Act, therefore, is to create by statute what is, in most respects, Supreme Court No. 2, to work in almost full co-ordination with our constitutional Supreme Court, exercising what amounts, to a great extent, and in most respects, to concurrent jurisdiction and co-equal judicial powers, although our Constitution declares that there shall be "one Supreme Court," and therein lodges exclusively the supreme judicial power.   Art. 5, sec. 3.

G.   Neither said relief Act nor any other statute makes any provision whatever for enforcing judgments, orders or actions of the designated justices in any cause.

Among the material questions which said relief Act presents are these:

1.   May the Legislature delegate its constitutional authority to determine what cases shall or shall not be reviewed, upon their merits, by the Supreme Court?   Art. 3, sec. 1.

2.   May the Legislature prevent, abridge, shift, or transfer elsewhere, in causes within the appellate jurisdiction of the Supreme Court pursuant to pre-existing and still operative statutes, the exercise of all, or even part, of the supreme judicial power which our Constitution itself has vested in that court alone?   Art. 5, sec. 3.

3.   If the second question be answered affirmatively, may that authority of the Legislature be delegated to, and be exercised by, either the Supreme Court or a majority of its members?

4.   If the second question be answered affirmatively, may the exercise of that supreme judicial power be transferred by the Legislature to an aggregation of members of other constitutional courts?

5.   If the fourth question be answered affirmatively, may such transfer be made contingent upon the will and action of either the Supreme Court or a majority of its members?

Each of these five questions should, I think, be answered negatively.

From the provisions of our State Constitution it is evident that it was the intention of the framers of that instrument that legislative power shall be restricted to the Senate, the House of Representatives, and the Governor, art. 3, sec. 1, and that the judicial power shall be restricted thus:

(a)   To certain courts therein enumerated.   Art. —, sec. 1.

(b)   In special instances, and in only carefully stated extent, to certain therein enumerated justices or judges, not including justices of Courts of Civil Appeals.   Art. 5, sec. 3.

(c)   To other *courts* to be created and established by the Legislature. Art. 5, sec. 1.

Thereby is excluded the idea of conferring *legislative* power upon the Supreme Court, or upon justices thereof, or upon justices of Courts of Civil Appeals; thereby is excluded the idea of conferring, by statute, *additional judicial power* upon justices of the Supreme Court, *as such justices;* and thereby is excluded, also, the whole idea of conferring, by statute, upon an aggregation of justices of Courts of Civil Appeals, any judicial power whatsoever, to say nothing of that supreme judicial power which, in relation to civil actions, the Constitution has vested in the Supreme Court, as a court, and in that court alone.   Art. 5, sec. 3. Herein the expression "supreme judicial power" is used, throughout, as relating to civil actions only.   Supreme judicial power in criminal cases is, of course, vested in our Court of Criminal Appeals.   Art. 5, sec. 5.

In order definitely to eliminate one question which is not material to the inquiry before us, it may be conceded, merely for the sake of the argument, that the Legislature has authority to create a new appellate court, intermediate between Courts of Civil Appeals and the Supreme Court.

To the constitutional declaration that the judicial power of this State shall be vested in certain enumerated courts are added the words, "and in such other courts as may be provided by law."   Sec. 1, art. 5.   Again, the same section provides for the establishment of other courts by declaring "the Legislature may establish such other courts as it may deem necessary, and prescribe the jurisdiction and organization thereof," but to that it adds, "and may conform the jurisdiction of the district and other inferior courts thereto."   The last quoted clause, if taken by itself, may be regarded as a restriction, carrying the implication that the Legislature may not conform the jurisdiction of the Supreme Court, or of Courts of Civil Appeals, to the jurisdiction of such "other courts," the enumerated appellate courts not being "inferior" courts.   But, be that as it may, and without ever reaching the question of the power of the Legislature to authorize the transfer, from the Supreme Court to some other court, tribunal, or aggregation of individuals, of cases already within or subsequently coming within the appellate jurisdiction of the Supreme Court pursuant to statute, it may be conceded, though I do not now admit that the Legislature validly may create a court of review intermediate between Courts of Civil Appeals and the

Supreme Court, and provide that appeals shall lie from Courts of Civil Appeals to such new court, and thence to the Supreme Court.

Whether our Constitution permits that may be a pertinent question in this connection, but its determination is not essential, although it might be helpful in reaching a correct conclusion as to the validity of said relief Act; because, even if it be conceded that such power does exist in the Legislature, it is clear that the Legislature, in the enactment of said relief Act has not attempted to exercise that authoriy. Such designated justices of Courts of Civil Appeals do not constitute *any court.*

Furthermore, I do not question, but freely concede, and do not doubt, that our Legislature has ample power and authority to create a new tribunal or agency and to charge it with the duty of "aiding" the Supreme Court in its labors upon either its application docket, or its submission docket, or both,—with the proviso, however, that the work of such tribunal or agency, *shall not have the quality of finality,* but shall be reported to the Supreme Court for *modification, rejection, or adoption by that court, as a court,* in the exercise of its final appellate jurisdiction as conferred upon it by the Constitution or by the Legislature pursuant to constitutional provisions, and in the ultimate and exclusive exercise therein of the supreme judicial power which the Constitution has vested in it, *as a court.*

That the Legislature may create such an assisting tribunal, instrumentality or agency, has been generally recognized, and held by decisions of courts of last resort in other States, several of which are cited herein, and has been expressly held by the Supreme Court of this State in sustaining the validity of our old Commission of Appeals, after the Act of July 9 (9 Gam. L., 62), which created it, had been amended by the Act of February 9, 1881 (9 Gam. L., 96), wherein, in lieu of the pre-existing provision that no case should be referred by the Court of Appeals or by the Supreme Court to said Commission except by written consent of parties litigant, it was provided that either of those appellate courts, without consent of the parties, might refer cases to such Commission for examination and report, the court from which it was so referred having reserved authority to *reject, modify,* or *adopt* the report of the Commission in the particular case, and being thereby placed *under the duty* of exercising that authority in each case. Stone v. Brown, 54 Texas, 330. That much our Constitution of 1876 required, and as much is required by said judiciary article as it now stands. However, said distinguishing feature of said amendatory Act of 1881 is conspicuously and fatally absent from said relief Act of 1917.

The powers which the latter seeks to confer upon designated justices of Courts of Civil Appeals are not only not simply in aid of the Supreme Court, but are in direct contravention and usurpation of much of its continuing final appellate jurisdiction and of much of its supreme judicial power. Obviously that Act was not adopted in an effort to exercise said admitted power.

To reach sound conclusions as to the validity of said relief Act, and especially as to so much thereof as attempts to confer judicial power upon justices of the Supreme Court, and upon justices of Courts of Civil Appeals, as justices only, it is essentially necessary to get and keep clear conceptions of what our State Constitution means by *"courts,"* "justices," "judges," and "judicial power," and of the elementary and radical distinction which, in apportioning "judicial power," that instrument constantly draws between *courts,* upon one hand, and *justices or judges,* upon the other hand. The meaning of the word "court" depends upon the context. Railway Co. v. Cox, 104 Texas, 556; Rochelle v. Lane, 105 Texas, 350, 148 S. W., 560; Colorado & S. Ry. Co. v. Hamm, 103 S. W., 1125, and c. c.; Wilkerson v. Ward, 135 S. W., 692; Sartin v. Snell, 87 Kan., 485, 125 Pac., 47, Ann. Cas. 1913 E. 384.

The signification of "courts" and of "justices" and "judges;" as those words are used in said judiciary article, are as below indicated.

Courts and judges, and their respective functions and powers, are defined and discussed by an able Texas author as follows:

"A court is an agent of sovereignty, created by it or under its authority, consisting of one or more officers, for the purposes of hearing and determining issues of law and fact regarding legal rights and alleged violations thereof and applying the sanctions of the law, exercising its powers in due course of law, at times and places previously determined by lawful authority.

"A court . . . is the tribunal, created by sovereignty as an agent to administer justice judicially, at designated times and places.

"As an agency of sovereignty it exercises delegated powers and administers the will of sovereignty as expressed and embodied in the law. . . .

"The judicial function of government involves the exercise of three powers:

"(1) The power to investigate and decide the facts and apply the law to the facts ascertained.

"(2) The power to determine and announce the result of the investigation and application.

"(3) The power to enforce, or more accurately to supervise the enforcement of the result as announced.

"The courts of a government are the tribunals through which it exercises this judicial function. . . .

"A court, considered abstractly, exists only in legal contemplation. . . . All of its functions must be discharged through natural persons and the law frequently speaks of these persons in their official capacity as constituting the court. These officers comprise a judge or judges, a jury, a clerk, and an executive officer known as marshal, sheriff, constable, etc., and attorneys at law.

"It is manifest that an agency as complicated and important as a court can not be operated without some responsible head who is authorized to give general direction to its operations and supervise the action

of all its subordinate and correlated parts.   The officer occupying this position is the judge.   One such officer is essential to the practical working of the court.   Frequently there is a larger number of them with some one designated to act as the presiding officer, or chief, among them.   The judge is the head of the court, presides at its sessions, exercises general control over all its actions.   He decides all questions of law arising in the course of the trial, determines such facts as arise incidentally, hears and decides all motions during the trial, and determines what judgment shall be rendered. He supervises and directs the clerical officers in keeping the records and issuing process and the executive officers in the discharge of their duties."   Townes' Ele. Law, 2 ed., pp. 447-448; see, also, 11 Cyc., 654, and c. c.

"A judge is a public officer, who, by virtue of his office, is clothed with judicial authorities."   Todd v. United States, 158 U. S., 278.

"A judge is an officer of the State charged with the duty of seeing that the law is faithfully administered."   Cox v. State, 8 Texas App., 524, 34 Am. Rep., 746.   See, also, 23 Cyc., 504, and c. c.

"A court must act as an organized body of judges." · Cooley's Const. Lim., 5th ed., 115.

The Constitution of Michigan, section 1, article 6, provided: "The judicial power is vested in one Supreme Court, in circuit courts, in probate courts, and in justices of the peace."   In construing that provision it was said: "By 'courts,' as the word is used in the Constitution, we understand permanent organizations for the administration of justice, and not those special tribunals provided for by law, that are occasionally called into existence by particular exigencies, and that cease to exist with such exigencies."   Streeter v. Paton, 7 Mich., 348.   See, also, Shurban v. Hooper, 40 Mich., 503, and Bissell v. Heath, 98 Mich., 477.

Evidently, in contemplation of said judiciary article of our State Constitution, "a court is not a judge, nor a judge a court."   Todd v. United States, 150 U. S., 278.

The phrase "judicial power," as used in our State Constitution, has a well considered, and what heretofore has been understood to be a firmly settled meaning.   That phrase has been defined and discussed as follows:

"By the judicial power of courts is generally understood the power to hear and determine controversies between adverse parties and questions in litigation."   State v. LeClair, 30 Atl., 7, 9, 86 Me., 522; People v. Murphy, 72 N. Y. Supp., 475, 65 App. Div., 126.   See, also, Daniels v. People, 6 Mich., 388; Underwood v. McDuffee, 15 Mich., 361; Risser v. Hoyt, 53 Minn., 185.

"It is one of the striking and peculiar features of judicial power that it is displayed in the decision of controversies between contending parties, the settlement of their rights, and the redress of their wrongs.

Inhabitants of Durham v. Inhabitants of Lewiston, 4 Me. (Greenl.), 140, 143."

"It is the province of judicial power to decide private disputes between or concerning individuals. Sanders v. Cabaniss, 43 Ala., 173, 181."

"Judicial power is power belonging to or emanating from a judge as such. Webster's definition of the word 'judicial' is 'pertinent to courts of justice, as judicial power.' State v. Noble, 21 N. E., 244, 248, 118 Ind., 350, 4 L. R. A., 101, 10 Am. St., 143."

"Judicial power is whatever emanates from a judge as such, or proceeds from courts of justice. Merchants Nat. Bank v. Jaffray, 54 N. W., 258, 259, 36 Neb., 218, 19 L. R. A., 316."

" 'Judicial power' is well defined in the Century Dictionary: '(a) The authority to determine the rights of persons or property by arbitrating between adversaries in specific controversies at the instance of a party thereto. . . . (c) A power conferred upon a public officer, involving the exercise of judgment and discretion in the determination of questions of right in specific cases affecting the interest of persons or property, as distinguished from ministerial power or authority to carry out the mandates of judicial power or of the law.' In re Walker, 74 N. Y. Supp., 94, 96, 68 App. Div., 196."

The foregoing definitions are from 4 Words and Phrases, 3860-3861.

"Judicial power can mean nothing more nor less than the power which administers justice to the people according to the prescribed forms of law." State v. Fry, 4 Mo., 120.

The five next following definitions of "judicial power" are from 23 Cyc., 1620-1621:

"The authority vested in some court, officer, or person to hear and determine when the rights of persons or property or the propriety of doing an act is the subject matter of adjudication." Merlette v. State, 100 Ala., 42, 14 So., 562; Grider v. Talley, 77 Ala., 422, 54 Am. Rep., 65.

"The authority or power vested in the judges or in the courts," citing Bouv. L. Dict.; State v. Noble, 118 Ind., 350, 21 N. E., 244, 10 Am. St., 143, 4 L. R. A., 101; Home Ins. Co. v. Flint, 13 Minn., 244; Gilbert v. Commissioners, 11 Utah, 378, 40 Pa., 264; Improvement Co. v. New Whatcom, 20 Wash., 53, 54 Pa., 774; State v. Hyde, 121 Ind., 20, 22 N. E., 644; People v. Salsbury, 134 Mich., 537, 96 N. W., 936.

"The power exercised by courts in hearing and determining cases before them or some matter incidental thereto and of which they have jurisdiction," citing Musser v. Adair, 55 Ohio St., 466, 45 N. E., 903.

"The power to interpret the Constitution and the laws and make decrees determining controversies," citing State v. Hyde and People v. Salsbury, supra.

"The power which adjudicates upon and protects the rights and interests of individual citizens, and to that end construes and applies the laws," citing Cooley's Const. Lim.; People v. Simon, 176 Ill., 165,

52 N. E., 910, 44 L. R. A., 801; People v. Chase, 165 Ill., 527, 46 N. E., 454, 36 L. R. A., 105; Land Owners v. People, 113 Ill., 296.

"The functions assigned to the judge under the Act of February 18, 1836, to take evidence of the refusal of the Bank of the United States to pay in gold or silver its promissory notes, are judicial." Kuhn v. U. S. Bank, 2 Ashm. Pa., 170.

"We regard it as an indisputable proposition that where the inquiry to be made involves questions of law as well as fact, where it affects a legal right, and where the decision may result in terminating or destroying that right, the powers to be exercised and the duties to be discharged are essentially judicial." Commonwealth v. Jones, 73 Ky. (10 Bush), 749.

"The duties performed by the officer or the jurisdiction appertaining to the office may be looked to to determine in a case where it is not made clear by the Constitution or the statute, the inquiry as to whether a particular office is a judicial office or not." Waldo v. Wallace, 12 Ind., 574.

With reference to the powers of a "master" it was said:

"He is but the ministerial officer of the court, to perform such duties as may be required of him by the chancellor in the performance of his judicial functions. His powers are delegated to him by the court, and the court can confer on him no judicial powers. Those powers are vested in the judiciary, and can not be delegated to any but persons belonging to that department of government. All the acts of the master become binding only by being approved and adopted by the court. Hence the court alone can find, adjudge and decree so as to bind the parties and the subject matter." Hards v. Burton, 79 Ill., 509.

The water commissioners statute of Wisconsin was attacked upon the ground that it created a tribunal and conferred "judicial powers upon it in contravention of the Constitution, which vests the whole judicial power of the State in courts therein specified."

In view of the fact that the action of the commissioners was not made final, the court upheld its validity, saying:

"The first objection to the validity of the statute rests upon the assumption that the commissioners constitute an independent tribunal. This is incorrect. They are mere referees, and as such are only aids of the court, through whom and by whose investigations it possesses itself of the facts of the case, to the end that it may award the proper judgment.

"No valid reason occurs to us for holding the statute void, which would not be equally applicable to any law authorizing a cause to be referred to a referee to hear, try and determine the same, unless such reason is found in the provision which assumes to make the report of the commissioners binding upon the parties before the court acts upon it. It may be doubtful whether that is a valid provision. But if it is not, we think it may be rejected without impairing the valid portions of the statute. There is no reason to believe that the statute would not

have been enacted just as readily without that provision as with it. This is the test. State v. Dousman, 28 Wis., 541, and cases cited. Eliminate that provision, and we have a statute providing for a simple reference of a cause to referees to hear, try and determine the same, with directions to report the evidence and their conclusions upon it to the court for its information, to enable it to give the proper judgment. Of the validity of such statutes there can be no doubt." Janesville Mfg. Co. v. Ford, 55 Wis., 200.

In discussing a statute authorizing a vice-chancellor, when disqualified in a case, to designate four members of the bar, one of whom should be selected by lot to try the case, the decree to be signed and entered by the vice-chancellor, it was said:

"Is there any valid objection, then, on the ground that the decree is, in substance, the act of a person not clothed with judicial power under the Constitution? It has not either the force or effect of a judicial act until signed by the chancellor; and the statute can not, therefore, be said to create a new judicial officer unknown to the Constitution. His power ceases when he makes and renders his decision, and his act is not more than ministerial until it is rendered judicial by the adoption of the chancellor in the mode prescribed by the statute. In principle and in legal effect his decision is no more a judicial act than that of a master in chancery upon a matter referred to him under the ordinary practice of courts of chancery. It derives all its legal force and character from the adoption of the chancellor, which, though formal, is yet essential as rendering it the act of the duly constituted judicial tribunal." Grinstead v. Buckley, 32 Miss., 148.

"The principal objection to these proceedings is claimed to be found in the clauses of the Constitution which vest all the judicial power of the State in courts, and which provide how those courts shall be constituted, and, as is argued, leave no room for judicial action elsewhere. The judicial power, even when used in its widest and least accurate sense, involves the power to *'hear and determine'* the matters to be disposed of; and this can only be done by some order or judgment which needs no additional sanction to entitle it to be enforced. No action which is merely preparatory to an order or judgment to be rendered by some different body, can be properly termed judicial. A master in chancery often has occasion to consider questions of law and fact, but no one ever supposed him to possess judicial power. A jury in a court of record determines all the facts in the case, but the judicial power is in the court which enforces the verdict by judgment. This view is very clearly explained by Kent, C. J., in Tillotson v. Cheetam, 2 Johns, 63, where it held that the sheriff himself, when presiding over a jury of inquest, acted ministerially, because he had no power to give judgment. See, also, Story on Const., sec. 1640 et seq.; Daniels v. People, 6 Mich., 381; Chandler v. Nash, 5 Mich., 409. It is the inherent authority not only to decide, but to make binding orders or judgments, which constitutes judicial power; and the instrumentalities used to inform the

tribunal, whether left to its own choice or fixed by law, are merely auxiliary to that power, and operate on persons or things only through its action, and by virtue of it." Underwood v. McDuffee, 15 Mich., 368. See also Townsend v. Radcliffe, 63 Ill., 10.

"A commissioner is not a judge; he does not possess final power in any one instance." Ex parte Gray, 1 Bailey Eq. (S. C.), 77.

As to commissioners, it was said:

"Indeed they are not, and under the Constitution can not be, clothed with judicial power to hear and finally determine any matter whatever." United States v. Berry, 2 McCrary, 61.

"It is competent to send a case to referees or to a master for investigation of accounts. Underwood v. McDuffee, 15 Mich., 361; Hard v. Burton, 79 Ill., 504. But it is not competent to give the referee powers of final decision. Johnson v. Wallace, 7 Ohio, 342; King v. Hopkins, 57 N. H., 334; St. Paul, etc., R. R. Co. v. Gardiner, 19 Minn., 132 s. c., 18 Am. Rep., 334." Cooley's Const. Lim., 5th ed., 506, note 1.

"The referee exerts no power proprio vigore. Without the court he could have no existence; without the court he could not act after his creation; and without confirmation and adoption by the court, his acts have no force or validity whatever. Nothing can originate before a referee, and nothing can terminate with or by a decision of a referee. The court acquires the jurisdiction, and the court renders the judgment upon the controversy, wherefore the whole exercise of the judicial power is by the court, the referee acting only in an intermediate capacity as an auxiliary to the court in the ascertainment of certain facts and law necessary to its enlightenment in giving the proper decree of judgment." Carson v. Smith, 5 Minn., 88.

"Legislation providing for the trial of causes by auditors and referees and making their findings evidence, without concluding the parties thereby, is within the power of the Legislature and valid. In such cases the subordinate officers act under the direction of the courts who may review and reverse the findings of such officers; but legislation making the findings of such officers conclusive is an invasion of the province of the judiciary and unconstitutional."

"Judicial power," as used in Constitutions, has been discussed as follows:

"The judicial power mentioned in the Constitution, and vested in the courts, means the power conferred upon courts ordained and established by and under the Constitution, in the strict and appropriate sense of that term—courts that compose one of the three great departments of the government, prescribed by the fundamental law, the same as the other two—the legislative and the executive." Charge to Grand Jury under Fugitive Slave Law, 30 Fed. Cas. No. 18,261.

"The judicial power extends to all cases in law and equity arising under the Constitution and laws and treaties of the United States." Story on Constitution, 5th ed., sec. 1640.

"Article 5 of our Constitution provides for the organization of the judicial department of the government. It prescribes what courts shall be established and defines their jurisdiction; names the officers of courts and prescribes their powers; and in every instance save one the province of the courts so provided for is to hear and determine causes between parties affecting the rights of persons as to their life, liberty and property. The exception is the Commissioners Courts, which are not properly a part of the judicial department. But the whole scope of the article shows clearly what is meant by the judicial department of the government." Missouri, K. & T. Ry. Co. of Texas v. Shannon, 100 Texas, 389, 100 S. W., 138.

Under a statute which authorized District Courts to remove disabilities of minority, our Supreme Court, through Judge Gaines, said:

"Can an order which under the statute removes the disabilities of a minor be deemed in strict language the judgment of a court? We think not. It fixes no° right; it settles no dispute. It acts merely upon the status of the applicant, enlarges his capacities as a free agent, and as to all matters not political places him upon the plane of persons who have attained their majority. If the proceeding should be deemed judicial, we should be compelled to hold the statute in conflict with the Constitution, for the reason that it attempts to confer upon the District Courts a jurisdiction not embraced in their powers as defined by the Constitution. . . .

"We think the power given by the statute must be regarded as an authority conferred upon the district judge as a commissioner, to be exercised while holding the sessions of his court, and not upon the court itself. He could hardly be compelled to exercise the function; it could hardly be deemed an official duty." Brown v. Wheelock, 75 Texas, 385, 12 S. W., 384.

"Our Constitution, in strong terms, declares that judicial powers shall be vested in courts, and not in ministerial officers. Its framers were careful to clearly mark out the different departments of government, and to firmly prohibit the lodging of judicial powers elsewhere · than in judicial tribunals. Our decisions have given full effect to · our constitutional provisions, and have uniformly declared that only judicial officers can exercise judicial functions. Little v. State, 90 Ind., 338; Wright v. Defrees, 8 id., 298; Waldo v. Wallace, 12 id., 569; Columbus, etc., Ry. Co. v. Board, etc., 65 id., 427." Gregory v. State, 48 Am. Rep., 162.

"All judicial power, by the Constitution of the States and nation, is vested in the courts; but the judicial power therein conferred upon and limited to the courts is that judicial power which can be exercised only by the courts. In other words, the courts have exclusive power to hear and determine those matters which affect the life or liberty or property of a citizen. All other rights, while they may be in a sense 'judicial,' are not so far within the jurisdiction of the courts that

their exercise by another department is void.  Territory v. Cox, 6 Dak., 501; Cameron v. Parker, 38 Pac., 14, 2 Okla., 277."

" 'Judicial power,' in Const., art. 7, sec. 2, providing that the judicial power in this State, 'as to matters of law and equity,' shall be vested in a Supreme Court, in circuit courts, courts of probate, and justice of the peace, is construed to vest such power as the courts under English and American systems of jurisprudence have always exercised in legal and equitable actions; that is, in actions at law the power of determining questions of law and not of fact, and in suits in equity the power of determining questions of both law and fact.  Callanan v. Judd, 23 Wis., 343, 349."

" 'Judicial powers,' in Const., 1879, art. 3, sec. 1, providing that the judicial powers of this State shall be vested in a superior court and in such inferior courts as the Legislature shall from time to time ordain and establish, embraces all cases, criminal and civil, at common law and in equity.  Gilbert v. Thomas, 3 Ga., 575, 579."

"The judicial power which by the third article of the Constitution is vested in the Supreme Court and such inferior courts, etc., and which shall extend to all 'cases in law and equity arising under the Constitution or laws of the United States,' is a conclusive power.  It embraces the whole judicial power as to such matters.  United States v. Smith, 4 N. J. Law (1 Southard), 33, 38."

"Judicial power, within the meaning of the Constitution, may be defined to be that power by which judicial tribunals construe the Constitution, the laws enacted by Congress, and the treaties made with foreign powers or with Indian tribes, and determine the rights of parties in conformity with such construction.  Gilbert v. Priest (N. Y.), 65 Barb., 444, 448."

The four next preceding quotations are from 4 Words and Phrases, pp. 3860-3861.

In Hall v. Marks, 34 Ill., 358, the Supreme Court of Illinois reviewed the constitutional provisions vesting the powers of government in three separate and distinct bodies of magistracy, and held that the rendition of a judgment is a judicial act, and that a statute authorizing a clerk to render a judgment by default in vacation was unconstitutional.  With reference to the judicial power the court said:

"The power to adjudge, determine, and render a judgment is beyond all question a judicial act, and under this provision can only be done by judicial authority. . . . The Constitution has conferred this power, as we have seen, upon the judicial department, and has only authorized the officers composing that department to exercise the power. That instrument has designated the judges and magistrates of the various courts it has created or authorized to be formed, as the officers authorized to exercise the judicial power of the State."

In relation to the writ of *habeas corpus* it was said:

"It is worthy of serious consideration whether, in those States where the whole judicial power is by the Constitution vested in certain specified

courts, it is competent by law to give to judicial officers not holding such courts authority to review, even indirectly, the decisions of the courts, and to discharge persons committed under their judgments. Such officers could exercise only a special statutory authority. Yet its exercise in such cases is not only judicial, but it is in the nature of appellate judicial power. The jurisdiction of the Supreme Court of the United States to issue the writ in cases of confinement under the order of the District Courts, was sustained in Ex parte Bollman and Swartwout, 4 Cranch., 75, and Matter of Metzger, 5 How., 176, on the ground that it was appellate. See also Ex parte Kearney, 7 Wheat., 38; Ex parte Watkins, 7 Pet., 568; Ex parte Milburn, 9 Pet., 704; Matter of Kaine, 14 How., 103; Matter of Eaton, 27 Mich., 1; Matter of Buddington, 29 Mich., 472." Cooley's Const. Lim., 5th ed., 425, note 3.

Further, as to what acts are judicial acts, see Henderson v. Beaton, 52 Texas, 29; Rochelle v. Lane, 105 Texas, 560, 148 S. W., 559, and cases cited; Railway v. Shannon, 100 Texas, 379, 100 S. W., 138, 10 L. R. A. (N. S.), 681; State v. DeSilva, 105 Texas, 95, 145 S. W., 331; Accousi v. Furniture Co., 83 S. W., 1104; Baldacchi v. Goodlet, 145 S. W., 328; "Addendum," by this writer, in White v. White, filed June 30, 1917.

"Judicial acts, within the meaning of the Constitution of Indiana, are such as are to be performed in the exercise of judicial power. But the judicial power of this State is vested in courts. A judicial act, then, must be an act performed by a court, touching the rights of parties, or property, brought before it by voluntary appearance, or by the prior action of ministerial officers, in short, by ministerial acts. See Waldo v. Wallace, 12 Ind., 569, where the constitutional provisions are quoted. The acts done out of court, in bringing parties into court, are, as a general proposition, ministerial acts; those done by the court in session, in adjudicating rights between parties, or upon the rights of one in court *ex parte,* are judicial acts. 3 Blacks. Comm., p. 25." Shoultz v. McPheeters, 79 Ind., 377.

"A judicial duty, within the meaning of the Constitution, is such a duty as legitimately pertains to an officer in the department designated by the Constitution as judicial." State v. Hathaway, 115 Mo., 38, 21 S. W., 1084.

"Where the inquiry to be made involves questions of law as well as facts, where it affects a legal right, and where the decision may result in terminating or destroying that right, the powers to be exercised, and the duties to be discharged, are essentially judicial." 6 Ruling Case Law, sec. 158.

The power to render judgments and decrees, and to make orders forever disposing of appeals in pending actions, and to grant or refuse rehearings on such appeals,—such powers, in brief, as are conferred, by said relief Act upon what my associates are pleased to call the "Committee of Judges," unquestionably are "judicial powers." Sanders v. Cabaniss, 43 Ala., 173.

Our Constitution vests those powers in *courts,* and not elsewhere; and said "committee" is not a court.

The suggested distinction between the judicial powers of a court and the powers of a judge thereof is one which has been recognized, very clearly, in Constitutions of Texas, and by our Legislature, in many statutes, and by our courts, including the Supreme Court, in various decisions.

Among such provisions in former Constitutions were the following:

"The Supreme Court and judges thereof shall have power to issue the writ of habeas corpus, and under such regulations as may be prescribed by law may issue writs of mandamus, and such other writs as may be necessary to enforce its own jurisdiction, and also compel a judge of the District Court to proceed to trial and judgment in a cause." Const. Texas, 1845, art. 4, sec. 3; Const. Texas 1861, art 4, sec. 3.

"The District Court . . . . or the judges thereof shall have power to issue all writs necessary to enforce their own jurisdiction and (to) give them general superintendence and control over inferior jurisdictions." Const. Texas 1861, art. 4, sec. 10.

"The Supreme Court and the judges thereof shall have power to issue the writ of habeas corpus; and under such regulations as may be prescribed by law, the said court and the judges thereof may issue the writ of mandamus, and such other writs as may be necessary to enforce its own jurisdiction." Const. Texas 1866, art. 4, sec. 3.

"The said (district) courts and the judges thereof shall have power to issue writs of injunction, certiorari, and all other writs necessary to enforce their own jurisdiction, and to give them a general superintendence and control over inferior tribunals." Const. Texas 1866, art. 4, sec. 6.

"The Supreme Court and the judges thereof shall have power to issue the writ of habeas corpus; and under such regulations as may be prescribed by law, may issue the writ of mandamus, and such other writs as may be necessary to enforce its jurisdiction." Const. Texas 1869, art. 5, sec. 3.

"The said (district) courts and the judges thereof shall have power to issue the writ of habeas corpus, and all other writs necessary to enforce their own jurisdictions, and to give them a general superintendence and control over inferior tribunals." Id., sec. 7.

"The Supreme Court and the judges thereof shall have power to issue, under such regulations as may be prescribed by law, the writ of mandamus and all other writs necessary to enforce the jurisdiction of said court." Const. Texas 1876, art. 5, sec. 3.

"The Court of Appeals and the judges thereof shall have power to issue the writ of habeas corpus; and under such regulations as may be prescribed by law, issue such writs as may be necessary to enforce its own jurisdiction." Id., sec. 6.

"The said (district) courts and the judges thereof shall have power

to issue writs of habeas corpus in felony cases, mandamus, injunction, certiorari, and all other writs necessary to enforce their jurisdiction." Id., sec. 8.

Among Texas statutes making such distinctions these may be mentioned, although the constitutionality of many of them seems not to have been determined by the courts:

Acts May 11 and 12, 1846, Hartley's Dig., arts. 2928, 643, referred to in Thorne v. Moore, 101 Texas, 211; Vernon's Sayles' Texas Civ. Stats., arts. 96, 150, 152, 166, 239n et seq., 240, 458, 473, 523, 743, 1080, 1526, 1528, 1529, 1592, 1595, 1660, 1713, 1714, 1772, 1787, 1788, 1793, 1800, 1802, 1811-9, 1811-21, 1811-38, 1811-40, 1811-59, 1811-67, 1811-83, 1811-99, 1811-110, 2016, 2017, 2073, 2098, 2128, 2169, 2185, 2201e, 2550, 3147, 3154, 4088, 4621, 4643, 4644, 5249, 6044, 6045, 6319m, 6508, 7094, 7434, 7437, 7446, 7747. See also Acts 1915, ch. 39, sec. 4; ch. 17, sec. 4 (a) ; Acts 1917, ch. 19, p. 31, ch. 89, p. 243, ch. 107, p. 296.

In the light of foregoing provisions of our State Constitution and hereinafter cited Texas decisions, the above cited Texas statutes furnish food for much serious thought.

Such distinction between powers of courts and powers of justices lies, conspicuously, upon the face of even said relief Act itself. Its caption declares the Act to be one "granting additional powers to the chief justice and associate justices of the Supreme Court and of the Courts of Civil Appeals as incidental to the offices held by them," and a corresponding declaration appears in section 6. In the declaration that such new powers are "incidental" to the *office,* rather than to the duties of the *courts* mentioned, fine discrimination is shown, probably in recognition of the fact that the new powers and duties which the Act seeks to confer and impose upon justices of Courts of Civil Appeals as such *justices* only, are not even germane to the powers and duties of Courts of Civil Appeals, as set out in the Constitution, and as defined by our statutes. Not reasonably could such powers be said to be "incidental" to the powers and duties of those *courts*.

To what pre-existing powers, then, are these new powers "additional"? As related to the chief justice, and to the associate justices of the Supreme Court, it fairly may be said that they are additional to (a) the powers which the Constitution expressly confers upon the Supreme Court, *as a court,* and to (b) the powers which the Constitution expressly confers on all members of that court, separately, as justices of that court, to be exercised in that capacity, in chambers or in vacation, and not by the court, and to (c) the powers which the Legislature heretofore validly, pursuant to specific constitutional provision, has conferred upon justices of that court, separately, to be exercised by them, respectively, in that capacity and not otherwise. But as to justices of Courts of Civil Appeals the same reasoning can not apply throughout, because, through a notable and apparently intentional omission, our Constitution has not conferred any power whatever upon them,

separately, as justices, to be exercised in that capacity and not as a court, and has not authorized the Legislature to do so; hence, as to those justices, the most that can be said is that these new powers are "additional" to the powers which have been granted by the Constitution to Courts of Civil Appeals and to the powers which, heretofore, the Legislature has conferred upon those courts and has attempted to confer upon justices of those courts (Rev. Stats., art. 1592), to be exercised by them, separately, as such justices. But, inasmuch as the Constitution does not confer nor expressly authorize the Legislature to confer upon them, as justices, any powers except such as they, collectively, have and exercise *as a court,* it is evident that the powers which this relief Act of 1917 attempts, conditionally, to confer upon them, as "designated justices," are really to be exercised by them as individuals only. The reference to them as justices of Courts of Civil Appeals serves no other purpose or function than to indicate the class of individuals out of which such designation is to be made.

Again, in authorizing the designation of three justices of Courts of Civil Appeals to pass upon referred applications, section 2 of said Act plainly restricts to the chief justice of the Supreme Court, acting in that capacity and alone, and not otherwise, or, in the alternative, to *any two of the justices* of that court, acting in those capacities, together, and not otherwise, the exercise of that power of designation; but, in treating of the reference, to the designated justices, of such applications for writs of error, section 3 of the Act provides that such reference shall be made by the *"Supreme Court"* or by *"any two of the justices thereof."* The distinction thus made is too plain to be ignored without doing violence to that Act; yet it has been ignored, in designating justices of Courts of Civil Appeals under said Act.

Moreover, section 5 of said Act provides that "the *Supreme Court* shall still have power to act upon applications for writs of error, when deemed expedient, and the same power is hereby conferred upon the *justices of that court,* action by any two of whom shall be sufficient."

It will be noted that thereby said Act seeks to do these two distinct things: (1) to preserve the right and power of the *Supreme Court,* under pre-existing laws, to act, *as a court,* upon applications for writs of error; and (2) to confer "the same power" upon any two *justices* of that court, this being the first attempt of the Legislature to do that, and said power being additional to the powers conferred by our Constitution upon justices of that court, and additional to the powers which that instrument authorizes the Legislature to confer upon them. Art. 5, sec. 3.

In this connection it will be observed that despite said provision that any two of the justices of the Supreme Court may "act upon applications for writs of error" the subsequent portion of section 5 expressly provides that in any case falling within any one of three therein enumerated classes "the application for writ of error shall be passed upon by the *Supreme Court.*" Consequently, the legislative intent appears

to be that such an exceptional application in any case belonging to any such class shall not be referred to the designated justices of Courts of Civil Appeals, and shall not be acted upon by even two justices of the Supreme Court, acting as such justices only, but shall be acted upon by the Supreme Court, *as a court,* as formerly, and pursuant to pre-existing laws.

Furthermore, the emergency clause, embodied in section 8, declares the necessity for haste in getting three justices of Courts of Civil Appeals to work "in the disposition of business of the Supreme Court." Inasmuch as that work is not within the jurisdiction of Courts of Civil Appeals, and is not, even remotely, related to any duty arising from, or growing out of, or incidental to, that jurisdiction, or to any power or duty of those courts, under the Constitution, or said relief Act, or any other statute, and such designated justices constitute no court or other organized tribunal (as is hereinafter shown), it is evident that such new work is by said relief Act really imposed upon them *individ-ually*. Consequently, the declared haste is to get outside individuals, who happen to be justices of Courts of Civil Appeals, busy in their *individual* capacities, in performing duties and in exercising powers which, under our Constitution and laws, devolve upon the Supreme Court, as a court.

Never before, since the amendment, in 1891, of the judiciary article of our Constitution, authorizing the creation of Courts of Civil Appeals, has the Legislature undertaken to confer elsewhere than upon the Supreme Court, *as a court,* the power of passing upon any application for a writ of error. Consequently, the effort, in said relief Act of 1917, to confer that power upon any two justices of the Supreme Court, also, like the effort therein to confer it, with certain exceptions, and contingently, in nearly all cases, upon such designated justices of Courts of Civil Appeals, constitutes a radical departure from long established constitutional and legislative policy, and indicates very strongly that, in the enactment of said relief Act, the legislative mind must have been directed to the stated distinction between the judicial powers of appellate courts when acting *as courts* and the powers of justices of those courts when acting *merely as such justices,* or as in-dividuals. This fact, obviously should be of controlling force in con-struing said relief Act, and particularly so as to the manner of desig-nating members of Courts of Civil Appeals to serve under that Act. Nevertheless, the stated distinction is one to which my associates seem to attach no importance whatever in relation to either the validity or the construction of said Act.

Among our Texas decisions which recognize the above stated distinc-tion are these: Hines v. Morse, 92 Texas, 194, 47 S. W., 516; Griner v. Thomas, 101 Texas, 36, 104 S. W., 1058; Thorne v. Moore, 101 Texas, 205, 105 S. W., 985; Ex parte Reeves, 100 Texas, 617, 103 S. W., 478; Nalle v. City of Austin, 101 Texas, 48, 104 S. W., 1050; Ashford v. Goodwin, 103 Texas, 497, 131 S. W., 538; Hodges v. Ward, 1 Texas,

244; Doss v. Waggoner, 3 Texas, 515; Jones v. McMahon, 30 Texas, 727; Hunton v. Nichols, 55 Texas, 224; West v. Burke, 60 Texas, 51; Wilson v. Wichita Co., 67 Texas, 657; Brown v. Wheelock, 75 Texas, 385, 12 S. W., 111; Pittman v. Byars, 100 Texas, 518, 101 S. W., 798; Couturie v. Crespi, 103 Texas, 554, 131 S. W., 403; Hamill v. Samuels, 104 Texas, 46, 133 S. W., 419; Pecos & N. Tex. Ry. Co. v. Cox, 104 Texas, 556, 140 S. W., 1078, 105 Texas, 40, 143 S. W., 606.   See. also, Ellis v. Harrison, 56 S. W., 592; Railroad Co. v. Alexander, 135 S. W., 703; Wier v. Hill, 125 S. W., 366; Chickasha Milling Co. v. Crutcher, 141 S. W., 357; Brown v. McClendon, 121 S. W., 903; Accousi v. Furniture Co., 83 S. W., 1104; Neville v. Miller, 171 S. W., 1109, and c. c.; Rosamond v. Murff, 185 S. W., 1067.

As to appointment of receiver in vacation, see Hdw. Co. v. Mfg. Co., 88 Texas, 468, 27 S. W., 100; Land Co. v. Blevins, 34 S. W., 828; Drug Co. v. Freeman, 39 S. W., 628; Williams v. Odell, 47 S. W., 151, in none of which, it seems, was the constitutionality of the statute questioned.   The foregoing lists of decisions are not exhaustive.

The great weight of them is to the effect that when judicial power is conferred by our Constitution upon a "court" it means the court in session and not in vacation.   It does not mean the justices, or the judges, or the judge of the court, in chambers or in vacation.

By a petition addressed to the chief justice and associate justices of our Supreme Court, they were asked, in vacation, to grant, in vacation. a writ of mandamus to compel the clerk of that court to transmit to the clerk of a Court of Civil Appeals a certain order of the Supreme Court.   The first question was: "Have the judges of the Supreme Court during vacation the power to grant a writ of mandamus in any case?"   That court, through Chief Justice Gaines, said:

"1.   Section 2 (3?) of article 5 of our Constitution, which provides for the organization of the Supreme Court and defines the powers and jurisdiction which are conferred upon it and which may be conferred by the Legislature, contains this provision: '. . . The Supreme Court and the justices thereof shall have power to issue writs of habeas corpus as may be prescribed by law, and under such regulations as may be prescribed by law said court and the justices thereof may issue writs of mandamus, procedendo, certiorari, and such other writs as may be necessary to enforce its jurisdiction. . . . Upon the construction of this provision the determination of the first question must depend.   Courts, the terms of which are fixed by law, have no power to sit save during term time, unless for special reasons, authority to hold a special session, or to hear and determine some special class or classes of cases during their ordinary vacation, be conferred upon them.' . . .

"The Constitution limits the sessions of the Supreme Court to a specified term of nine months and fixes the place where it must sit and does not specially provide for the exercise of its jurisdiction at any other time or place.   It follows that it can act at no other time or place.

"But the provision in question confers the same jurisdiction *with*

*respect to the writs therein specified,* upon the *justices* of the Supreme Court, which is conferred upon the court itself, and neither directly nor indirectly limits the time or fixes the place at which *they* are to act. In the exercise of the jurisdiction thereby conferred they may act as *justices* of the Supreme Court and *not as the court itself,* either in term time or in vacation. The power, however, is limited to the grant of such process as may be *necessary to enforce the jurisdiction of the court.* The provision, in our opinion, is a wise one. It may be necessary to issue a writ to enforce the jurisdiction of the court in vacation as well as in term time; and for this reason, doubtless, the power was conferred upon the justices of the court. The present case serves to illustrate the point. Here the clerk being without a decision of the Supreme Court to guide him, and pursuing the usual practice of the court, cautiously declined to transmit to the clerk of the Court of Civil Appeals a certificate necessary to prompt enforcement of a judgment of that court; and although the relator felt aggrieved by this course, she would have been without remedy but for the power conferred upon us, as justices of the court, to hear and determine in vacation the case made by her petition." (Italics mine.) Hines v. Morse, supra.

In an action for a writ of mandamus to compel a district judge to vacate his vacation order temporarily suspending a county judge from office, our Supreme Court, through Mr. Justice Williams, said:

"The application for mandamus was presented to some of the justices of this court in vacation and they were asked then to issue the mandamus under the authority of article 946, Revised Statutes, but were of the opinion that the Legislature was empowered by section 3 of article V of the Constitution to confer such original jurisdiction upon the court, only, and not upon the judges thereof. The cause was, therefore, set down for hearing in term time. . . ." Griner v. Thomas, 101 Texas, 39, 104 S. W., 1058.

Similarly, this writer, some two years ago, and after making a somewhat careful study of the distinction which our Constitution and statutes make between the judicial powers of courts and the judges thereof, declined to issue, in vacation of the Supreme Court, a writ of mandamus not necessary for enforcement of its jurisdiction.

In an action for a writ of mandamus to compel a district judge to vacate an order, made by him, in vacation, upon a hearing and after notice, requiring publication of the result of a local option election, our Supreme Court refused the writ of mandamus, saying, through Mr. Justice Williams:

"Section 8 of article V of the Constitution, which defines the power and jurisdiction of the District Court and of the judges thereof, provides: 'And said court and the judges thereof shall have power to issue writs of habeas corpus, mandamus, injunction, and certiorari, and all writs necessary to enforce their jurisdiction.'

"This provision has been construed as giving the substantive power

to issue the writs named in all cases when courts of law or equity under settled rules, would have the power to issue them, whether they be necessary to enforce some jurisdiction given by the other provisions or not. This provision is, in itself, a grant of jurisdiction and powers which do not depend upon the other provisions defining classes of cases or amounts in controversy over which also jurisdiction is given. (County of Anderson v. Kennedy, 58 Texas, 616.)

"The well settled construction of such a phrase as 'said court and the judges thereof' is that it means the court when in session, and the judges acting in vacation. The language, therefore, equally empowers the court, when in session, and the judge, when the court is not in session, to issue the writs. The power is conferred upon the judge in the same language that confers it upon the court. Unquestionably the court has power to issue the peremptory mandamus. How, then, can the same words that grant it to the court be held not to have granted it to the judge? . . .

"The power lodged with the district judge is not an arbitrary one. He is the same officer that exercises the power when presiding over the court, and acts judicially, after a hearing, in the same manner in which the court acts.

"Nor was the power unknown to our judicial system before the adoption of the present Constitution. The Acts of May 11 and 12, 1846, conferred it upon the judges of both the Supreme and District Courts. (Hartley's Dig., arts. 2928, 643.) It is given to judges also in a number of other jurisdictions. (23 Cyc., p. 55, and authorities cited.)

"The decision in the case of Murphy v. Wentworth (36 Texas, 147) was made under the Constitution of 1869, which did not contain the provision which we have discussed. It seems to be irreconcilable with the decision in Jones v. McMahan (30 Texas, 719). Neither of those cases, however, involved the construction of a provision like that in the present Constitution, and we are not called upon to determine which, if either, of them is correct." Thorne v. Moore, supra.

The foregoing decisions carry clear recognition of the principle that justices and judges, acting in those capacities and not as a court, can exercise only such judicial powers as the Constitution, by way of exception, expressly confers, or authorizes the Legislature to confer, upon them as judges.

Under the circumstances it is, therefore, as remarkable as it is regrettable that the principle mentioned was not consistently regarded in drafting said relief Act.

Our Supreme Court, through Judge Brown, held:

"The Legislature had no power to require the judges of the District Courts to hear and determine contested elections in vacation; the Constitution confers that power upon the District Courts, which means the court in session. . . . This court will not direct the respondent to hear the contest in vacation, because the law that so provides is void." Ashford v. Goodwin, supra.

In Ex parte Reeves, supra, it was held by our Supreme Court, that under section 29 of article 5 of the Constitution "the Legislature is without power to provide for the court sitting at a called term," although section 17 of the same article provides that the county court "may dispose of the probate business either in term time or vacation as may be provided by law." See, also, Stewart v. Kemp, 54· Texas, 248.

In the early case of Hodges v. Ward, supra, in an opinion by Judge Wheeler, it was held that no judgment or decree could be rendered by a district court "in chambers."

In Doss v. Waggoner, supra, through Judge Hemphill, it was said: "The court had no jurisdiction to try and determine causes at the time these judgments purport to have been rendered. There was in fact no court in session, and no judgments could by law have been pronounced; and, consequently, they are not only absolute nullities, in the ordinary signification of that term, when applied to judgments of courts having no jurisdiction over the subject matter of the parties, but they are not even the acts of a court, and are, therefore, not susceptible of appeal or the subjects of revision in an appellate tribunal."

In Jones v. McMahan, supra, under section 6 of article 4 of the Constitution of 1866, which provided as above shown, that District Courts and "the judges thereof" shall have power to issue writs of injunction, certiorari, "and all other writs necessary to enforce their own jurisdiction," it was held that the power resided in the judges as well as in the courts.

In Hunton v. Nichols, supra, under the Act of February 5, 1840, "regulating the duties of probate courts and the settlement of succession," it was said: "There is not in the seventy-two sections which compose this statute, a line or syllable from which can be deduced any power or authority in the chief justice, as such, to make partition of estates or decree the sale of lands in vacation. . . . This power is conferred upon the probate court. It is the highest attribute of its jurisdiction."

In Wilson v. Wichita County, supra, the county judge approved, in his own name, in open Commissioners Court, the bond of the county treasurer. Held: That did not make the approval the act of the court.

With reference to the statute concerning statements of fact it was said: "Article 1293 requires the authentication to be made by the court. This implies that it must be made by the judge while sitting as a court. Counsel for plaintiff in error contends that the term 'court' as there used, means the same as 'judge of the court,' and he refers to decisions of other States which seem to support that view, but cites none from the courts of this State. . . .

"That the terms 'court' and 'judge,' as used in the statute relating to the regulation of appeals, are not intended to be used interchangeably, is, we think, settled by the Supreme Court of this State. Couturie v.

Crespi, 131 S. W., 404; Pittman v. Byars, 100 Texas, 518, 101 S. W., 789." Chickasha Milling Co. v. Crutcher, supra.

In Accousi v. Furniture Co., supra, in relation to an order granting additional time for filing a statement of facts and bills of exception, it was said:

"This power is inherent in courts, both at law and in equity, and is not dependent for its existence upon any statute. But in the absence of express statutory authority, it can only be exercised by the court in the discharge of its judicial functions as such. . . .

"To determine whether a judgment has been rendered, so that it may be entered nunc pro tunc, is a judicial function, to be exercised only by the court wherein it claimed the judgment sought to be entered was pronounced. This often requires the hearing and consideration of testimony before it can be judicially determined that a judgment sought to be entered nunc pro tunc was actually rendered. The exercise of this power to hear and determine is of its very nature judicial; and, if there be degrees in judicial functions, is as high an exercise of judicial power as that which is called into play in rendering the judgment itself. We know of and can find no authority for the exercise of such power by a court or its judge during vacation; and such power, from its very nature, in the absence of legislative authority (if, indeed, it is within the power of the Legislature to grant it), can only be exercised while the court is in session. The very meaning of the term 'vacation,' as applied to a court, imports an absence of power to render or grant interlocutory judicial orders."

Several of the above cited decisions are to the effect that no appeal will lie from the judgment of a judge rendered during vacation, or in chambers, because it is not the judgment of any court.

"Though a judge of the District Court may decide certain matters in vacation, and render judgment therein, yet such judgment, whether interlocutory or final, is not the judgment of the court over which he presides, but is merely his judgment as a district judge sitting in vacation. In such a case, unless a right of appeal be given by positive law, none exists. (Sec. 4, Ency. Pl. & Pr., 365.) Since our statutes give the right of appeal only from judgments of the District and County Courts, and since the judgment in the case was a judgment in neither court, we think that we acquired no jurisdiction to reverse the judgment." Pittman v. Byars, 100 Texas, 518, 101 S. W., 789.

In Couturie v. Crespi, supra, the Supreme Court, through Judge Gaines, said, in substance, that an order extending the time for the preparation and filing of a statement of facts must be made "by the court, which means by the court in session and presumably at the term at which the judgment was rendered."

In Hamill v. Samuels, supra, the Supreme Court, through Chief Justice Brown, said: "The court, or the judge of the court, may, for good cause shown, extend the time, with the limitation only that it must

not delay the filing of the statement of facts with the transcript in that court within the time prescribed by law."

In Pecos & N. T. Ry. Co. v. Cox, 104 Texas, 556, in reviewing the same question, the Supreme Court, through Mr. Justice Ramsey, said: "It may be conceded that the word court is many times used as synonymous with and interchangeably with the word judge, but in the particular clause controlling us here, it is used in its strictly legal sense, and that this construction must control."

In the report of another hearing of the same case, the question being as to the construction rather than as to the validity of the statute, the court said: "The Act of the Thirty-first Legislature, as copied above, is in plain terms and conferred authority upon the judge of the District Court to make in vacation the order that was entered in this case." 105 Texas, 40.

In Brown v. McClendon, supra, the Court of Civil Appeals raised, but did not decide, the question as to whether a justice of the peace may hear a cause on its merits out of term time.

Many of the above mentioned Texas cases, some of which appear to be somewhat conflicting, are cited, not so much to show the status of the law upon the point involved as to call attention to the great number of instances in which the courts of this State have recognized said distinction between the powers of courts and the powers of judges. The stated distinction is recognized by many State Constitutions, and by decisions of courts of various States.

"The king himself, though he be intrusted with the whole executive power of the law, can not sit in judgment in any court, but his justice and the laws must be administered according to the power committed to and distributed among his several courts of justice." 1 Bacon Abr., 619.

"The gladsome light of jurisprudence, the judicature, only belongeth to the judges." 4 Inst., 73.

"Our Constitution vests the judicial power of the State, not in officers, but in courts. In speaking of the constitutional provision, in Waldo v. Wallace, 12 Ind., 569: 'It will be observed that the judicial power is vested in courts, not in officers,' it is clear that the common law so vested it, and that the Constitution there continues it. Cooley, Const. Lim., 4th ed., 74." People v. Noble, supra.

"The judicial power, properly so called, has never been vested anywhere but in courts." Abbott v. Matthews, 26 Mich., 176.

"Where the Constitution divides the powers of the government into three distinct departments, and confides each department to separate magistrates, the Legislature has no judicial power and can confer none upon a court or judge. Norwalk St. R. Co.'s Appeal, 69 Conn., 576, 37 Atl., 1080, 39 L. R. A., 794." 8 Cyc., 813 (note 53.)

In holding invalid a statute which sought to authorize a judge, at chambers, to render a judgment in cases of insolvent debtors, it was said: "By article VI of our Constitution the judicial power is vested in

one Supreme Court, in circuit courts, in probate courts, and in Justice of the Peace Courts. The Legislature is also authorized to establish municipal courts in cities and courts of conciliation. The courts referred to in the article are permanent organizations for the administration of justice. . . . The exercise of judicial power in its strict legal sense can be conferred only upon courts named in the Constitution." Risser v. Hoyt, 53 Minn., 185, 18 N. W., 611.

"If the Legislature should attempt to establish independent tribunals and vest them with judicial powers, the constitutional formalities would have to be complied with to give them validity." Carson v. Smith, 5 Minn., 88.

In holding void a statute which assumed to confer judicial power upon a notary public, the Supreme Court of Michigan said:

"This presents the naked question, whether the Legislature possessed the constitutional power to confer such jurisdiction upon the notary. The proceeding authorized by the statute first cited, for dissolving attachments, is as clearly a judicial proceeding as the trial of a cause in any court of the State; and the power 'to hear and determine' such application under the statute is as clearly a judicial power as that exercised by a justice of the peace or a judge upon the bench. It is not like a mere reference to take proof or compute amounts to be reported to a court of record for their judicial action, but it is, 'to hear and determine,' questions both of law and fact. Section 1, article VI, of the Constitution declares: 'The judicial power is vested in one Supreme Court, in circuit courts, in probate courts, and in justices of the peace. Municipal courts of civil and criminal jurisdiction may be established by the Legislature in cities.' This, beyond all controtroversy, vests the *whole* judicial power of the State in courts and officers named in this section, unless there be some further provision in the same Constitution, conferring upon some other court or officer a part of such judicial power, or authorizing the Legislature to confer it; and in the latter case, it can only be possessed or conferred by such further provision expressly, or by necessary implication, which would have the effect to take the case out of the general provision above quoted. This must be so upon principle, or the Constitution itself must be subject to legislative repeal. It is also well supported by authority. See 2 Story on Const., secs. 1590 to 1592; State v. City of Rockford, 14 Ill., 420; Gibson v. Emerson, 2 Eng., 173." Chandler v. Nash, 5 Mich., 409.

Under our Constitution such powers as are strictly judicial in their character can only be vested in certain courts which are named in the Constitution itself. The circuit courts, as courts, have such power. The judges as judges, out of court, do not possess them and can not be vested with them. Railway Co. v. Dunlap, 47 Mich., 456, 11 N. W., 271.

A statute provided that an injunction of a certain character should not be granted except by the court, and on notice. Such an injunction

granted *ex parte,* by a justice of the court, was held void. Wilkie v. R. Co., 19 N. Y., 242.

A statute authorizing the Supreme Court to direct the filing of an information was held not to authorize judges of that court to do so in their individual capacities. Ohio R. Co. v. State, 10 Ohio, 360.

Under the code a county judge had no powers except while holding a quarterly court. Arthur v. Green, 3 Metc. (Ky.), 75.

Under the Constitution of Colorado, which provided that the Supreme Court "shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, injunction, . . . with authority to hear and determine the same," it was held that the justices of that court, acting singly, in vacation, are without jurisdiction and authority to issue writs of habeas corpus or to determine matters arising thereon. In re Garvey, 7 Colo., 502, 4 Pac., 758.

Constitutional provisions conferring upon the Supreme Court authority to issue certain writs do not confer that authority upon *judges of that court in vacation.* People v. District Court, 28 Colo., 485, 69 Pac., 1066.

"It is contended that our statutes confer on the judge the authority to hear and determine the whole issues in a case of this kind in vacation. If there is such a statute, it is in violation of section 1, article 6, of our Constitution, above quoted." State v. Woodson, 161 Mo., 444, 61 S. W., 252.

Rule XVII of the Supreme Judicial Court of Maine provides:

"When a motion for a new trial is made for any other cause (than that the verdict is against the law or evidence) the evidence in support thereof shall be taken within such time and in such manner as the court, at the next ensuing term, shall order, or the motion will be regarded as withdrawn." That court held that by said rule "no power is conferred upon a justice in vacation to make such order." Mitchell v. Emmons, 104 Me., 76.

Likewise it was held that a statute authorizing "the court," upon overruling a motion for new trial, to enter judgment as of a former term, conferred no authority upon a judge in vacation to enter judgment. Green v. Bradford, 128 Mass., 296.

"As a general rule all judicial business must be transacted in term, whether there is any express direction to that effect or not. Such judicial business as may be done by the judge out of court is exceptional, and must find its warrant in some express provision of the statute. Larco v. Casanueva, 30 Cal., 664." Gruner v. Moore, 6 Colo., 530. See, also, Miles v. Strong, 68 Conn., 278, 36 Atl., 55; State v. Jackson, 21 S. D., 494, 16 Ann. Cas., 87, 113 N. W., 881.

The South Carolina Constitution of 1895 gave to the Supreme Court, as a court, "power to issue writs or orders of injunction," and also provided: "Each of the justices of the Supreme Court and judges of the circuit court shall have the same power at chambers to issue interlocutory writs or orders of injunction as when in open court." Art. 5,

sec. 25. Thereunder it was held that a justice of the Supreme Court has power at chambers to grant an *interlocutory* writ of injunction in a cause not pending in that court. Salinas v. Aultman, 49 S. C., 378, 27 S. E., 407.

·"All judicial power by the organic act, like the Constitutions of the States and of the nation, is vested in the courts; a prohibition upon its exercise by the executive or legislative department, but the judicial power therein conferred upon and limited to the courts, is that judicial power which in the legal acceptation of words can be exercised only by the court. . . . The courts have exclusive power to hear and determine those matters which affect the life or liberty or the property of the citizen; all other rights, while they may be in a sense judicial, are not so far within the jurisdiction of the courts that their exercise by another department would be void." Draper v. Cox, 6 Dak., 510.

"By the ninth section of the 'Act establishing the territorial government of Wisconsin' the judicial power of the territory is vested in the Supreme Court, District Courts, probate courts, and in justices of the peace. These are the courts for the disposition of all the judicial business of the territory, and it is not competent for the legislative assembly to create any more. The creation of any additional judicial tribunal is in the Congress of the United States. The legislative assembly is authorized to limit, by law, the jurisdiction of the several courts above mentioned, both appellate and original—but no farther." Smith v. Odell, 1 Pinn. (Wis.), 449.

The Constitution of Indiana provided:

"The judicial power of the State shall be vested in one Supreme Court, in circuit courts, and in such other courts as the General Assembly may establish."

Thereunder it was said:

"All judicial powers are, by force of this provision, vested in the courts of the State. The Legislature has no authority to invest any other tribunals than courts with judicial power. . . . Nor can these powers be vested elsewhere than in the tribunals designated or indicated by the Constitution. Judicial powers can not be delegated. Taking and following as guides these fundamental principles, we are led to the conclusion that judicial powers can not be vested in officers, such as master commissioners, appointed· by the judges of the courts. By the express provision of the paramount law, the whole judicial power of the State is vested in courts. . . .

"The predominant idea in all the definitions of the courts and the text-writers is, that a court is a tribunal organized for the purpose of administering justice, and presided over by a judge or judges. · . . . Our Constitution means by the term *court* judicial tribunals presided over by a judge or judges. . . . The Legislature may establish courts, but can not vest the judicial power in any other tribunals." Shoultz v. McPheeters, 79 Ind., 373.

Later, in a noted case, in passing upon the constitutionality of "an Act for the appointment of commissioners of the Supreme Court," etc., the Supreme Court of Indiana, through Chief Justice Elliot, said:

"Section 1 of article 7 of the Constitution vests the judicial power of the commonwealth in the courts. It ordains that 'the judicial power of the State shall be vested in one Supreme Court, in circuit courts, and in such other courts as the General Assembly may establish.' The effect of this provision is to vest in the courts the whole element of sovereignty known as the judicial, established by the Constitution and laws enacted under it, except in a few instances, where powers of a judicial nature are expressly and specifically lodged elsewhere. Kilbourn v. Thompson, 103 U. S., 168 (26 L. Ed., 377); People v. Keeler, 99 N. Y., 463, 1 Cent. Rep., 157, 52 Am. Rep., 49."

After quoting the section of the Constitution which, like ours, declares that the three departments of government shall be kept separate, the opinion proceeds:

"The words employed are clear and strong. There is more than a mere theoretical separation, or else the words are powerless and Constitutions are mere empty fulminations. The provisions of the Constitution we have quoted, taken in connection with those which prescribe, define and limit the powers of the other departments of government, remove all doubt and make it uncontrovertibly plain that the courts possess the entire body of the intrinsic judicial power of the State, and that the other departments are prohibited from assuming to exercise any part of that judicial power.

"The authorities sustain our conclusion, for there is neither conflict nor clash of opinion, nor is there even diversity. The difficulty is not to find authority, but to select cases which best express the universal doctrine that all judicial power is exclusively in the courts, and the departments of government absolutely separate and distinct. . . .

"The Constitution vests the judicial power in every instance and the Legislature in none. The Legislature has no judicial power and can confer none upon any person or tribunal. Under the Constitution it may establish courts, but it does not invest the courts it creates with judicial power; the Constitution alone can do that, for all judicial power comes from that instrument, and is vested by it in courts and judges. Speaking of the mayor of a city, the Supreme Court of Illinois said: 'Unless he was such a judge or justice of the peace, no law could vest him with judicial power; for in these officers alone is the entire judicial power of the State vested by the Constitution. As mayor alone, the law would be incomplete to vest him with judicial power, as it would the Governor or the Speaker of the House of Representatives. The Constitution itself has disposed of the entire judicial power of the State and has exhausted that subject. The Legislature may multiply some of the officers who are by the Constitution vested with judicial powers; but, when this is done, it is the Constitution which vests the power.' People v. Maynard, 14 Ill., 419.

"It is the Constitution and not the Legislature which makes the investiture, and it is the courts and judges who are invested with the judicial power.   Shoultz v. McPheeters, 79 Ind., 373; Gregory v. State, 94 Ind., 348, 48 Am. Rep., 162; Little v. State, 90 Ind., 338; Pressly v. Lamb, 105 Ind., 171, and authorities cited, 185, 186, 2 West Rep., 704; Kuntz v. Sumption, Smythe v. Boswell, and Campbell v. Board of Comrs., supra; Hall v. Marks, 34 Ill., 458; re Griffiths, supra.

"As the Constitution of its own vigor, and as the sole source of the judicial power, vests that power in designated tribunals, the Legislature can neither vest it elsewhere nor create new judicial offices, nor divide the duties of the judicial offices designated by the Constitution."   State v. Noble, 118 Ind., 350, 4 L. R. A., 101.   See, also, below, an excerpt from In re Cleveland, 51 N. J. L., 311, 17 Atl., 772; 8 Cyc., 813.

Although some of the State Constitutions above referred to are different from ours in that they do not permit the Legislature to create "additional" courts, the reasoning of the foregoing decisions is applicable here to the extent that our Constitution vests the judicial power in (a) courts therein named, or in (b) justices or judges of those courts, or in (c) *courts* to be created by the Legislature, pursuant to constitutional provision therefor; and that reasoning plainly and conclusively negatives the idea that any portion of the judicial power of the State may be vested by the Legislature elsewhere, as, for instance, in justices of the Supreme Court, or in designated justices of Courts of Civil Appeals, in manner and form as attempted by said relief Act.

In view of the foregoing definitions and discussions of judicial power and the well established and generally recognized distinction between the judicial power of courts and special powers of justices or judges, and the specific provisions of the present judiciary article of our State Constitution vesting judicial power in the courts alone except where otherwise therein specially stated, and carefully enumerating the powers conferred or which may be conferred upon justices of that court, and the failure of that instrument to confer any power upon justices of Courts of Civil Appeals, other than as a court, I can not understand how anyone can consider valid a statute which attempts to divert from the Supreme Court to a majority of the justices of the Supreme Court and, contingently, to designated justices of Courts of Civil Appeals, acting together, any portion of that supreme judicial power which our State Constitution vests, exclusively, in our Supreme Court for exercise by it alone in cases and matters within its own exclusive supreme appellate jurisdiction, nor how it can be held that the Supreme Court, *as a court,* may, under said relief Act, appoint men to serve under that Act.

The evident purpose of said amended judiciary article of our State Constitution was to mark out and define *a complete judicial system,* subject only to the rights of the Legislature (a) to create additional courts, and (b) to make, *by statute,* certain conformations in the jurisdictions of courts, and (c) to confer only certain stated powers upon

only certain enumerated justices and judges. Marbury v. Madison (U. S.), 1 Cranch., 137; Draper v. Cox, 6 Dak., 522.

Many of the provisions of that article establishing courts and distributing the "judicial power," and particularly the provision that there shall be "one Supreme Court," were taken, substantially or literally, from judiciary articles of the Constitution of the United States and the Constitutions of various sister States, after such provisions had received a settled construction inhibiting the law-making department from abolishing that court and from conferring its constitutional powers upon even a legislative *court* of another name, and from conferring upon any other court or tribunal any portion of that which, essentially, is the supreme judicial power of the Supreme Court. Various such decisions are cited herein. Consequently, according to both reason and the settled rules of construction, our courts should presume that such settled constructions of said judiciary provisions were imported into our Constitution.

That Constitution having created a judicial system comprising various courts of different ranks and for different purposes, and having authorized the Legislature to create additional courts, and having declared that, with certain stated exceptions, the entire judicial power of the State shall be vested in such "courts," it must be assumed that the purpose of those who framed and adopted that instrument was that the judicial power to be vested in and exercised by each such court shall correspond to its rank, and shall be appropriate for the accomplishment of the purpose for which that particular court was created. Darnell v. Lyon, 85 Texas, 455.

In discussing the effect of section 1 of article 5 of our Constitution of 1876, which vested the judicial power of this State in certain enumerated courts "and in such other court(s) as may be established by law," our Supreme Court, through Chief Justice Roberts, said:

"It defines the general limits of their respective jurisdictions, and, either expressly, or from the terms used, indicates the subject matter of their action, their relation and mode of proceeding in the exercise of their jurisdiction. . . .

"It was certainly the object of the framers of the Constitution to mark out a complete judicial system, by defining generally the province of each of the courts, by reference to the objects confided to the action of each and the relation of each to the others.

"To that extent it must be held to be permanent, and not subject to change by the action of the Legislature, except as a change may have been provided for. This is plainly, though incidentally, indicated by a special provision for a change in the jurisdiction of the County Court. (Const., 1876, art. 5, sec. 22.)

"The relation of the original and appellate courts is well defined in the system. The Supreme Court is an appellate court in reference to the District Court as a court of original jurisdiction in civil cases. (Const., art. 5, sec. 3.)" Ex parte Towles, 48 Texas, 431-439.

In a later case the Supreme Court, through Stayton, afterward chief justice, said:

"It must be presumed that the Constitution conferred upon each court created by it all the jurisdiction which it may have intended it should exercise, and the Legislature has no power to add to, or withdraw therefrom, except as such power is expressly conferred by the Constitution upon the Legislature, as in section 22, article V.

"If any such general power had been conceived to exist in the Legislature, the section of the Constitution referred to would have been wholly unnecessary." Ex parte Whitlow, 59 Texas, 274. See Williamson v. Lane, 52 Texas, 335; also references in Odell v. Wharton, 87 Texas, 173, to amendment of sec. 8, art. 5.

"On the question whether the Legislature had power to enact the law relied upon, courts ought to look to the fact that through such a power the Legislature would be enabled practically to destroy some of the most important courts created by the Constitution; and it never ought to be held that such a power exists in the Legislature, unless it clearly appears to have been conferred by the Constitution. A power in one department to destroy another, in whole or in part, would be anomalous." Chief Justice Stayton in Darnell v. Lyon, supra.

Such being the organic purpose, it must be true that the share or portion of judicial power so vested in our Supreme Court is *supreme* judicial power. Such power differs, in essential respects other than that of finality, from mere appellate judicial power, such as is vested in Courts of Civil Appeals, District Courts, and County Courts, much of which is "final," but none of which is "supreme" in any other sense.

It is true that our Constitution and laws together inhibit appeals from various courts in several enumerated classes of cases, and that the effect thereof is to make final the judgments of those courts therein, rendering such courts, in a sense, but to that extent only, supreme courts in those classes of cases; but that does not render them Supreme Courts, even as to those cases, in the sense in which our Supreme Court is a Supreme Court by the terms of the Constitution itself, nor change the quality or character or nature of the supreme judicial power which the Constitution confers upon that court to be exercised by it *as a court,* and exclusively, in all cases whatsoever in which its appellate jurisdiction attaches by virtue of the Constitution itself or by virtue of a statute prescribing that appellate jurisdiction in conformity with the provisions of the Constitution.

Whether our Supreme Court is or is not the only possible court, tribunal, or agency to which an appeal from a Court of Civil Appeals may be provided by statute, still, and in any event, the Legislature may not validly provide for appeals from Courts of Civil Appeals to any tribunal, instrumentality, or agency which is not, in the full constitutional sense, a *court;* and it can not confer upon even such an intermediate court appellate jurisdiction concurrent with that which continuing valid statutes confer upon the Supreme Court, because, in

the very nature of things, it can not confer upon such intermediate court any *supreme judicial power* whatever.

In discussing the authority of the Legislature, under the Virginia Constitution, relative to supreme judicial power, Baldwin, J., of the Supreme Court of Appeals of that State, said, in 1849:

"The supremacy of this court is to be found, not in the extent of its jurisdiction, or the amount of its business, but in the paramount force and authority of its adjudications—a force acting directly in controlling, without being controlled by other tribunals—an authority operating indirectly, from the respect and deference due to the highest tribunal known to the Constitution and the laws. The influence of its authority extends beyond the range of its power. It is not limited by its actual, but is co-extensive with its potential jurisdiction—with its capacity to receive from the laws unlimited control over all cases decided by the subordinate tribunals. The conformity of the other courts to its principles is not a slavish submission to the lash of power, but a willing and cheerful obedience yielded from a sense of propriety and duty." Sharpe v. Robertson, 5 Grat. (46 Va.), 606.

In the same case the same subject was discussed by Allen, J., as follows:

"Nor does its supremacy result from the exercise of appellate jurisdiction. Every court in the commonwealth is an appellate court in certain cases. Nor is it a consequence of the finality of its decisions in cases of appeals; for the judgments of every other court are final within certain limits, whether the cases be brought before them by appeal or original process. Nor does its supremacy depend on the importance of the controversies submitted to its cognizance. The general court by the existing law decides finally in cases involving the life of the citizen. The principle upon which the supremacy of the court rests is not to be found in any of these circumstances. We have courts endowed with all these attributes, and yet they are confessedly subordinate tribunals. It is the consequence of the fact that the form of the court can not be changed or modified at the will of the Legislature; it must exist as a Supreme Court or not at all; and because its judgments are not only final by the law giving it jurisdiction, but there exists no power to subject them to revision; otherwise it would cease to be the highest, and if so, the court of last resort. The court can act in no case except by virtue of and in the mode prescribed by law; and the Legislature may at their discretion enlarge or limit its jurisdiction. But when it has acted upon a case confided to its jurisdiction, the judgment is binding on all. Though existing laws may make the judgments of other courts final within certain limits, or even a particular class of cases, or in all cases decided by them, the Legislature can, by a different regulation, subject all the decisions to be pronounced by such courts to review in some higher tribunal, or the Supreme Court. But it is incompetent on the part of the Legislature to subject a decision, which may be rendered by this court, to revision elsewhere. No tribunal exists, or under the Constitution, can be called into existence, which

can reverse its judgments. Being thus irreversible, its judgments stand, from the necessity of things, as authoritative expositions of the law, whenever the same question arises in other cases. For it is to be presumed that the court, from principles of public policy, and for the repose and security of private rights, will adhere to its matured opinion, and apply the same rule to all cases of like character. Where the decision of an inferior court is pronounced in a case from which no appeal is allowed, it furnishes the law of the case; but is not authority which binds the same or other tribunals, because there is no assurance that the principle announced as law will be sustained in the court of the last resort. . . .

"It is not the power of granting appeals, but that of deciding them as a court in the last instance, and of causing the decisions to be respected and obeyed by all other courts in the State, that denotes in the judicial tribunal the residence of supreme judicial power."

Supreme judicial power embraces these four elements:

1. That of determining whether the case belongs to a class which is within the appellate jurisdiction of the Supreme Court.

2. That of determining whether the appeal has been duly perfected.

3. That of deciding the cause, upon its merits, finally and authoritatively, by a decision which will operate as a precedent in like cases.

4. That of ultimately compelling obedience to and due observance of said decision. Henderson v. Beaton, 52 Texas, 29; Accousi v. Furniture Co., 83 S. W., 1104; Loving v. Hazelwood, 184 S. W., 358; Chandler v. Nash, 5 Mich., 409; Townes' Ele. Law, supra.

In Risser v. Hoyt, 53 Mich., 185, it was said:

"But if the constitutional objections in regard to judicial power to act were all to which the Act was obnoxious, it is possible that in its main features it might be upheld and enforced through the circuit courts. An objection more plainly fatal is that the Act gives no sufficient means whereby it may be enforced and the rights of parties protected."

The foregoing excerpts are presented here as aids in determining what are the real powers and functions of our Supreme Court. Their condemning relevancy lies in the fact that said relief Act, in addition to dealing with the appellate *jurisdiction* of the Supreme Court, deals also with its said supreme "judicial power," as follows: (1) It confers upon (a) a majority of the *justices* of the Supreme Court, and (b) conditionally, upon *justices* of Courts of Civil Appeals, a large share of *supreme* judicial power to be exercised by them, *otherwise than as a court,* in an enormous number and a great range of cases which, according to every test *other than that prescribed by said relief Act itself,* clearly fall and lie within the appellate jurisdiction of the Supreme Court, under valid pre-existing, unrepealed, and continuing statutes, although, in no such instance is the decision or action upon the application for writ of error in any sense that of a court "in the last instance," or of *any court whatever.* (2) Conversely, to the same extent, in all cases in which the application for a writ of error is dis-

missed or refused by justices of the Supreme Court or by designated justices of Courts of Civil Appeals, comprising about three-fourths of all cases appealed from Courts of Civil Appeals, said relief Act practically prevents, in toto, the exercise by the Supreme Court of its supreme judicial power; and in all instances in which the application for a writ of error is granted otherwise than by the Supreme Court as a court, said relief Act prevents the exercise by that court of its supreme judicial power in determining whether the cause is or is not within its appellate jurisdiction.

It is true that under our present judiciary article the power of the Legislature to change the jurisdiction of the Supreme Court is plain and indisputable; but that fact does not affect the principle that, by the Constitution, the Supreme Court was established to exercise, *exclusively,* its supreme judicial functions over, in and upon all causes within its jurisdiction, as defined by either (a) the Constitution itself, or (b) the Legislature in a manner and form prescribed by that instrument, the source of the power or authority by which such jurisdiction is conferred being wholly immaterial in the premises, so long as it actually exists.

I freely concede that under such safeguards and restrictions as the Constitution itself imposes by the language in which it creates the different courts comprising our judicial system and indicates the character of their respective functions and duties, the Legislature has full power and authority to change, adjust, define, restrict, and prescribe, *by statute,* the appellate jurisdiction of the Supreme Court, and also to regulate, *by statute,* the procedure according to which an appeal to that court may be taken in certain stipulated classes of cases; but I strenuously deny the right of the Legislature to shift elsewhere, or to circumscribe or prevent the full and unabridged exercise by that court of all or any of its supreme judicial power in any cause or matter lying within its jurisdiction.

I maintain that regardless of the extent to which the Legislature may restrict or extend the appellate jurisdiction of the Supreme Court, the judicial power which it, as a court, may exercise within that field, is both *supreme* and *exclusive.* It is supreme, not alone because it is final, nor because there is no higher State court to which a particular cause may be taken, but because, in its quality and texture, in its very essence, that judicial power is of a supreme nature in a constitutional sense in that it is to be exercised (a) both finally and authoritatively, and as a binding precedent in like cases, to decide the case, and (b) to enforce the decree or action of that court therein, compelling, if need be, due observance thereof by the litigants and by all other courts and by all officers of the State; and it is exclusive because it is given by the Constitution to that court, alone, to be exercised by it as a *court,* and not otherwise.

Our Constitution unquestionably contemplates that whenever and so long as any certain class of cases is within the jurisdiction of the

Supreme Court, that court, acting as a court, and it alone, can exercise in, over, and upon such case the supreme judicial power of the State. Consequently, any law which, like said relief Act, purports to confer elsewhere authority to exercise all or any portion of its supreme judicial power in a case, falling, under the Constitution and laws, within its supreme appellate jurisdiction is void.

Upon principle, and under the decisions, where a Constitution confers certain jurisdiction upon a court, without authorizing the Legislature to add to or subtract therefrom, the Legislature can not alter such jurisdiction, it being presumed that the Constitution gave such court all the jurisdiction intended to be exercised by it and no more.

The Constitution of the United States declares: "The judicial power of the United States shall be vested in the Supreme Court, and in such inferior courts as Congress may from time to time ordain and establish." Art. 3, sec. 1. In distributing that power it provides that certain classes of cases shall be within the original, and all others within the appellate jurisdiction of the Supreme Court. Sec. 2.

However, Congress attempted, by an Act, to confer upon that court original jurisdiction over still another class of cases; but that court held said Act void, saying, through the chief justice:

"It has been insisted, at the bar, that as the original grant of jurisdiction, to the supreme and inferior courts, is general, and the clause, assigning original jurisdiction to the Supreme Court, contains no negative or restrictive words, the power remains to the Legislature to assign original jurisdiction to that court in other cases than those specified in the article which has been recited; provided those cases belong to the judicial power of the United States.

"If it had been intended to leave it in the discretion of the Legislature to apportion the judicial power between the supreme and inferior courts according to the will of that body, it would certainly have been useless to have proceeded further than to have defined the judicial power, and the tribunals in which it should be vested. The subsequent part of the section is mere surplusage, is entirely without meaning, if such is to be the construction. If Congress remains at liberty to give this court appellate jurisdiction, where the Constitution has declared their jurisdiction shall be original; and the original jurisdiction where the Consttution has declared it shall be appellate; the distribution of jurisdiction, made in the Constitution, is form without substance.

"Affirmative words are often, in their operation, negative of other objects than those affirmed; and in this case, a negative or exclusive sense must be given to them, or they have no operation at all.

"It can not be presumed that any clause in the Constitution is intended to be without effect; and, therefore, such a construction is inadmissible, unless the words require it." Marbury v. Madison, 1 Cranch., 137.

Restrictive effect was given to the words conferring original juris-

diction, negativing the power of Congress to enlarge that field. "As a tree falls, so shall it lie"; and as the Constitution fixed it so it was held.

"While recognizing the rule that constitutional limitations upon legislative action must be construed in favor of the power of the Legislature and be either expressly declared or clearly implied (State v. Wilson, 265 Mo., 1, 175 S. W., 603), it must also be borne in mind that, when so expressed or implied, they are to be construed as mandatory rather than directory (State ex rel. v. Hitchcock, 241 Mo., 433, 146 S. W., 40), and consequently exclusive in their terms." State v. Commission (Mo.), 192 S. W., 560. See, also, Nalle v. City of Austin, supra.

A New Jersey statute which provided that, pending controversies over municipal offices, the chief justice of the Supreme Court should designate persons to serve, temporarily, was held void by Beasley, C. J., who declined to make such designation, saying:

"My conclusion is, that the function to be discharged by me, as thus legislatively- prescribed, is to decide in what persons the legal title to these offices is vested, and, by that measure, to direct who, for the time being, shall exercise their duties. The function thus delineated is plainly a judicial one.

"Viewing the matter, then, from this standpoint, it appears to me entirely evident that I can not exercise the power thus attempted to be conferred, inasmuch as such a power is not one that can be granted by the Legislature.

"The right to adjudicate as to the constitutionality of legislation; as to the legality of an alleged acceptance of a statute by a popular vote; as to the efficacy of a particular method of submission of a law to such vote; as to the title to public office, is a power immemorially resident in the highest courts of the State, and such right is not alienable at the legislative will. This jurisdiction is fixed in these tribunals by the Constitution, and must remain so fixed until that fundamental instrument be modified. Sitting in the character of chief justice I can no more, even though acting under a legislative sanction, decide efficaciously with respect to a person's title to his office than I can similarly decide with respect to the title to his land. I know of no way in which a person who is colorably and peaceably in possession of a public office can be dispossessed or ousted from it except by the writ of quo warranto, or by some mode of proceeding that is its substantial equivalent, and that process is, and always has been, one of the prerogative writs. of the Supreme Court, and which, consequently, except as to form, is absolutely beyond legislative control. Nor can the cognizance which the Supreme Court, by means of this procedure, exercises over the title to public office, be imparted to the Legislature, either in whole or in part, to an individual or to any other tribunal.

"The consequence is, that if I were to attempt to adjudicate touching the title to these offices now in question, I should do so with the conviction that I was simply arrogating to myself a prerogative of the Supreme Court of the State of a high and indefeasible character.

"The doctrine of the inviolability of the jurisdiction of our constitutional courts has been so frequently and fully elucidated in our judicial decisions, and is so completely established, that all citation of authority on the subject seems to me to be obviously superfluous.

"My conclusion is that the power conferred is a judicial one, belonging inalienably to the Supreme Court, and, therefore, that the attempted grant of it to me is a nullity." In re Cleveland, 51 N. J. L., 311, 17 art. 772.

The reasoning in Marbury v. Madison relative to the restrictive force of provisions concerning jurisdiction applies as well to the above quoted provisions of our State Constitution conferring certain enumerated powers upon justices of the Supreme Court, as justices only, and not as a court; wherefore, it should be presumed and held that thereby said justices were given all the powers which it was intended they should exercise, as justices only, thus placing it beyond the authority of the Legislature to confer upon them additional powers to be exercised by them, jointly or severally, as justices. But see section 5 of our relief Act.

In support of the principle stated as many of the hereinabove cited cases, and many others might be added. They establish a fundamental rule of constitutional construction which demonstrates both the invalidity of so much of said relief Act as confers additional judicial powers upon justices of the Supreme Court, and the error which has been made by that court in designating, *by an order of court,* men to serve under said Act.

Said rule and principle of constitutional construction, as exemplified by Marbury v. Madison and In re Cleveland, obviously controlled the decisions of our Supreme Court in Hines v. Morse, and in Griner v. Thomas, and in Thorne v. Moore, and in Ashford v. Goodwin, and in Ex parte Towles, and in Ex parte Whitlow, all supra, and in various other above cited Texas cases.

Why should the plain meaning of our Constitution and of said decisions, and the universally accepted canons of construction, all be disregarded and ridden down by the law-making department and by the Supreme Court itself, in order to confer upon any two members of that court judicial powers which the Constitution deliberately omitted from the list of their enumerated powers, as justices, and expressly conferred upon the Supreme Court *as a court* to be effectively exercised in term time only? From all responsibility therefor, both now and in future, I desire to be absolved.

Furthermore, under the operation of said principle and rule, and in view of the fact that, in addition to conferring judicial powers upon courts, *as courts,* our Constitution confers certain powers upon justices of the Supreme Court, separately, as justices, and certain powers upon judges of the Court of Criminal Appeals, separately, as judges, and certain powers upon judges of District Courts, as judges, and certain powers upon judges of County Courts, as judges, but does not confer, and does not, in terms, authorize the Legislature to confer any power

whatsoever upon any justice of any Court of Civil Appeals, separately, as such justice, I regard as invalid those provisions of said relief Act which purport to confer powers upon justices of Courts of Civil Appeals.

Why that discrimination, if it was not made with the intention and purposes of withholding judicial power from those justices to whom none was granted by the Constitution?

The stated omission is, I think, deeply significant, and strongly suggests, if it does not conclusively show, a definite purpose that justices of Courts of Civil Appeals, as justices, shall not have or exercise any judicial power whatever, especially extraneous powers, but that they shall be and remain free to devote their entire time and energies to the great and responsible work assigned by the Constitution, or statutes, or both, to those courts, *as courts.* City of Austin v. Nalle, supra. See, also, opinion of Stayton, C. J., in Darnell v. Lyon, 85 Texas, 459; Dean v. State, 88 Texas, 290.

In Moore v. Nation, 23 L. R. A. (N. S.), 1115, 103 Pac., 107, according to the syllabus of the case prepared by Burch, J., the author of the opinion, the Supreme Court of Kansas held:

"The duties of a public office include all those which fairly lie within its scope, those which are essential to the accomplishment of the main purposes for which the office was created, and those which, although incidental and collateral, are germane to or serve to promote or benefit the accomplishment of the principal purposes. All such duties are official, and the incumbent is obliged to perform them. Duties not so related to an office are unofficial, can not rightfully be attached to it, and the incumbent is not obliged to perform them." See 75 Texas, 385, 89 Texas, 281, 103 Texas, 491.

In so far as the jurisdiction, functions, rights, powers, duties, and authority of such "designated justices," as set out in said relief Act, are concerned, they are in nowise related to Courts of Civil Appeals any more than to District Courts, or County Courts; and that controlling fact stands out in bold relief.

In no sense has any Court of Civil Appeals jurisdiction over any such application for a writ of error. Moreover, the relief Act declares that none of such designated justices "shall participate in acting upon applications in a cause decided during his incumbency by the court of which he is a member." Sec. 4.

At least as to justices of Courts of Civil Appeals the declaration of the Act that the powers thereby conferred are "incidental to the offices held by them, respectively," states a purpose rather than a fact. Even the Legislature can not change the stubborn fact that the new and added powers and duties thus thrust upon those men are not only not "incidental," but are inconsistent with and repugnant to and derogatory of their plain and mandatory constitutional and statutory duties as members of those courts. Justices of those courts can not, at the same time, serve, in different capacities, and in different cases.

The plain and unequivocal duties of "the offices held by them" require

them to attend upon the sessions of their own courts, and to hear the oral arguments, and to act with the other members of such court in transacting its business.

The exercise of said added powers and the discharge of said super-added duties, under said relief Act, take either all or a majority of such "designated justices" away from their respective supreme judicial districts, and all of them from their respective Courts of Civil Appeals for indefinite and extended periods of time, thereby denying to them the performance of duties vested in, and the exercise of privileges granted to, them by our Constitution and laws, and thereby very seriously disturbing and crippling those courts, and hindering and delaying them in the discharge of their judicial functions, and sometimes, through resulting delays, greatly disturbing and delaying the operations of the State, county and municipal governments, and constantly depriving litigants, without their consent, of various constitutional and statutory rights in relation to those courts and all three members thereof, respectively.

Said relief Act recognizes that, necessarily, it will interfere with the work of the Courts of Civil Appeals, and plainly attempts to reduce such interference to a minimum. Sec. 2.

I do not believe our Constitution leaves the Legislature free so to order, or to authorize justices of the Supreme Court so to direct. And, to my mind, it seems absurd to say that the makers of the Constitution contemplated that in addition to exercising their powers and discharging their duties, as therein determined, the chief justice or associate justices of various Courts of Civil Appeals should ever be required, for any period of time, however long or short, to do any of the work, or to entertain any of the jurisdiction, or to exercise any of the judicial powers, so imposed or conferred or bestowed by the Constitution itself, or by the Legislature, through a statute, upon some other court exclusively and alone.

It was never intended that it should be made the duty of those men (a) to determine what appeals to the Supreme Court shall be reviewed and finally passed upon by that court, and (b) actually and finally to perform, in hundreds of cases, all of the work of the Supreme Court in certain referred cases,—identically the same character or work which that court heretofore has done exclusively.

And beyond all room for doubt, it seems clear that our Constitution does not contemplate that three members of as many Courts of Civil Appeals shall be taken away from the supreme judicial districts from which they were elected or appointed, and in which the courts of which they are members are required by the Constitution to be located, and from the faithful performance of the gravely important judicial duties which have been imposed by the Constitution or by statutes upon them as members of said courts, respectively, and set to work, without or with their consent, at the State Capitol, in conjunction with other members of other courts of Civil Appeals, where as a mere "committee of judges,"

they are compelled to entertain appellate jurisdiction and to exercise judicial powers which, by said Constitution, and under other statutes fixing the appellate jurisdiction of the Supreme Court, are then vested in the Supreme Court as a court—jurisdiction and judicial powers which are being, or, under other statutes, and even under said relief Act itself, may be exercised at that very moment, by the one Supreme Court, of only three members, which was created by that Constitution.

If the relief Act is valid, why may not the next Legislature create a committee of judges of District Courts to pass, finally, upon all the odd numbered cases then or thereafter on the Supreme Court's submission docket, and to write therein opinions which shall be authoritative as precedents? And why may not such new Act provide that district judges shall be drafted to fill, temporarily, the places of such absent justices of Courts of Civil Appeals, and that county judges who happen to be lawyers shall be drafted to fill, temporarily, the places of all such absent district judges, and that justices of the peace shall be drafted to fill, temporarily, the places of such absent county judges, and that the place of each such absent justice of the peace shall be filled, temporarily, by his nearest neighbor, the new duties being declared by the Act to be "incidental to the offices held by them, respectively," except that, as to such neighbor, the new duties so thrust upon him shall be deemed and held to be "incidental" to his citizenship and the proximity of residences? The foregoing question is propounded seriously. Is it true that the whole matter is within legislative power and discretion? If it is, said judiciary article has become a mere "scrap of paper." And that, I think, is its present status.

Section 5 of article 5 of our Constitution, in dealing with Courts of Civil Appeals, and after prescribing their jurisdiction, does, indeed, declare, "Such courts shall have such other jurisdiction, original and appellate, as may be prescribed by law"; but that grant of authority relates to courts, as courts, and not to the justices of any one of those courts, when acting as justices only, and not to justices of *different* Courts of Civil Appeals when not comprising a court, and acting in matters then lying outside of the jurisdiction of any one of those courts. Schintz v. Morris, 89 Texas, 649; Bond v. Carter, 96 Texas, 359, 72 S. W., 1059. Said relief Act does not attempt to change the jurisdiction of those courts.

It is true that in Ellis v. Harrison, 56 S. W., 592, one of our Courts of Civil Appeals said, "Courts of Civil Appeals and *the judges thereof* have power to issue the writ of injunction only whenever it may be necessary to enforce the jurisdiction of such courts"; but, as to such "judges," the remark appears to be dictum.

It is true, also, that our statute which provides that "A majority of the several Courts of Civil Appeals shall constitute a quorum for the transaction of business (art. 1588), has been held valid. City of Austin v. Nalle, 85 Texas, 520, 22 S. W., 668; Gwin v. O'Daniel, 85 Texas, 563, 22 S. W., 876; Holt v. Maverick, 86 Texas, 457, 25 S. W.,

607.  See, also, Long v. State, 127 S. W., 551.  It is not my purpose to disturb or question that decision which, I think, probably was sound; but much of the reasoning upon which it rests is not applicable to the question which arises, under said relief Act of 1917, as to the power of the Legislature designedly to divert, for an indefinite period of time, a member of such court from his constitutional duties.

In the Nalle case, our Supreme Court, through Judge Gaines, quoted section 2 of said article 5, which provides that two members of that court shall constitute a quorum, and may decide a case, and section 4, which provides similarly with reference to the Court of Criminal Appeals, and pointed out the fact that there is no similar provision concerning Courts of Civil Appeals; which omission, it was said, "is, to say the least of it, remarkable," and "strongly tends to evince the intention that every case in that court should be decided by a full bench."

However, in discussing said statute, which was designed to overcome said omission, the court said:

"If this provision was not prohibited by the Constitution, it settles the question; and notwithstanding the considerations which indicate that it was the purpose of section 6, article 5, as amended, to require all the members of each Court of Civil Appeals to act together in the transaction of its business, we feel constrained to hold that it was not intended to deprive the Legislature of the power of establishing a different rule.  The amended article 5 was adopted in order to secure a prompt disposition of causes which had been, and which should be, appealed from the trial courts.  It had been found wholly impracticable to accomplish this under the original article 5 of the Constitution.  To secure this end the Courts of Civil Appeals were established.  It was evidently contemplated that as many as three might be necessary at the time of its adoption, and that even the three first established might be found inadequate.  The great number of cases now pending in the three courts already created, and the recent legislation providing for the establishment of two in addition to those now existing, indicate that it required no great powers of prophecy to foresee the probable contingency that the new courts would be burdened with more labor than they would be able to perform.  Looking, then, to the result of a rule which would require the presence of all the judges to constitute a court upon the dispatch of its business, we can not believe that such was the intention of the Legislature which passed the amendment or of the people who voted for its adoption."

With evident reluctance, even in a case in which one of the justices of the Court of Civil Appeals was _disqualified,_ and out of deference to a co-ordinate branch of the government, the statute not being plainly unconstitutional, and perhaps partly out of consideration of public policy in expediting the dispatch of business in Courts of Civil Appeals, the court held that statute valid.  That is as far as that line of cases goes, except, perhaps, an intimation in the Holt case.  Said relief Act goes much farther—away beyond the occasional disqualification of a justice

in a particular cause, or a temporary and usually unavoidable absence, and premeditatedly takes a justice, and ofttimes, mayhap, the chief justice, away from his court, for weeks or months, or, possibly for an entire term, or more, thereby greatly disturbing and retarding the work of his court. The validity of a decision by such a court, agreed upon and rendered by the remaining two members during the absence of the third member in service under said relief Act, can not, in reason, be free from doubt, although technically and impliedly set at rest, perhaps, by the action of the 'Supreme Court under said relief Act, and said opinion by our chief justice in the Blair case.

However, even assuming the soundness of the decision in the Nalle case, and the validity of all such decisions of mere quorums of Courts of Civil Appeals, there remains a very serious question as to the power of the Legislature to drag members of those courts away from their districts and courts and to deprive litigants therein of the benefit of their presence and perhaps determining judgment, all as provided in said relief Act.

Viewing our Constitution as a whole, I do not believe that power exists. It is a very dangerous power, which may determine the nature of the decisions of Courts of Civil Appeals in hundreds of cases, as well as the character of final action on appeals from such decisions, all to the practical subversion of the plan defined by our Constitution for disposition of appealed cases.

To hold that the Legislature has such power is to rivet the argument in favor of an early amendment of said judiciary article.

As we have seen, said relief Act attempts to confer elsewhere than upon the Supreme Court, *as a court,* the exercise of a large share of its supreme judicial power in cases within its appellate jurisdiction, it being therein provided, in substance, that in all cases lying within such appellate jurisdiction in which applications for writ of error shall be acted upon by two justices of the Supreme Court, *as justices,* they, instead of the Supreme Court, and in all causes in which applications for writs of error shall be referred to such designated justices, they, instead of the Supreme Court, shall exercise such supreme judicial power.

However, by way of exception, and as if realizing that the Constitution intends that some classes of cases of paramount importance shall be decided finally by that court in which alone, and *as a court,* the Constitution has vested the supreme "judicial power," although not all of the final "appellate jurisdiction," in civil cases, said relief Act forbids the reference to such designated justices of said three enumerated classes of cases (sec. 5), and denies to justices of the Supreme Court the right to act, *merely as justices,* thereon, reserving the "applications" in all such cases, and the cases themselves, to be acted upon, in all respects, and finally decided, by the Supreme Court, as a court, in the exercise of its supreme judicial power.

The first stated exception is of cases wherein a Court of Civil Appeals "shall have declared void a statute of the State." In such cases it would

be a manifest absurdity, as well as utterly contrary to all accepted tenets and theories of checks and balances in government, to require or to authorize ultimate decisions thereof by any court or tribunal or agency created and existing solely by virtue of legislative fiat, and subject in all respects to legislative control. "The constitutional courts are designed to secure the citizen in his rights, and to enforce the observance of constitutional limitations." Henderson v. Beaton, 59 Texas, 33; People v. Noble, supra; People v. Alverston, 55 N. Y., 57. The importance of leaving the other two excepted classes of cases, also, for final decision by the Supreme Court alone, is likewise readily discernible, although not so imperative.

Co-ordinate and contemporary work, such as is contemplated or permitted by said relief Act, most probably will lead to confusion and conflicts. "Designated justices" and our Supreme Court, or any two justices thereof, may, on the same day, act upon like applications presenting the same questions of law in companion cases, or even in the same case, growing out of the same or similar facts, with the results that the designated justices may deny one application, and motion for rehearing thereon, thereby finally denying the cause admission to the Supreme Court for decision on its merits, and forever disposing of it in accordance with the decision of the Court of Civil Appeals therein—whereas the Supreme Court, or any two justices thereof, as justices only, may grant a like application, and, upon final hearing the Supreme Court may reverse the similar decision of the same or another Court of Civil Appeals, and remand the cause, or, possibly, render a contrary decision. Consequently, the almost inevitable operation of the Act will be to give to some litigants, and to deny to others, in precisely the same classes of cases, even when presented by similar "applications," a hearing thereon by the Supreme Court, *as a court*—a probability which is absolutely abhorrent to quoted provisions of our own State Constitution, and equally obnoxious to that provision of the Constitution of the United States which guarantees to all, alike, "equal protection of the laws."

Not so patent to casual observation or superficial thought as the three excepted classes of cases, but not less certainly, it is likewise contrary to the spirit and letter of our Constitution, and to the whole theory upon which our judicial system was therein marked out and defined, and to the entire idea of a definite distribution of judicial power among various courts, and to the very conception of supreme judicial power lodged in one Supreme Court of last resort, as the capstone of the judicial column, for *any portion whatever* of that supreme judicial power to be exercised at any time, or in any degree, or to any extent, by any other court, or tribunal, or by any combination of judges acting in their capacities as judges and not as a court, or by any aggregation of individuals, in any case which, at the time of such exercise thereof, and according to the express terms of our Constitution or by virtue of

the express provisions of then valid existing statutes, lies within the appellate jurisdiction of the Supreme Court. In construing the Constitution of Virginia it was said:

"Language more appropriate to convey the idea that there shall be but one such court as that mentioned could not be used. The attribute of singleness, as an essential and characteristic quality of a Supreme Court, necessarily presents itself to the mind, in the plain and obvious definition of the terms employed." Daniel, J., in Sharpe v. Robertson, 5 Grat. (46 Va.), 577.

Judicial power has a common stock, rooted in the Constitution, with various branches, represented by the various courts; but the supreme judicial power, which that instrument conferred, in civil cases, upon only one Supreme Court of but three members, has, and can have, no branches. The very conception of the existence or exercise of co-ordinate and concurrent supreme judicial power is anomalous and irrational. No written Constitution ever made among men has provided for such dual tribunal of last resort in the same class of cases, because such an arrangement obviously must and will result in confusion in expounding and applying and enforcing the written law.

Aside from all considerations of advisability, propriety, and public policy, and from a constitutional standpoint, a sufficient though not the only reason why the Legislature may not, by statute, provide for reference to designated justices of Courts of Civil Appeals of petitions for writs of error in cases wherein a State statute has been held void, and for action thereon by them, is that the decision of such cases, and even action upon the applications for writs of error therein, necessarily involves a direct exercise of some portion of that supreme judicial power which the Constitution vests in the Supreme Court alone. And, since action upon any application for a writ of error in any appealed case, whether it be or be not within one of said three enumerated exceptions, involves an exercise of *supreme judicial power*, there is, in the premises, so far as the Constitution is concerned, no valid ground for distinction between said excepted classes and other classes of cases; wherefore, as to all appeals from Courts of Civil Appeals, there exists, uniformly, the same want of legislative authority to control or to shift the exercise of Constitution-vested supreme judicial power. In other words, if the Legislature is powerless to refer to any two of the justices of the Supreme Court, as justices only, or to designated justices of Courts of Civil Appeals, for their decision or action thereon, appeals in cases in which a statute has been "declared void," the Legislature is likewise powerless to refer to them, for their decision or action thereon, any appeal in any case whatever; the deterring common constitutional factor in all instances being the fact that such decision or action involves the exercise of some portion of that judicial power which rests exclusively in the Supreme Court.

Conversely, if the Legislature has authority practically to prevent the exercise by the Supreme Court of a given portion of its supreme judicial

power in any particular case lying, under a valid statute, within its appellate jurisdiction, it follows, inexorably, that the Legislature likewise has full authority to prevent the exercise by that court of all, and of every portion, of its judicial power in every case within its appellate jurisdiction, thereby effectually ·denying to that court the exercise of any appellate judicial power in any case. The practical effect would be to shear the Supreme Court of all judicial power except such as it may exert in matters lying within the very limited original jurisdiction which is conferred upon it by the Constitution. Indeed, upon the only theory on which the validity of that portion of said relief Act can be even argued, which is that the "judicial power," as well as the "appellate jurisdiction," of the Supreme Court, is the subject of legis-·lative action and bestowal, even the original jurisdiction of that court is indirectly subject to invasion and control by the Legislature, and is exercised by that court *at sufferance only.* And, since the same reasoning applies with respect to all the jurisdiction and all the judicial power of all the courts, the net result of upholding the validity of said relief Act is to degrade the judiciary from its useful and honorable position as a co-ordinate department of government and to make all the courts of Texas the playthings of the law-making department.

To the contention that the Legislature has such power and authority the sufficient reply is that the Constitution makers saw fit to leave to legislative discretion the definition and limitation of the "appellate jurisdiction" of the Supreme Court, but took care to place entirely beyond legislative discretion or control the exercise by that court of its supreme "judicial power" in, over, and upon any and all cases lying within that jurisdiction. Too much emphasis can not be laid upon the fact that the investiture of judicial power, in the courts, is made by the people, directly, through the Constitution, and not indirectly, or by or through the Legislature.

It is one thing for the Legislature to enlarge or restrict the "appellate jurisdiction" of the Supreme Court; it is quite another thing for the Legislature to undertake to limit the exercise by that court of its constitutional "judicial power" over, or in, causes within that jurisdiction.

The former is constitutional and valid; the latter is unconstitutional and revolutionary. The distinction between those two things is one which said relief Act utterly ignores; and that vice, if it had none other, is enough to taint and to destroy it, under a Constitution such as ours.

The Legislature and the Supreme Court are co-existent and co-ordinate; neither created the other, nor bestowed its powers; both were created by the people, through their Constitution. Thereby, also, each is invested, by the people, with certain powers and charged with certain duties which relate to the other; but neither can stop or stay or abridge, to any extent or in the slightest degree, the exercise by the other of any of its aforesaid powers or duties. For illustration: in a proper case

it is within the power and duty of the Supreme Court to hold that in the enactment of a particular statute the Legislature violated some provision of the Constitution; but that court can not impose upon the exercise of legislative power any other restriction whatever. For further illustration: the Legislature, by a proper statute, and in pursuance of the express provisions of said section 3 of article 5 of the Constitution, may prescribe the appellate jurisdiction of the Supreme Court; but, having done so, it can not, directly or indirectly, divert, limit, restrict, or abridge the exercise therein, by that court, of each and every element of the supreme judicial power which the Constitution has conferred upon the court, *as a court*.

By the Act of 1913, page 107, which still is in force, or, at least, has not been expressly repealed, the Legislature prescribed and defined the appellate jurisdiction of the Supreme Court; and to do that it had an undoubted right and full power and authority, said section 3 of article 5 of the Constitution expressly so declaring. Thereafter and thereunder, as cases falling within the appellate jurisdiction of the Supreme Court arose and were properly appealed upon applications for writs of error, the constitutional powers and functions of the Supreme Court, as a court, seized hold of the subject matter, and, under it, the judicial power of that court attached and necessarily became exclusive; wherefore, at least during the life and operation of said statute defining said appellate jurisdiction, the Legislature has been and is and will be utterly impotent to interpose any other agency or the judgment of any other tribunal or person whatever between the Supreme Court and the full and untrammeled exercise by it of that appellate jurisdiction over that case, and the unlimited and unrestricted exercise therein by that court of every atom and every vestige of its applicable constitutional judicial power. But that, as we have seen, said relief Act attempts to do (with the stated exceptions) both as to the more than three hundred cases then pending on the Supreme Court's application docket and as to the applications thereafter filed.

"Hence arises a most important distinction between *constitutional* and *legislative* courts. The judges of the former hold an office co-existent with the government itself, and which they can only forfeit by a breach of good behavior. The judges of the latter, although their commissions should import upon the face of them, to be during good behavior, may be at any time discontinued from their office, by abolishing the courts. In other words, constitutional judges may be an independent branch of the government, legislative judges must ever be dependent on that body at whose will their offices exist.

"If the principles of our government have established the judiciary as a barrier against the possible usurpation or abuse of power in the other departments, how easily may that principle be evaded by converting our courts into legislative, instead of constitutional tribunals?" Kamper v. Hawkins, supra. See, also, People v. Noble, supra, and c. c.

The quoted remarks lend force to my conclusion that our State Con-

stitution does not contemplate that any portion of the supreme judicial power which that instrument confers upon the Supreme Court shall ever be exercised, in whole or in part, by justices of that court, *as justices,* or by any inferior constitutional court, or, much less, that it shall be exercised by a purely·legislative court, or, still less, that it shall be exercised by an aggregation of justices from various other courts, not comprising any court, but acting simply as an aggregation of individuals, as provided by said relief Act.

If the Legislature had never exercised its constitutional power and authority of changing the appellate jurisdiction of the Supreme Court, and if the latter stood now as originally fixed by said section 3 of article ·5, thus embracing only the three classes of cases there enumerated, towit: cases "in which the judges of any Court of Civil Appeals may disagree, or where the several Courts of Civil Appeals may hold differently on the same question of law, or where a statute of the State is held void," it would be perfectly plain that the Legislature would have no authority to confer upon any other court or tribunal, officers or individuals, either (a) the legislative power to determine in a particular case of that character whether that case shall or shall not go before the Supreme Court for revision, or (b) the judicial power of passing upon the merits of those cases, thereby at once delegating the law-making function of the Legislature, and practically preventing the Supreme Court, as a court, from exercising therein all the elements of its supreme judicial power. In that status, as to the relative power and duties of the Legislature and of the Supreme Court with regard to the exercise of the supreme judicial power, no change whatever has been wrought by the adoption of a statute changing the confines and boundaries of that appellate jurisdiction by including therein additional classes of cases.

Suppose that by the express provisions of the Constitution, or by legislative action in strict pursuance thereof, the appellate jurisdiction of the Supreme Court were restricted solely to cases wherein a Court of Civil Appeals had held a State statute violative of the Constitution of this State or of the Constitution of the United States, and, therefore, void; under that status it clearly would be beyond the power·or authority of the Legislature to transfer, directly and expressly, by statute, a specific case of that character from the docket of the Supreme Court to the docket of any other constitutional or statutory court, and an Act purporting to do so would be void.

Just as certain, and even more obvious, would be the unconstitutionality of a statute transferring specific cases of that character from the docket of the Supreme Court to the docket of a mere aggregation of justices of other courts for their consideration and action, and, permissibly, for their final disposition. The whole matter would be greatly aggravated if, instead of doing those things directly, the Legislature should attempt to delegate to the Supreme Court or any two justices thereof optional power and authority to do so. And if the

discharge of such new duties seriously interfered with the performance by such justices of such other courts, of their constitutional and statutory duties in connection with the causes pending in their respective courts, the matter would be still further aggravated. That is the present status, under said relief Act.

It is true that said Act does not in express terms so directly transfer elsewhere specific cases from the docket of the Supreme Court—cases which under other and valid statutes are within its appellate jurisdiction, and, therefore, by the terms of the Constitution, finally determinable by only the exercise of its supreme and exclusive judicial power—but said Act does accomplish much of that, in practical results, and was designed to do so, and is, therefore, in my estimation, utterly repugnant to the Constitution.

The obvious purpose of the Constitution is that all cases which, by its provisions or by a valid statute fall and lie within the appellate jurisdiction of the Supreme Court shall be operated upon by, and shall be determined in, and shall share in all benefits of, the normal and heretofore customary exercise of every applicable element and ingredient of the supreme judicial power which is vested by the organic law in the Supreme Court alone. For that purpose that court was established, and for that purpose its jurisdiction was prescribed by the Constitution or under its authority; and to deny to that court the full exercise of its supreme judicial power in any cause within its appellate jurisdiction, as so duly prescribed, is to defeat the great constitutional design and to deprive litigants of valuable rights conferred by existing laws, and to deny to the people as well as the litigants the benefits of precedent arising from an authoritative decision of that cause by the only court in whose decisions, in cases of that class and character, inhere each and all of the above mentioned qualities of supreme judicial power.

When the Supreme Court has appellate jurisdiction in or over a particular case, that jurisdiction extends to the whole case and to all the issues therein, as presented by the application for writ of error, and is both *final* and *supreme,* and, necessarily, absolutely *exclusive.*

Even the appellate jurisdiction of the Courts of Civil Appeals, which is *final* in some cases, though not in others, is, in all cases, "exclusive for the time, in the absence of some other provision giving to some other court concurrent or co-ordinate jurisdiction"; but in no instance is that jurisdiction really *supreme.* The quotation is from Chief Justice Stayton's opinion in Darnell v. Lyon, 85 Texas, 460, wherein he said, also:

"A court is said to have jurisdiction concurrent or co-ordinate with that possessed by another when each has power, under the same facts and conditions, to determine and enforce the right of a litigant; and the general rule, when such jurisdiction is possessed by two or more courts, is, for the one first acquiring jurisdiction of a particular cause to retain it; but there is no instance, under the Constitution of this State,

in which two courts can exercise concurrent or co-ordinate appellate jurisdiction.

"On the contrary, that is carefully graded from the lowest court exercising appellate jurisdiction to the highest."

By the same reasoning, and in the very nature of the thing, supreme appellate jurisdiction can not concurrently exist in the Supreme Court, where the Constitution places it, and elsewhere, in any other court, or tribunal, or in any aggregation of justices of the Supreme Court or of justices of Courts of Civil Appeals.   Continuing, that distinguished jurist said:

"Jurisdiction of a given cause means the power to hear and determine the rights of parties, as the judges of the court, under their official oaths, may think it ought to be; and to refer it to another court for a decision, and simply to register its decree as the rule of right between the parties, is in no sense the exercise of jurisdiction.   .   .   .

"Concurrence of jurisdiction must be given by law, the only source of jurisdiction, or it does not exist; it can not be made to depend on the volition of another tribunal having jurisdiction, nor upon the refusal of that court to act, or its order suspending action for a time, though under some circumstances a court refusing or suspending action in a cause of which it has jurisdiction may be compelled by some superior tribunal to adjudicate the right of litigants."

Nor can it be said, reasonably, that by *referring* cases to such "designated justices" the Supreme Court, which is not authorized by law to modify, or to adopt, or to reject, or even to register their decrees or actions, adequately or properly exercises its own appellate jurisdiction or its own exclusive and supreme judicial power, in or over that particular cause.

The option given to the Supreme Court, or to any two justices thereof, to pass upon any application for a writ of error (sec. 5), even though the case be not one of those in which by the terms of the Act, the Supreme Court, *as a court,* is required to pass upon it, must, it seems, be exercised in advance of such *reference* to the "designated justices," and not afterward.   There is no provision for retransferring any application back to the Supreme Court.

But, whatever may be the effect of the Act, upon that point, the entire scheme of making the exercise of its appellate jurisdiction to any extent optional with the Supreme Court, *as a court,* or with a majority of its members, not acting as a court, is foreign to the whole trend and purpose of our Constitution.   Exercise of such option prevents the other member of that court, when he does not join in so *referring* the application, from exercising his constitutional functions in the case, unless the designated justices happen to "grant" the "application," and, even in such instances, those functions are materially abridged and curtailed, in that such other member of the Supreme Court has had no voice in determining whether the "application" is or is not in statutory form, and whether the case is or is not one which

the Constitution and laws have placed within the appellate court of which he is a constituent member. And, thereby, the litigants in that case are deprived of their corresponding constitutional rights.

Said relief Act derives no legal efficacy or virtue from the fact that a majority of the Supreme Court are willing to put it into operation. The courts can no more divest themselves of their constitutional functions, power, and duties than can the Legislature.

"The judicial being a co-ordinate and independent department of the State government can not consent that either one of the other departments shall interfere with it in the exercise of its exclusive rights to determine the law of existing cases." Allison v. Railway Co., 9 Bush (Ky.), 247; 8 Cyc., 808.

"Judicial power can not be delegated." Cohen v. Hoff, 3 Brev., 500; Gough v. Dorsey, 27 Wis., 119; Milwaukee Industrial School v. Supervisors, 40 Wis., 328; Allor v. Auditors, 43 Mich., 76; Ward v. Farwell, 97 Ill., 593.

"Those who are chosen by the people to sit as judges must themselves discharge all the judicial duties of their offices. The trust is imposed upon them, and they can not share their judicial duties with any person. The people have a right to the judgment of those whom they have made judges, and this right the judges can not surrender, if they would, without a flagrant breach of a sworn duty. The trust is a personal one, inalienably invested in the persons selected by the people, and it can not be delegated by the judges themselves, nor by anyone else for them." People v. Noble (Ind.), supra.

"These political agencies, commonly called branches of government, are the representatives of the people in their sovereign capacity; and the powers thus conferred upon them, so far as they are essential to the attainment of the objects and purposes of the government, are held by them in trust for the people, and it is not in their power to delegate them to others." Ward v. Farwell, 97 Ill., 607.

"But a party in any case has a right to demand that the judgment of the court be given upon his suit, and he can not be bound by a delegated exercise of judicial power, whether the delegation be by the courts or by legislative act devolving judicial duties on ministerial officers. Proceedings in any such case would be void. (Hall v. Marks, 34 Ill., 358; Chandler v. Nash, 5 Mich., 409.) It is not competent to provide by statute that the judge may call a member of the bar to sit in his place in a special case. 'The Legislature has no power to authorize a district judge to place his judicial robe upon the shoulders of any man.' Winchester v. Ayers, 4 Greene (Iowa), 104. See Wright v. Boone, 2 Greene (Iowa), 458; Michales v. Hine, 3 Greene (Iowa), 470; Smith v. Frisbie, 7 Iowa, 486. To allow it would be to provide a mode for choosing judges different from that prescribed by the Constitution. State v. Phillips, 27 La. Ann., 663; State v. Fritz, 27 La. Ann., 689. Even the consent of parties would not give the judge this authority.

Hoagland v. Creed, 81 Ill., 506; Andrews v. Beck, 23 Texas, 455."
Cooley's Const. Lim., 5th ed., pp. 505-506; and note 1.

"The Constitution can not be evaded by a change in the name of an officer, nor can an office be divided and the duties assigned to two or more under different names." 55 N. Y., 57. See, also, Warner v. People, 2 Denio, 272; People v. Draper, 15 N. Y., 552; People v. Keeler, 29 Hun., 175; State v. Brunst, 26 Wis., 412; King v. Hunter, 65 N. C., 603, 6 Am. Rep., 754.

"The people have a right to the courts established by and under the Constitution, and this constitutional right the Legislature can neither alter nor abridge. . . . Judicial power distributed by the Constitution is beyond legislative control." People v. Noble, supra. As to that right, see Bullock v. McGerr (Colo.), 23 Pac., 980.

Inasmuch, therefore, as all the judicial power of the Supreme Court is *supreme* judicial power, and was vested in that court by the express provisions of the Constitution itself, to be exercised, with but few and stated exceptions, fully and completely, as necessity may require, *as a court,* it is, manifestly, utterly beyond the power and authority of the Legislature, even for a limited period of time, to abridge or to shift or to transfer or to have *referred* elsewhere, the full, or even the partial, exercise of that supreme judicial power in any cause then within that supreme appellate jurisdiction. It is a contradiction in terms and absurdly paradoxical to say that causes within the appellate jurisdiction of the Supreme Court can be acted upon in any way, and even decided finally, otherwise than through the exercise of the supreme judicial power, or that power of that character validly can be exercised otherwise than by the court itself, acting as a court. Because said relief Act undertakes to do that, as to (a) any two justices of the Supreme Court, and (b) designated justices of Courts of Civil Appeals, it is void.

Thus far, for convenience, I have assumed, in a measure, the soundness of certain propositions, but, in each instance, the assumption is well supported by both reason and authority, as below shown:

(1)   Said relief Act attempts to confer upon the Supreme Court, and upon the chief justice or any two justices thereof, and upon the designated justices of Courts of Civil Appeals, both legislative and judicial powers.

Underlying this whole subject, including both the validity and the construction of said relief Act, is a candid inquiry as to the nature and character of those powers, respectively.

Are they judicial? Are they legislative? Or, are they in some respects legislative and in other respects judicial?

If true answers to these questions once be found, little trouble will be experienced in determining whether the attempted distribution of those powers does or does not conform to the requirements of our organic law.

To whatever extent said powers, or any of them, may be found to be "legislative," to just that extent, inasmuch as they are not within

any stated exception concerning the exercise of legislative powers, they
fall within the general rule prescribed by our State Constitution,. and,
therefore, can be exercised by the Legislature only, and, as a conse-
quence, can not validly be delegated to or conferred upon all or any
of said instrumentalities or agencies. Likewise, to whatever extent said
powers, or any of them, may be found to be "judicial," to precisely
that extent, inasmuch as they are not within any stated exception con-
cerning the exercise of judicial powers, they fall within the general rule
prescribed by said Constitution, and, therefore, can be vested in and
exercised by some court only, *as a court,* and can not, validly, be con-
ferred by the Legislature upon justices of any court, to be exercised
by them in the capacities of justices, or to be exercised by them as a
mere group of designated individuals.

"The most general and important distinction between these powers
is that the first acts upon rights and liabilities already existing, and
the second creates rights to be enjoyed or liabilities to be enforced in
the future. The courts decide what the law is, the Legislature what
it shall be." Mod. Am. Law, vol. 1, p. 195, citing cases; Allison v.
Railway Co., 9 Bush. (Ky.), 247.

Under our Constitution the power of determining what classes of
cases may and what may not be carried before our Supreme Court, upon
appeal for actual review upon the merits of such appeal, is, in my
opinion, a purely legislative one. That conclusion is forced by the
quoted provisions of section 3, article 5, defining, and providing for
changing, in certain respects, and *in a certain manner,* the appellate
jurisdiction of that court.

The inflexible provisions, not subject to legislative change, are, that
such appellate jurisdiction shall be limited (a) to questions of law;
(b) arising in cases within the appellate jurisdiction of Courts of Civil
Appeals. The flexible provisions are (c) that such jurisdiction shall
be exercised "under such restrictions and regulations as the Legislature
may prescribe," and (d) that it shall include three enumerated classes
of cases, "until otherwise provided by law." The law-making depart-
ment, and it only, validly may make such a law. The quoted clause
concerning restrictions and regulations refers, not to Courts of Civil
Appeals, whose jurisdiction was being defined elsewhere (sec. 6), but
to the Supreme Court; and "restrictions" is there used in the sense of
"limitations." Maddox v. Covington, 87 Texas, 454, 29 S. W., 465;
Schleicher v. Runge, 90 Texas, 456, 39 S. W., 279.

The clause "until otherwise provided by law" was not intended merely
to fix a time limit upon the operation of the provisions of the Consti-
tution which prescribe, conditionally, said appellate jurisdiction. There,
as the context and the underlying reasons, alike, show, "until" means
*except and as;* and, if all statutes defining that appellate jurisdiction
were repealed, the *status quo ante* would be restored, instantly, and,
consequently, section 3 of article 5, *ex propria vigore,* still effectually
would prescribe that appellate jurisdiction, subject, however, to future

legislation specifically changing and defining that jurisdiction, but not extending it beyond questions of law in cases from Courts of Civil Appeals. Evidently the Constitution undertook very carefully to fix the confines of legislative authority in the premises. Its language concerning jurisdiction of the courts, like that relating to the investiture of "judicial power," is sharply and absolutely restrictive, except when, and only as, exceptional provision otherwise is therein expressly made. Opinion of the Judges, 4 N. H., 567-568, and various Texas cases, and other cases, supra.

Its manifest purposes, then, were (a) to restrict, to the Legislature, authority to change the appellate jurisdiction of the Supreme Court, and (b) carefully to limit both the extent and manner of the exercise of that right.

The cited cases illustrate the difference between "regulations" and "restrictions." It will be observed that authority to prescribe "restrictions," or limitations, upon the appellate jurisdiction of the Supreme Court, like that to prescribe "regulations" thereof, is confined strictly to the Legislature; it could not have been contemplated that the Supreme Court, or justices of any court, or courts, or an aggregation of individuals, should ever exercise the legislative power of determining, finally, whether a certain case, or even a certain class of cases, shall be reviewed by the Supreme Court. My theory is that said relief Act was enacted by the Legislature under the mistaken belief that thereby it was merely prescribing, and authorizing, enforcement of "regulations" relating to such appellate jurisdiction, but that, in so attempting it, unconsciously, employed language purporting to delegate to others, as stated, the unquestionable legislative power of prescribing "restrictions," or limitations, upon that jurisdiction.

A specific restraint which the organic law places upon the authority of even the Legislature to change said appellate jurisdiction is that it shall be done "by law." Those words have a well established legal signification, and imply a valid statute having a general, definite, fixed, constant, and invariable legal effect upon the subject matter. That phrase contemplates only a statute embodying terms from which all competent courts and lawyers may know, and know alike (unless it be in an exceptional case wherein the jurisdictional question lies along the border) and in advance of action upon the application for a writ of error, whether a particular case is or is not within the appellate jurisdiction of the State court of last resort in civil matters. Opinion of Judges, 4 N. H., 565. Said relief Act is not such a statute.

The history and present status of the matter of fixing and determining the appellate jurisdiction of our Supreme Court may be outlined thus:

By said judiciary amendment the Legislature was invested with and now has full power and authority (a) to "limit"—to change definitely, by statute, at its own discretion and in the exercise of its own legislative judgment,—the appellate jurisdiction of the Supreme Court, as

defined by section 3, article 5, by adding to or subtracting from said three enumerated classes of cases, and, with full power and authority; also (b) to "regulate," by statute, the manner of appeal to the Supreme Court, and the mode of the exercise by that court, alone, of its entire appellate jurisdiction, whether existing because of the original definition thereof in the Constitution, or by reason of a statutory grant.

Various changes in that jurisdiction have been made. Acts 1892. 10 Gam. L., pp. 383, 398; Rev. Stats. 1895, arts. 940, 941, 996; Rev. Stats. 1911, arts. 1521, 1522, 1589, 1590, 1591; Acts 1913, p. 107; Acts 1917, p. 142, said relief Act; and Acts 1917, p. 140, H. B. No. 38.

From the adoption of said judiciary amendment down to the enactment of said relief Act, the authority of the Legislature to prescribe "restrictions," or limitations, upon, or in any manner to change or determine or fix the appellate jurisdiction of the Supreme Court, has been exercised as the Constitution contemplates, by a written statute which expressly and specifically designated and defined the classes of cases to come within that jurisdiction, which statutes were operative, alike, and at all times and under all circumstances, upon all cases of the same class and character, when duly presented upon proper applications for writs of error.

And even in said H. B. No. 38 the Legislature seems to have adhered to the same rule, unless an exception should be made as to subdivision 6 of Revised Statutes, article 1521, as thereby amended.

In other words, each of those former statutes employed phraseology from which the Supreme Court, and the capable lawyer, and the intelligent layman, were able, alike, to understand and determine, from its classification as made in such statute, whether a given case was or was not within the appellate jurisdiction of the Supreme Court, and, if so, whether it would be considered, upon its merits, by that court, when duly presented there by an "application" in proper form. And, under former laws, except for such definite "regulations" concerning applications for writs of error as have been likewise specifically prescribed by statute, or rules of court made pursuant to the Constitution, the Supreme Court, in the discharge of its high constitutional functions, has been left free itself to determine, *as a court* (and not by action of two of its members acting by statutory direction and otherwise than as a court), (a) whether, according to such statutory classification, a particular case is or is not within that appellate jurisdiction, and, if it is, then (b) for itself to determine, *as a court,* whether, upon the showing made by such application therein in connection with the record, and without further consideration of the case, the writ of error should be refused, because of lack of merit in appeal, or whether the writ of error should be granted and the cause placed upon that court's submission docket for oral argument and decision with a written opinion—the uniform and unvarying practice heretofore having been for the Supreme Court, *as a court, to pass, thus, in one or the other way, upon the merits*

of every properly presented question in every such appealed case so coming within its appellate jurisdiction.

But, under the relief Act, the judgment of others is substituted for that of the Legislature, and that judgment is not ascertainable from any statute or rule, or otherwise than by a process of exclusion or inclusion in particular cases. The relief Act, in all but a few excepted cases, practically throws the litigant who would lay his course for the Supreme Court, far out on a boundless sea without chart or compass, to buffet, as best he may, the winds which may beat upon him, inconstant and conflicting though they may and probably will be, and varying, from time to time, with the variation between the legal views and opinions of members of the Supreme Court, on one hand, and those of frequently shifting "designated justices of Courts of Civil Appeals" on the other hand. It is no answer to the foregoing to say that under said Act the Supreme Court, as a court, still may pass upon any application for writ of error, whether the case is or is not in one of said three enumerated classes; because (a) said Act plainly contemplates that in all except said enumerated classes of cases, and in order to conserve the time of the constitutional Supreme Court, the "application" shall be "referred" to such "designated justices," and (b) that evident intention of the law-making department is being carried out in practice. Under said relief Act the Supreme Court will pass upon applications in but a small percentage of appealed cases.

Heretofore the appellate jurisdiction of the Supreme Court has been ascertainable from the Constitution itself, or from that instrument and the statutes, when construed together; but under said relief Act that jurisdiction is not ascertainable in that manner, and can be discovered in particular cases only, and not even then except from an inspection of the results of the action of one or another of said legislative instrumentalities or agencies (a), (b) or (c), upon the application for writ of error, if any, in that particular case, assuming, indeed, that a regular or authentic record of such action can be found.

According to the terms of said Act no appealed case is to be admitted to the Supreme Court "to be proceeded with by that court as heretofore provided by law" until an application for writ of error therein shall have been granted by one or another of said agencies; wherefore, the issue as to whether the Supreme Court is or is not really to have and exercise jurisdiction of any particular case is held in abeyance pending such action upon the application. In other words, whether the appeal in that particular case does or does not actually go to the Supreme Court, for its final decision thereon, depends, in the last analysis, and finally, upon whether such writ be granted or refused.

For the first time in the history of this State it is now utterly impossible for any man to say, from a study of our Constitution and laws, and the record in any case from any Court of Civil Appeals not falling within one of said three enumerated classes of cases, and the application therein for a writ of error, whether that case is or is not really

within the appellate jurisdiction of our Supreme Court—or, what practically amounts to the same thing, whether it will be considered, upon its merits, and acted upon, by that court, as a court, or even by two justices thereof, acting otherwise than as a court, or whether the case will be finally passed upon and disposed of by such designated justices of Courts of Civil Appeals.

If the writ of error be ultimately refused, that action finally disposes of the appeal, and ends all possible effort to get the case "before the Supreme Court for revision." The practical effect of the relief Act unquestionably is to transfer from the Legislature elsewhere the power and authority of determining whether a particular case shall or shall not be "reviewed," on its merits, by the Supreme Court, and that amounts to a delegation of legislative power.

Really, even in the three classes of cases enumerated in section 5 of said Act, the appellate jurisdiction of the Supreme Court is not certainly fixed by statute, but rests, avowedly, upon the estimate which the court, at the time, may place upon the contentions set out in the application, said new condition precedent being applicable in those cases also whereas our Constitution requires that such appellate jurisdiction shall be determinable according to the fixed terms of some statute, irrespective of whether the Supreme Court does or does not concur with the Court of Civil Appeals as to the law of that case. It is not the purpose of our Constitution that the *right* of seasonable and orderly appeal to the Supreme Court shall be made to depend upon the *merits* or *lack of merits* of such appeal.

It is, of course, an unheard of anomaly, under our Constitution, for our Supreme Court to be required by statute to pass upon the merits of a case in passing upon an application for a writ of error with a view to determining therefrom whether that court, acting as a court, will or will not admit that case to that court, "to be proceeded with by that court as heretofore provided by law"; nevertheless, all that conglomeration of ideas and of procedure would not condemn the Act if those provisions thereof were not plainly repugnant to unambiguous provisions of our State Constitution. And it is even more anomalous that the issue as to whether a particular case shall or shall not be admitted to the Supreme Court for revision shall depend, in one instance, upon the action of two justices of that court, upon an application for a writ of error, and, in another instance, upon the action of designated justices of Courts of Civil Appeals upon an application.

And confusion worse confounded, in determining the appellate jurisdiction of the Supreme Court, necessarily, will be produced by a statute which not only shifts from the Legislature, where the Constitution placed it, the power of defining and prescribing that appellate jurisdiction, but which places the exercise of that power in said three agencies, giving part of it, mandatorily, and all of it permissively, to the Supreme Court, as a court, and giving a large part of the same power, contemporaneously and co-ordinately, to two justices of the

Supreme Court and, contingently, to three designated justices of Courts of Civil Appeals. The plain language of section 3 of article 5 was designed to prevent all such uncertainties and confusion, and, if properly applied, will do so in future, as in the past.

The hopeless confusion as to jurisdiction which, unhappily, said relief Act has introduced into our judicial system, relates, not alone to *what* cases are and what will not be within the appellate jurisdiction of our Supreme Court, but, also, to *how,* and *when,* a particular case may or will be brought within that jurisdiction. Upon the latter point, as to *how* and *when* such jurisdiction attaches, arises, I apprehend, one of the main differences in opinion as to the constitutionality of said Act, as related to the issue of delegation of legislative power to define said appellate jurisdiction. Upon the one hand, if the jurisdiction of the Supreme Court over an appeal to it does not attach until a writ of error is *granted*—(the action which, the relief Act declares, "shall admit the cause into the Supreme Court," section 4), then, inasmuch as the grant of such writ is not by the Legislature, nor even according to any fixed rule prescribed "by law," it is obvious that those who grant the writ, and not the Legislature, actually determine, in practical effect, the appellate jurisdiction of the Supreme Court, in disregard of the provisions of the Constitution which authorize the Legislature, and it only, to change that jurisdiction from what that instrument declared it should embrace "until otherwise provided by law." The factor for which the Constitution sternly stipulates, in permitting such change, is the exclusively determining exercise of the discretion and judgment of the Legislature. That factor is eliminated, to a controlling and decisive extent, by said relief Act, which plainly subordinates that discretion and judgment, as expressed in all prior statutes defining and fixing that jurisdiction, to the discretion and judgment of others.

It is true that the outside boundaries of that jurisdiction still can not be one whit extended by those who pass upon the "application," and to that extent the discretion of the Legislature is still of controlling force; but, it is just as true that in cases lying within those defined boundaries the ultimate determination of actual and active jurisdiction rests, not in the Legislature, and not in the operation of any "law," which controls that issue with certainty, but in the discretion and judgment and practically untrammelled will of those who refuse or grant the writ of error in the particular case.

In that respect the relief Act marks a distinct and abrupt departure from the construction which all previous Legislatures dealing with the question have placed upon said quoted provisions of section 3, article 5.

Upon the other hand, if the jurisdiction of the Supreme Court over an appeal does attach prior to the granting of the writ of error, and when and as provided by former law, not one of which was expressly repealed by said relief Act, then the attempted effect of that Act, plainly and unquestionably, is to shift from the Supreme Court to any two justices thereof, or to designated justices of Courts of Civil

Appeals, for decision, a large proportion of all cases duly appealed from all Courts of Civil Appeals and already within the jurisdiction of the Supreme Court, and therefore subject, under the Constitution, to decision by that court, *as a court,* in the sole exercise of every applicable element of its exclusive supreme judicial power.

It seems clear that the jurisdiction of the Supreme Court had attached, in a sense, in all of the cases in which "applications" were pending in that court when said relief Act took effect, and that jurisdiction had attached, in the fullest sense in all of those cases belonging to classes appealable to that court under statutes then in force in which the appeal had been seasonably and duly perfected; yet, under said relief Act, a great number of them were referred to and disposed of, many being decided, finally, by said designated justices.

"Jurisdiction exists from the instant the judicial power is invoked by the submission or filing of a paper of some sort, stating either a good or a bad cause of action." Mod. Am. Law.

If the cases in which applications for writs of error are to be "referred" to such designated justices for their action thereon have not, at date of such reference, already come within the appellate jurisdiction of the Supreme Court, then, how, pray, may such applications "be referred to them by (the) Supreme Court or any two justices thereof"? Sec. 3.

It would be a manifest absurdity for the Legislature to authorize the making of such an order of reference by a court or judge not having jurisdiction over the case; from which it must be presumed that, in passing said relief Act, the Legislature assumed that at the date of any order of reference the Supreme Court, and also any two justices thereof, as such justices and not as a court, would have jurisdiction over the particular case in which the "application" so referred had been filed.

Aside from the provisions of said relief Act making the granting of the writ of error a "condition" precedent for the admission of the cause "into the Supreme Court," that Act carries clear recognition that, at the date of the authorized reference to designated justices, the cause will be upon the docket, and, if properly appealed, within the full appellate jurisdiction of the Supreme Court. Not only may such cause be referred, but in the alternative, it may be acted upon by that *court,* as a court, and without any granting of a writ of error. How can that be, if the cause be not then within its jurisdiction?

In no case, so far as I can find, has our Supreme Court ever held that its appellate jurisdiction therein did not attach until a writ of error therein had been granted. On the contrary, its uniform practice, under said judiciary amendment, has been, I think, to hold and treat that jurisdiction as attaching upon the seasonable filing in the Court of Civil Appeals, of a proper application (or petition) for a writ of error. Acts 1892, 1 S. S., p. 20; Rev. Stats. 1895, art. 492; Rev. Stats. 1911, arts. 1540-1545; Acts 1911, 1 S. S., p. 108; Acts 1913, p. 107; Riordan v. Railway Co., 86 Texas, 233, 24 S. W., 393; Sams v. Creager,

85 Texas, 497, 22 S. W., 399; Tel. Co. v. Smith, 88 Texas, 9, 30 S. W., 549; Insurance Co. v. Shrader, 89 Texas, 42, 33 S. W., 112; Schleicher v. Runge, 90 Texas, 456, 39 S. W., 279; Mauldin v. Southern Pac. Co.; 92 Texas, 267, 47 S. W., 964; McLane v. Evans, 94 Texas, 78; Texas Co. v. Stephens, 100 Texas, 638, 103 S. W., 481; Vinson v. Carter, 106 Texas, 273, 166 S. W., 363; Schiele v. Kimball, decided May 16, 1917, 194 S. W., 944; Henningsmeyer v. Bank, decided June 20, 1917; Stone v. Stone (Civ. App.), 43 S. W., 567.

Said Act of 1913 provides: "If the defendant in error shall file a reply to the application the Supreme Court may finally dispose of the cause upon such application *in the same manner* and to the same extent as if the application had been granted and the cause had been set down for hearing," etc. That demonstrates that the Legislature understood and intended that the seasonable filing of a proper application for a writ of error in any appealable case shall bring that case within the appellate jurisdiction of that court, and, consequently, that such jurisdiction attaches prior to the granting of the writ.

In Houston Oil Co. of Texas v. Village Mills Co., after the filing of the application for writ of error in the Court of Civil Appeals, but before said application had been acted upon, my associates granted, on December 29, 1916, in chambers, an injunction to maintain the status quo of the involved property, and afterward the validity of the injunction was recognized by the Supreme Court in an order modifying it. All that was done, as I understand it, upon the theory that the cause was within the jurisdiction of the Supreme Court prior to the granting of the writ of error. For no other purpose have justices of that court, or the court itself, authority to grant injunctions. Const., sec. 3, art. 5; Churchill v. Martin, 65 Texas, 357.

In Schiele v. Kimball, supra, Chief Justice Phillips, for our Supreme Court, said:

"The question of our jurisdiction of this case was considered in passing upon the application for writ of error. We overruled a motion to dismiss at that time, and, being of the view that we had jurisdiction, granted the writ. Upon a full investigation, it is apparent that the case is one of boundary, of which the jurisdiction of the Court of Civil Appeals is final. . . . The writ of error was improvidently granted, and the cause is dismissed because the court is without jurisdiction of it."

Inferentially, the decision clearly is to the effect that, had the case been appealable to the Supreme Court, its jurisdiction therein would have existed when it came to pass upon the application. The declaration that the court was "without jurisdiction," as I understand it, meant simply that the case was not appealable to that court, under applicable statutes, and not that the court was without authority, from and after the filing of the application, to pass upon that question. Even in cases of that character, and in relation to all applications the Supreme Court has authority, and, as to all applications upon which it acts, exercises its judicial power, to the extent of determining whether the case is

appealable, and whether the application was filed seasonably, and whether it is in proper form; and that power is exercised even in making an order dismissing an appeal, or application, for want of jurisdction for any reason.

It is true that article 1545 authorizes the court, at the time of granting the writ of error, to require a bond, if none has been filed; but that is a mere matter of procedure, and is not determinative of the question as to when jurisdiction attaches.

In Mauldin v. Southern Pac. Co., wherein the applicant was so required to file a bond, but failed to do so, the application was "dismissed," because of such failure; but the report of the case does not state nor indicate that the dismissal was for want of jurisdiction. On the contrary, the opinion by Gaines, C. J., states:

"The applicant, in his petition for a writ of error, in order to give the court jurisdiction, alleged that the decision of the Court of Cvil Appeals 'practically settled the case.' We were of the opinion that the ruling of the appellate court was decisive of the case, and, therefore, exercised jurisdiction and granted the writ."

Would not refusal of the writ have been as certainly an exercise of jurisdiction and of supreme judicial power? I think so.

It is an indefensible confusion of ideas and of terms to say that the jurisdiction of the Supreme Court in an appealed case does not attach until the writ of error is granted. What about the approximately eighty per cent of all appeals in which, for year after year, the writ of error has been refused, with the effect of affirming the decision of the Courts of Civil Appeals therein? Can it be that they have been acted upon by the Supreme Court without jurisdiction therein? Is it possible that for years some three-fourths of the time of that court has been expended in considering and acting upon appeals in cases in which its jurisdiction had not attached, in that no writ of error therein had been granted?

In so far as practical results in a particular case are concerned, refusal of that writ, by the Supreme Court, has the same effect as the granting of the writ and subsequent affirmance of the decision of the Court of Civil Appeals. Burrell v. Adams, 104 Texas, 183, 135 S. W., 1156; Terrell v. Middleton, 191 S. W., 1138.

The granting of the writ seems, therefore, to be only a matter of mechanics, to operate in a case in which the Supreme Court thinks error probably has been committed and is desirous of going more fully into the law of the case, and perhaps of writing thereon. Under both plans of procedure the disposition by the Supreme Court of an application in due form, seasonably filed in an appealable case involves the certain and effectual exercise by the Supreme Court, as a court, of its appellate jurisdiction and of its judgment and judicial power in determining the issues presented in the "application," and that, in substance, and nothing less, is what our Constitution means by an appeal to that court. Anything less amounts to a denial of the right of appeal to that court; yet said relief Act operates as just such denial, in all but a few

cases which, under other laws still are appealable to that constitutional court of last resort. Yet neither that Act, nor its companion, H. B. No. 38, expressly repeals or changes the legal effect of prior statutes relating to applications for writs of error, the purpose being, apparently, to leave those "regulations" of appeals to the Supreme Court in full force and effect. What, if any, reconciliation in apparent conflicts between said two recent Acts and said pre-existing statutes the Legislature expected the Supreme Court to make, by construction, I do not know.

That said powers which said relief Act purports to confer upon any two justices of the Supreme Court (sec. 5), and, contingently, upon "designated justices" (sec. 3) are "judicial powers," is demonstrably certain. Both upon principle and under the foregoing authorities, judicial power is exercised in passing upon any "application" for the writ of error.

The full exercise of judicial power certainly may involve both the decision of a case and the enforcement of that decision; and a necessary incident of the right of a court to exercise those powers in a given case is its right to determine whether that case is or is not within its jurisdiction. To act in all or any of those respects is to perform a judicial function.

It requires an exercise of judicial power to decide whether, under other statutes, the case is of an appealable class, and whether the application was filed in due time, and is in proper form, or should be "dismissed" for want of jurisdiction, or for want of compliance with the rules. It requires a very clear exercise of judicial power to decide, upon examination and consideration of the merits of the appeal, whether the application should be "granted," for more thorough examination of the appeal, and for oral argument, and for maturer consideration, or whether the application (the appeal), should be dismissed, without further ado, for lack of merit.

And ultimate refusal of an application, for lack of merit in the appeal, thereby finally and forever disposing of the appeal, and, in legal effect, affirming the judgment of the Court of Civil Appeals, involves an exercise of unmistakable and supreme judicial power in that it is the legal equivalent of affirming the case after granting the writ of error.

It is true that when an application is "refused" or "dismissed" by the "designated justices," two elements of *supreme* judicial power are lacking, in that (a) such action "shall not be regarded as a precedent or authority in any other cause" (sec. 4), and (b) there does not exist in said designated justices or, perhaps, elsewhere, authority to enforce such order. And, although the relief Act does not so declare, the same elements really are lacking from such orders when made by any two justices of the Supreme Court, as justices only. But, while those elements are lacking in the instances indicated, and while the absence of such elements in the powers which said relief Act seeks to confer stamps that Act as practically denying, to that extent, to the Supreme Court,

as a court, and to litigants in those cases, the exercise of those high powers in cases which, as we have seen, are within its appellate jurisdiction by virtue of other and pre-existing and still unrepealed and apparently continuing statutes, the stated powers which said relief Act does undertake to confer upon justices of the Supreme Court and upon said "designated justices" are, none the less, judicial powers.

Under all former laws, as above indicated, all that work has been restricted to the Supreme Court, *as a court,* concurrence of two members thereof being sufficient, however, under an express provision of our Constitution, "to the decision of a case," whether that final decision was made upon their examination of the application or after grant of the writ and submission of the cause; disposition of the appeal, in either way, having been uniformly considered and treated as an exercise of the supreme judicial power of the Supreme Court, and as a decision of the case, upon the merits, as disclosed by such application, provided it was seasonably filed, and was in due form.

To that effect are many decisions of that court, although several of them have emphasized the fact that, while impliedly affirming the result of the judgment of the Court of Civil Appeals, such refusal of the writ of error did not necessarily adopt the reasoning upon which that judgment was based, as disclosed by the opinion of that intermediate appellate court.

During the five years next prior to the taking effect of said relief Act, and probably for some time anterior to that period, the Supreme Court devoted much the larger portion of its work and time to its application docket and to motions for rehearing on applications for writs of error.

All that was done, I think, upon the theory that such work is of a strictly judicial character, and that in acting, as a court, upon such applications, the court was exercising its constitutional "judicial power." To that theory I still steadfastly adhere. If that theory is erroneous— if the power so exercised by the Supreme Court ever since the creation of the Courts of Civil Appeals, upon and in relation to applications for writs of error, is not really "judicial power," the Legislatures which have imposed those duties upon the Supreme Court, and the court itself, which undertook to perform those duties, have, it seems, alike been laboring under a delusion. However, it seems that said misapprehension is to be continued under the provisions of said relief Act, which authorize the Supreme Court, as a court, to pass upon any application for writ of error whatever, and require that it "shall" act upon any and all applications which may fall within any of said three enumerated classes of cases.

The analysis and discussion of judicial power, and the decisions bearing thereon, all as hereinabove set out, were inserted herein, at great length, with the hope of demonstrating the soundness of the proposition that said relief Act undertakes to confer "judicial power" elsewhere than upon a court,—a proposition which, to me, seems to be axiomatic,

requiring no proof—and as a predicate for applying to said Act, as a test of its validity, the quoted provisions of our Constitution, which, with certain here non-applicable exceptions, expressly vest that self-same power "in courts," and impliedly forbid its exercise, at even legislative behest, otherwise than by the particular court in which that special character or grade of judicial power is so "vested."

(2)    The "designated justices," even when designated properly, in manner and form prescribed by said relief Act, do not constitute a "court."

That they shall not do so was, evidently, in contemplation of said Act itself, since to hold that they do comprise a court would either strike down, at the outset, every portion of the Act applicable to them, and probably the entire Act, or, in the alternative, create vacancies in the Courts of Civil Appeals. Said justices can not hold two civil offices of emolument at the same time, and the Act, as a whole, clearly negatives the idea that vacation of their former offices was thereby attempted.

It is well settled that if a person duly assumes an office incompatible with one which he already holds his acceptance and qualification operate, *ipso facto,* as a resignation and vacation of his former office. State v. Brinkerhoff, 66 Texas, 45; Alsup v. Jordan, 69 Texas, 303, 6 S. W., 832; Ex parte Call, 2 Cr. App., 497.

It is true that said Act does not expressly provide an additional salary for such designated justices, but its caption declares the Act to be one providing for their "compensation . . . while acting as herein provided," and section 7 allows them "their actual and necessary expenses in going to, remaining at, and returning from the Capitol." The provision allowing them such expenses in so *remaining* at the Capitol is in the nature of an enlargement of, or addition to, their regular salaries as members of Courts of Civil Appeals, and, for that reason, it can not fairly be said that the new position of "designated justice," etc., is wholly without "emolument." Sec. 40, art. 16, supra.

However, even aside from said presumption as to legislative intent, the proposition that the designated justices do not constitute a court is demonstrably sound, and serves as a keystone in an arch in support of the proposition that said relief Act is invalid. Said designated justices certainly do not comprise a constitutional court, none such being enumerated. Nor do they constitute a legislative court. The Legislature did not call them a court. They are, legally, nondescript, the Legislature having given them no name or title; and, but for the unauthorized action of the Supreme Court in generously bestowing upon them an appellation they would be "nameless here forever more." They do not compose even an organized tribunal or board. They are not elected to their positions as "designated justices," etc., by the people of the entire State, as are justices of the Supreme Court, nor by the people of a particular district, as are justices of Courts of Civil Appeals. They are not appointed by the Governor. By the terms of said Act

they are to be merely designated *in writing* by the chief justice or any two justices of the Supreme Court, which *writing* is to be recorded in the minutes of that court (sec. 2), although, in practice, down to this date, they had been designated, instead, by a formal *order of that court,* as a court. The plain unvarnished truth about the whole matter is that, in performing their statutory duties as such designated justices, they act merely as an aggregation of individuals, and not as a court, nor yet as justices of Courts of Civil Appeals. They have not the ordinary indicia of a court; they have no presiding officer, no clerk, no seal, no records or minutes. They have no power to issue writs—not even to perfect the record; they take no oath pertaining to the duties with which they are charged by said relief Act, and they have no power to enforce their own orders, decisions, judgments or acts; and, probably, no power to enforce same exists anywhere. There is no prescribed procedure whereby the trial court, which tried the case, or the Court of Civil Appeals, which heard the appeal, or even the Supreme Court, from which the case was transferred to them and whose statutory appellate jurisdiction and constitutional supreme judicial power they exercise, are to learn, officially, of the action of such designated justices upon or in relation to any application for a writ of error. Said "Committee of Judges" is not a true branch of any Court of Civil Appeals, or of the Supreme Court; in reality it is a legislative fungus growth preying upon the latter.

Our Court of Civil Appeals for the Third Supreme Judicial District, through Neill, J., said:

"In every court there must be at least three constituent parts—the actor, reus, and judex. The actor, or plaintiff, who complains of injury done; the reus, or defendant, who is called upon to make satisfaction for it; and the judex, or judicial power, which is to examine the truth of the fact, to determine the law arising upon the fact, and, if an injury appears to have been done, to ascertain and by its officers to apply the remedy. Chase's Blackstone, 626, 627. The other two constituent parts of the court must co-exist with the judex, in order that it may exercise the power to examine the truth of the fact, determine the law arising therefrom, and apply the remedy; i. e., pronounce judgment. Then, when entered of record, and not until then, does the enrollment become 'a monument of so high a nature, and importeth in itself such absolute verity, that, if it be pleaded there is no such record, it shall not receive any trial by witness, jury, or otherwise, but only be itself.' 3 Black., Comm., 331." Accousi v. Furniture Co., 83 S. W., 1105. See, also, Bissell v. Heath, 98 Mich., 477.

In discussing the Act for the establishment of "the Texarkana Civil and Criminal Court," etc., our Supreme Court, through Judge Brown, said:

"If the court created by this law is not a District Court of Bowie County, then the law is void, because it has no provision for any judge to preside therein except the judge of the District Court, and no pro-

vision for any clerk of such court except the clerk of the District Court of Bowie County. Neither has it any provision for electing or appointing such officers in the future. Article 16, section 40, of the Constitution provides: 'No person shall hold or exercise at the same time more than one civil office of emolument except that of justice of the peace, county commissioner, notary public and postmaster, unless otherwise specially provided herein.' If it were admitted that, so far as the judge of the District Court is concerned, this would not be to him an office of emolument, it is nevertheless such a duty as the Legislature could not compel him to perform, and it would be simply a matter of choice on his part whether he would hold the court or not. The office would be one of emolument to the clerk, and, therefore, if it is not a District Court it would be an office different from that of clerk of the District Court of Bowie County, and not one of those excepted by the Constitution, therefore he could not lawfully hold or perform the duties of both offices at the same time. The Act, therefore, if it be considered, as we think it can not, as creating a court different from the District Court of Bowie County, must be held void, because it does not provide any of the officers necessary to perform the duties of such court." Whitener v. Belknap, 89 Texas, 281, 34 S. W., 594.

In Henderson v. Beaton, 52 Texas, 29, the question was as to the validity of the Act of July 9, 1879, 9 Gam. Laws, 62, creating "a commission of arbitration and award, to consist of three persons learned in the law, to be appointed by the Governor, by and with the advice and consent of the Senate, if in session, who shall hold their offices for two years from the date of their appointment, and receive for their services the same salary as judges of the Supreme Court . . . to be styled the 'Commissioners of Appeals of the State of Texas,'" etc. Section 2 thereof provided:

"Said Commission shall have the power to hear and pronounce award upon civil cases now or hereafter pending in the Supreme Court or the Court of Appeals, wherein the parties or their attorneys may file consent in writing to the reference thereof to said Commission."

The Act provided for a clerk, and a seal, and required that a regular docket and minutes of all proceedings by or before said Commission be kept, giving them the same verity as are given by law to records and proceedings of courts of record, and that all cases be docketed in the order of dates of filing of such written consent, and gave the Commission the right to issue writs of certiorari to perfect the record, and such processes as the Supreme Court might issue to make parties, and power to punish for contempt. Section 7 went so far as to provide:

"Said Commission shall report its conclusions or award to the Supreme Court or Court of Appeals, as the case may be, in the cases so referred, and may accompany the same with a brief synopsis of the case and their opinion thereon; and the conclusions or award aforesaid shall be and become the judgment of the said Supreme Court or the Court of Appeals aforesaid; and said courts shall make and render such further

order, judgment, or decree thereon as may be necessary or proper to make said award effective."

The majority of the Supreme Court upheld the validity of the statute upon the ground that it was merely a statute of arbitration and award, and deprived no citizen, against his will, of the right to go with his appeal to courts of last resort created by the Constitution; but expressly declared that said Commission *was not a court.*

Judge Gould, in the majority opinion, said:

"In our opinion, the Commission is not a court, because it acts only by consent of both parties, and even then is without jurisdiction to render or power to enforce a judgment. It has no jurisdiction, for consent can not give jurisdiction. It is but a convenient and suitable board of referees or arbitrators, provided to facilitate the adjustment of litigated cases pending in the courts of last resort, available only where both parties agree that the case be so referred. It is not a tribunal before which any litigant can be forced to come with his appeal. The constitutional Supreme Court and Court of Appeals are still open to every party.

"Undoubtedly the Constitution, in establishing these courts of last resort, intended to place it beyond the power of the Legislature to force the citizen to go with his appeal before some other tribunal. . . .

"As in other cases of arbitration, the Commission acts only after consent of both parties. If, in consequence of the stage of the litigation and limitations under which it is placed, the award of the Commission assimilates to the opinion of an appellate court, it is still in substance but an award. In our opinion, the Commission is not a court, but is a board of referees or arbitrators, for cases in the Supreme and appellate courts."

Judge Bonner said:

"I concur in the decision that the statute under consideration is constitutional, at least to the extent of the principal object intended by the Legislature—the creation of a Commission of arbitration and award. The question whether, under our Constitution, a new court could be created having co-ordinate powers with the Supreme Court, does not arise in this case, and no opinion is intended to be indicated on this question. . . . In our opinion, the Commission provided by the statute, though having many of the attributes, is not technically a court, as it lacks at least two essential ingredients—a certain fixed jurisdiction, none being given except by the express consent of both parties, and the power to enter up or enforce its awards as judgments. It is more properly, what it purports to be, a commission of arbitration and award."

From the foregoing it will be found that many of the ordinary indicia and attributes of a court which were given by statute to said Commission of Appeals have been withheld from such "designated justices," and, especially, the latter, like the former, are "without . . . power to enforce a judgment"; wherefore, under the tests heretofore prescribed

by our Supreme Court, such "designated justices" do not constitute *a court*.

In his dissenting opinion in the last cited case, Chief Justice Moore held that our Commission of Appeals was in fact a court, and in another case it was held: "Whenever the Legislature confers upon any board or officers powers which are unquestionably judicial in their nature, and when they also invest such board or officer with all the indicia and paraphernalia of a court, 'they undoubtedly create a court, although they may not in terms say so." Young v. Lederick, 14 Kan., 95. But it will be observed that said relief Act does not invest the designated justices with "all the indicia and paraphernalia" of a court, nor can they, collectively, meet even the tests of a court prescribed by Judge Moore.

Even constitutional courts can exercise no judicial power except such as is conferred upon them by the Constitution, or by statute in pursuance of some provision of the Constitution. The Constitution does not expressly create nor authorize the creation of a committee of "designated justices of Courts of Civil Appeals," and does not confer, and does not, in terms or by implication, authorize the Legislature to confer, upon them, in that capacity, *or even in their capacities as justices of Courts of Civil Appeals,* any judicial power whatever. It follows that such "Committee of Judges," although composed of both eminent and able jurists, is, *legally,* a mere excrescence upon our judicial system, and, therefore, is not vested with and can not validly exercise any judicial power whatever, and, consequently, can not validly do all or any of the judicial work assigned to it.

Now, if such designated justices together do not constitute a court, then, at least in so far as it relates to them, said statute plainly and certainly is unconstitutional in that it attempts to confer "judicial power" elsewhere than upon a "court." But, if they do constitute a court, then, undeniably, the legal consequences of said relief Act, assuming its validity, are to compel justices of Courts of Civil Appeals to accept and enter upon the discharge of inconsistent duties of other and entirely different offices from those to which they were elected, thereby vacating their former constitutional offices. If that is what the relief Act means and does, it is unconstitutional because the Legislature has no such power. So, upon either horn of the dilemma, said relief Act certainly is, to that extent—as to such designated justices—invalid. Without those features the Act would hardly have been adopted; hence, the entire Act should fall. Spence v. Fenchler, 180 S. W., 597.

What pertinent lesson is taught by the experiences of the past, in this and other States, relative to various legislative plans and agencies for relieving congested dockets of appellate courts?

Pre-eminently, this: A statute is invalid if it purports to confer upon such agency, or elsewhere than upon the court of last resort, authority and power finally to decide or dispose of cases within its appellate jurisdiction. However, as above indicated in several States, and,

notably in Texas (heretofore), it has been held that the Legislature has authority to provide for commissioners merely to assist the Supreme Court in the performance of its constitutional duties, the final and actual exercise of judicial power being left, not in such commissioners, but in the *court*. There lies the distinction which, almost without exception, the courts of the States wherein the question has arisen have considered of determinative importance—a vital distinction which our relief Act ignores, and which my associates seem to disregard as inconsequential.

Illustrating the general application of the principle just stated, which is in line with the above mentioned decisions of the Supreme Court of Texas in Henderson v. Beaton, 52 Texas, 29, and Stone v. Brown, 54 Texas, 330, upholding the validity of our former Commission of Appeals statutes, are the following decisions of other States: In re Supreme Court Commissioners, 37 Neb., 655, 56 N. W., 298; State v. Noble, 118 Ind., 350, supra; People ex rel. Morgan v. Hayne, 83 Cal., 111, 23 Pac., 1, 17 Am. St.; 211, 7 L. R. A., 348; Bullock v. McGerr (Colo.), 23 Pac., 980; Railroad Co. v. Abilene, 21 Pac., 1112; Harris v. Vanderveer, 21 N. J. Eq., 424; Landers v. R. Co., 53 N. Y., 450; Hutkoff v. Demorest, 103 N. Y., 377; Re Senate Bill No. 76, 9 Colo., 623; Gough v. Dorsey, 27 Wis., 131; Allor v. Auditors, 43 Mich., 97; Smith v. Odell, 1 Pinn. (Wis.), 449; Hildreth's Heirs v. McIntyre's Devisees, 1 J. J. Marshall's R. (Ky.), 206; State v. Leonard, 86 Tenn., 485, 7 S. W., 453.

In said Nebraska case the statute authorized the Supreme Court to appoint three attorneys to act as commissioners of that court, and made it their duty, "under such rules and regulations as the Supreme Court may adopt, to aid and assist the court in the performance of its duty in the disposition of the numerous cases now pending in said court, or that shall be brought into said court during the term of office of such commissioners." They were appointed, and, after taking the required constitutional oath of office, prepared certain opinions in such cases. The syllabus of each case was examined and approved by the court, and the opinion filed, under a general rule of the court that when so filed it should stand as the judgment of that court. The validity of various judgments of that character was questioned, and, the questions being considered and treated collectively, the Supreme Court said:

"The commissioners themselves file no opinions. They are all submitted to the court and the syllabus of each case is examined. If approved, it is filed by the court. If not approved, it is then returned to the commissioners to have the same made to conform to the suggestions of the court, or the court itself makes the necessary changes. The court, however, desires to have the Commission act independently in the first instance in rendering decisions, and to examine the records and investigate the authorities and endeavor to reach a correct conclusion in each case. Motions for a rehearing are filed in the same manner as in cases prepared by the court. These motions are

carefully considered by the court, and if sufficient cause is shown for a rehearing it will be granted. The court, however, files the opinions, and when filed they stand as the judgment of the court until vacated or modified."

Accordingly the statute was upheld. But the points of material dissimilarity between that statute and our relief Act are obvious. To the same effect, substantially, as the Nebraska statute, was the Colorado statute of 1889, 23 Pac., 980, 138 U. S., 56.

In State v. Noble (Ind.), a statute which provided for commissioners of the Supreme Court, and made it their duty "to aid and assist that court in the performance of its duties," and which even went to the length of expressly declaring that "in no event shall such duties and work be in any way binding upon the Supreme Court," was held invalid. The decision rests, partially, upon the proposition that the commissioners were not to be selected by the court, the statute providing for their appointment by the General Assembly, vacancies to be filled by the Governor. However, the authority of the Legislature to confer the stated powers upon the commissioners was vigorously denied.

The court said:

"Of the element of sovereignty which is exclusively and intrinsically judicial the people gave the courts all they had to give. . . . The proposition that the judiciary is an independent department of the government, and that the whole judicial power of the State is exclusively vested in the courts, . . . is one that neither lawyer nor publicist will challenge. . . ."

Denying that the commissioners were mere assistants of the court, said opinion declared:

"The Supreme Court must decide for itself all questions of law and of fact. The facts must be gathered from the record by the court itself, and can not be obtained from any other source or by any other persons than the judges. It is a court of errors, an appellate tribunal, charged with the duty of deciding cases upon the record, and this duty can not be performed by deputies. Independently of any constitutional provision this would be so, because judicial powers can not be delegated.

"This principle has been established for ages. (Citing authorities.) . . . We know judicially that our Constitution was so amended as to invest the Legislature with power to create courts superior to circuit courts, and that this was done for the purpose of enabling litigants to have appeals disposed of by a constitutional tribunal. It can not be unknown to anyone that all the departments of the government believed that the only method of administering the laws was by courts created under the provisions of the Constitution; and this belief the people confirmed by their votes in favor of the constitutional amendment. This supplies strong reasons for holding, as we do, that nobody not provided for by the Constitution can exercise any part of the judicial power of the State. . . . The attempt, to vary somewhat our statement, although veiled and somewhat obscured, is to create a body with judicial

power and to invest officers with judicial rights and functions. The tribunal and the officers are unknown to the Constitution. . . .

"Our Constitution vests the highest appellate jurisdiction of the State in a Supreme Court, and provides that the number of judges shall not be more than five. There can, therefore, be no other Supreme Court than the one established by the Constitution, and it must be composed of five judges and no more. There is, consequently, no such officer under the Constitution as a Supreme Court commissioner; and there can be no division of the duties of the Supreme Court, and a distribution to any person other than the judges of that court chosen as the Constitution provides. . . .

"Constitutional tribunals can not be changed by legislation, and the Supreme Court is a constitutional court. . . . No part of the judicial duties of that, court can be assigned to any other person than one of the duly chosen judges. The Legislature has no power to change its organization, nor can that body, under the guise of creating commissioners, divide the duties of the judges, nor authorize it to be done.

"Under our Constitution, as amended, the Legislature may establish courts, but it can not destroy the constitutional courts—the circuit courts and the Supreme ·Court—nor can it change their organization nor redistribute their powers, for these courts owe their organization to the Constitution, and as the Constitution has ordained that they shall be organized, so they shall be. Judicial power distributed by the Constitution is beyond legislative control."

Inasmuch as that Indiana statute plainly attempted to restrict the duty of the commissioners to *assisting* the Supreme Court in its work, and expressly declared that their duties and work should not be "binding" upon that court, that decision goes far beyond the principle herein asserted by me and heretofore affirmed by the Supreme Court of Texas in its said former decisions. The reasoning of the Indiana court, if sound, is fatal to the validity of our relief Act; but the converse of that proposition is not true.

In the other cited Colorado case, the Supreme Court said:

"The judicial power, both appellate and original, lodged by the Constitution in the Supreme Court, can not be transferred to another court created by the Legislature in any manner so as to make its decisions and opinions final. This jurisdiction is lodged in 'a Supreme Court.' Two such courts with like jurisdiction and powers is not contemplated by the Constitution."

The noted case of People v. Hayne, supra, was under a California statute, which provided for the appointment by the Supreme Court, of "five persons, of legal learning and personal worth, as commissioners of said court," and made it their duty, under such rules and regulations as the Supreme Court might adopt "to assist in the performance of its duties, and in the disposition of the numerous causes now pending in said court undetermined." Its constitutionality was attacked upon the ground that pursuant to its provisions such commissioners were usurp-

ing the office of judges of the Supreme Court, and exercising judicial powers of the State vested solely in the Supreme Court by the Constitution and laws of the State.   Upon consideration of the case, which was declared of "commanding public importance," the Supreme Court overruled that contention, saying:

"Not only is there an entire failure to confer judicial power upon these commissioners, but there is also an entire absence of an attempt to interfere with the exercise of the powers conferred by the Constitution upon and belonging to the judicial department of the government. . . . They are given no power except to 'assist the court' under such rules and regulations as it may adopt in the performance of its duties. . . .

"Many of these reports and opinions are never approved and never see the light.   Others of them are used in part, and only in part.   In every case, when the judgment is rendered, it is the judgment of the court, and not that of the commissioners.   Nothing originates before these commissioners, and nothing terminates with their labors or opinion. The conclusions to which they arrive are but opinions submitted for our adoption, if we think they are founded in reason and law.   Hence their reports and opinions are neither decisions nor infallible guides, but they are serviceable instrumentalities to aid us in performing our functions.   The commissioners exercise no power *proprio vigore*.   The court acquires the jurisdiction, and renders the judgment upon the controversy.   Therefore the whole exercise of the judicial power is by the court, the commissioners acting only in an intermediate capacity, as auxiliary to the court in the ascertainment of certain facts and law necessary to its enlightenment in giving the proper decision and judgment."

Thus it appears, conclusively, that, in principle, the California statute was like that under which our own Commission of Appeals was operating when it passed out of existence through adoption of said judiciary article, and, consequently, was essentially different from our relief Act of 1917.

Of all reported decisions bearing upon the subject, so far as I have been able to find, the one which tends, most strongly, to uphold the validity of our said relief Act, is Sharpe v. Robertson, 46 Va. (5 Grat.), 518-644, and even the statute under which it arose differed from ours in several very important particulars, and their Constitution was different.

To relieve the crowded dockets of the Supreme Court of Appeals of Virginia the General Assembly, by Act of 1848, established a "special Court of Appeals" consisting of five judges of circuit superior courts, in the order of precedence and seniority.   The Act also provided that the new court might adjourn from time to time and "sit as often and as long as the judges thereof may consider they may properly sit, without interfering with their duties" as members of other courts; that, annually, in December, there should be transferred to its docket, the seventy cases of longest standing on the docket of the old Supreme Court

of Appeals, *"provided, however,* that no cause shall be placed upon said docket, where any party, by himself or his counsel, shall object thereto," and that "such special court shall proceed to hear and determine all causes on the docket so made out." It was also declared that, nevertheless, the old court might decide any such case, and that if, for any reason, the new court might be unable to decide such transferred cause, it should strike it from the docket, and that such case might be decided by the old court.

Said Act expressly declared the right of "any three or more" of the members of such new court to hold its sessions, and to decide cases therein. The clerk of the old court was required "in person or by deputy" to attend upon the new court, and to "enter the ·proceedings of such special court, which shall be signed by the presiding judge thereof," and provided that "the decisions of such special court shall be certified and carried into execution in like manner as if made by the Court of Appeals." Radical differences between that statute and ours are patent, but I call special attention to several of them, thus:

(a)  There transfer of cases was to a "court," with a "presiding judge thereof," and a "clerk," with minutes.

(b)  There new duties were not to interfere with performance of duties of the judges as members of other courts.

(c)  There it was specially provided that a majority of the new court should constitute a quorum and might decide cases.

(d)  There full provision was made for enforcing decisions of the new court.

(e)  There provision was made whereby the old court might decide cases notwithstanding their previous transfer to, and then pendency upon, the docket of the new court.

(f)  There provision was made whereby cases might be sent back to the old court.

(g)  There *no case could be transferred to the new court over the objection of any litigant or his attorney,* a provision which reminds us of the "arbitration" feature of our said original Commission of Appeals Act. 52 Texas, 29.

Moreover, the Virginia Act did not define any new condition precedent to the exercise of appellate jurisdiction, although, like our relief Act, it seems to have conflicted with previous statutes fixing such jurisdiction unconditionally.

Furthermore, the Virginia Constitution essentially differed from ours, in that· it vested the *general* "judicial power," not only in certain courts, but in "the judges thereof," as well, and declared that the jurisdiction of said tribunals and that of said "judges" should be regulated by law—features which were strongly emphasized in the opinion of the court upholding said Act. The Constitution of Texas, as I have shown, confers no general judicial power elsewhere than upon some court. In no single instance does it confer upon any justice or judge any except specific powers, not including disposition, finally, or

to any extent whatever, of any appealed case; nor does it, either expressly or ·by implication, authorize the Legislature to do .so.

On the contrary, it denies, by implication, the authority of the Legislature to do so, and to that effect, unquestionably, are many of the above cited decisions of our Supreme Court .in bygone days.

Indeed, a careful comparison of the Virginia statute with our relief Act will show that the principal common feature is that both practically place elsewhere than in the court of last resort final action upon and decision of cases lying within its continuing jurisdiction—cases which are left determinable by that. court down to the original transfer thereof, and, in Virginia, though not in Texas, determinable by that court at any time. And that feature of the Virginia statute rests largely upon the peculiar language of the Constitution of that State.

The decision in the cited case, as shown in the opinion of the court, by Baldwin, J., rests, also, to an extent, upon the propositions that "legislative control over the jurisdictions of the several courts continues to exist, in relation to the litigation which they embrace, until the judicial power over it is exhausted; . . . when there has been a final and irreversible adjudication of it by a court of competent jurisdiction," and that, at any prior time, the Legislature, in the exercise of its authority to define and regulate the jurisdiction of the various courts, may, by *a general law,* require the transfer of a certain proportion of cases lying within the jurisdiction of the Supreme Court to some other court for determination, leaving, however, such Supreme Court free to decide those identical cases.

Without affecting the issues here under consideration, and for the sake of the argument, it might be conceded that at any time prior to decision of a case by the Supreme Court the Legislature has authority to change its appellate jurisdiction, excluding therefrom cases of that class, and making judgments of Courts of Civil Appeals therein final, and even terminating the right of appeal in such cases then properly pending in the Supreme Court; but that is not what either the Virginia statute or the Texas relief Act attempted. From what has been said and quoted above, it must, I think, be evident that, at least under the Constitution of Texas, our Legislature is powerless to require, or to authorize, as attempted by said relief Act, any transfer whatever of cases from the docket of our Supreme Court elsewhere, to any other court or tribunal, to say nothing of such transfer to an aggregation of individuals, for final decision, so long as the classes of cases to which such transferred cases belong remain within the appellate jurisdiction of the Supreme Court, under and according to the terms and provisions of other pre-existing unrepealed and continuing statutes.

In said Virginia case there was a strong dissent, by Daniel, J., who expressed the opinion that the Act was invalid, the purpose of the Constitution being, .he said, "to vest the supreme appellate power in one court—a court as permanent as the Constitution itself," citing Kamper v. Hawkins, 1 Va. Cas., 20, wherein it was held that a judge of the

general court could not constitutionally exercise the functions of a judge in chancery, each class of judges having been "designed to be restricted, in the performance of duty, to the courts to which they were severally elected and commissioned." His dissenting opinion declared:

"The designation in the Constitution, of the tribunals in which the judicial power of the State is to be vested, would seem to be without any wise aim or purpose, if the Legislature may, in its discretion, assign to each the same or like judicial duties. If the judges of the superior courts may in virtue of their office be required to discharge the duties of judges of the Supreme Court, the provisions for the separate establishment of the courts, and the separate election of the judges, are but useless and idle restraints, on the power of the Legislature."

Therein he said, also:

"*The quantum of business, the amount of judicial duty* to be performed by the court, *may be made to vary,* from time to time, with the regulations and restrictions which the Legislature adopts, with respect to the right of appeal; *but the nature of the duty, the quality and character of the power* to be performed and exercised, *is fixed and ascertained,* and *must ever remain the same.*"

His conclusion was that because the Act undertook to confer those exclusive supreme judicial powers elsewhere—upon a legislative court—it was invalid. The report of that case, which embraces one hundred twenty-six pages, includes, also, the illuminating opinion of Judge Robertson, of the Richmond Superior Court of Chancery, in the form of his return to a rule by the Supreme Court of Appeals for mandamus to compel him to recognize the validity of a decree by such new court in a cause appealed from and remanded to his court. It contains, also, a forcible statement of the views of Judge Scott, who declined to take his seat as a member of said new court, because, in his opinion, said Act was "at variance with the Constitution of Virginia," in that it provided, in effect, for an additional Supreme Court of Appeals. There may be found, also, the views of the revisers of the code, who prepared said Act. The nub of their argument, also, relates to the above mentioned, and another somewhat similar, peculiar feature of their Constitution.

The case, as a whole, strongly supports my conclusion that our relief Act is invalid.

Coming back home, to our own Constitution and decisions, which, after all, must determine the involved issues, and recalling the double lesson derived from our Commission of Appeals statute, as originally enacted and as amended, we are reminded:

First. That in the case which arose under it while it embodied the "arbitration" feature, the Supreme Court, through Gould, J., said:

"The constitutional Supreme Court and Court of Appeals are still open to every party. Undoubtedly the Constitution, in establishing these courts of last resort, intended to place it beyond the power of the Legislature to force the citizen to go with his appeal before some other tri-

bunal. If, in a case involving life, liberty, or property, the citizen were denied the right of resort to these constitutional courts, and driven before different tribunals, organized, perhaps, under unfavorable circumstances, and in a manner less calculated to secure wise and impartial adjudications, it is believed the Constitution would be violated. If the constitutionality and validity of an Act of the Legislature were made to depend on the opinion of a commission, the Constitution would be violated. The constitutional courts are designed to secure the citizen in his rights, and to enforce the observance of constitutional limitations." Henderson v. Beaton, 52 Texas, 29.

To say that, under our relief Act, our Supreme Court is "still open to every party" in all cases lying within its appellate jurisdiction would be a merry jest if it were not grim mockery.

Second. That in a case which arose after said amendment of said commission statute, our Supreme Court sustained its validity because it embodied certain provisions, which we find conspicuously absent from said relief Act of 1917. Therein that court said:

"In announcing for the first time our action in this class of cases, it will not be amiss to say that it was not the purpose and intent of this law to relieve this court from the duty and responsibility of considering and deciding the causes which may be referred to it by the Commission of Appeals, but that the court, by the aid of reports of the commissioners, might the more rapidly, as well as the more correctly, dispatch the business with which its docket is so greatly overburthened. If on examination of the report of the commissioners, in connection with the transcript, the case is found to be correctly decided, the opinion of the commissioners will be adopted and published, as other opinions of this court. But if in any case the opinion reported exceeds or falls short in any essential particular of the measure of our approval, it is our duty to disregard it *in toto,* or so modify or change it as to have it conform to our view of the law and facts of the case." Stone v. Brown, 54 Texas, 330.

Said relief Act does not require or contemplate or permit that action by any two justices of the Supreme Court or by the "Committee of Judges" on applications for writs of error shall be examined or modified or rejected or approved by said court.

In practice hundreds of appeals have been finally disposed of by said "committee" without any member of our court having had any occasion or reason for knowing or inquiring, in the particular case, what the issues were, aside from determining that the case was not of any of the three excepted classes, and that, therefore, the appeal was referable under said Act. In no instance does the Supreme Court pass upon any other question or point in any *referred* case, unless, and until after, the writ of error has been granted. Plainly, therefore, said relief Act violates the constitutional principles announced in Stone v. Brown. In that respect said Act is likewise at variance with every other decision

of the Supreme Court of Texas bearing upon the issue and rendered prior to its enactment.

Turning from the inquiry as to the constitutionality of said Act to the question as to its workability, either alone, or in conjunction with other statutes, we encounter what I consider serious difficulties, as follows:

(a)   Does it broaden, or does it restrict, the appellate jurisdiction of the Supreme Court? My associates seem to consider it restrictive in that said new condition precedent for the granting of the writ of error is prescribed; but it will be observed, the granting of such writ—the operation of said condition precedent—is not, in express terms, there confined to cases appealable to that court under either pre-existing statutes or said later jurisdictional Act, H. B. No. 38.

Note the provisions of the caption and of section 1 of said relief Act, H. B. No. 39. The former declared that the main purpose is to be accomplished "by regulating the mode in which and the conditions on which *judgments* of the Courts of Civil Appeals may be brought before the Supreme Court for revision," while the latter declares that said condition applies to any *"final judgment* of any Court of Civil Appeals."

In their context, alone, and without reference to the narrower provisions of articles 1521-1522, as amended in 1913, page 107, and by said later Act of 1917, page 140, the words employed in said relief Act would seem to throw into said appellate jurisdiction appeals from any and all judgments of said intermediate appellate courts, and also to confer upon the Supreme Court authority to review all questions of law therein, whether involving "substantive law," alone, or "adjective law," as well, under subdivision 6 of said Act of 1913, and whether involving or not involving an error of law . . . of such importance to the jurisprudence of the State, as in the opinion of the Supreme Court requires correction" (whatever that latitudinous expression may mean), under said subdivision 6 as amended by said H. B. No. 38.

Necessarily, if said relief Act shall be construed as so broadening the right of appeal, it will induce the filing of a much larger number of applications for the writ of error, just as will the provision that "refusal or dismissal of any application shall not be regarded as a precedent or authority in any other cause." Sec. 4. The effect of said H. B. No. 38 upon this question of jurisdiction has not been passed upon by either of our Supreme Courts, inasmuch as it became operative since the end of the term.

In that connection I am not unmindful of the Cobolini case, 106 Texas, 472, 170 S. W., 1036, in which, I think, a sound rule of statutory construction was misapplied. However, I refer to said features of said two Acts of 1917 merely to point out the existing confusion in our jurisdictional laws, and without indicating any opinion as to how it should be settled in the event both Acts are to be held valid.

(b)   Every application for the writ of error must still be made

directly to our Supreme Court; but when once it has been transferred to said designated justices, they, and they only, and not a majority of the justices of the Supreme Court acting merely as justices, and not even that court itself, has power and authority, at any future time, to act upon that application, the necessary effect of such "transfer" being, it seems, to take the case out of its appellate jurisdiction, subject, however, to a rehabilitation thereof by the granting of the writ of error.

Nevertheless, even while the designated justices are exercising their statutory powers over or in relation to that application, another like application of another litigant in that identical case, not having been so transferred, may be acted upon, in the same hour, or moment, by the Supreme Court, or even by any two justices thereof, not acting as a court; from which it is evident that, except as to the effect of the action as a precedent, and except as to enforcement of such order or action, the powers of the designated justices, and of the two justices of the Supreme Court, and of that court itself, are all co-ordinate. Any one of said three agencies may act upon the application before it, and, if the writ be refused, may thereby finally dispose of the particular appeal. If one such application be refused and another be granted, ·as may happen, although involving identical questions of law upon identical facts, the confusion will be practically without remedy.

(c)   Said relief Act is made applicable to all of the three hundred fifty-two writs of error pending in the Supreme Court when it took effect, as well as those filed afterward (sec. 3), although appeals then so pending, with few exceptions, clearly were within its jurisdiction under former laws which have not been expressly repealed.

The glaringly contradictory philosophy of the relief Act seems to be that by virtue of prior laws and the "applications," the appeals—the cases—get within the appellate jurisdiction of the Supreme Court, but that the granting of the application shall be a condition precedent to getting the causes (including those already there) into that court; that the cause being so in that court, the court, or a majority of its members not acting as a court, may renounce that jurisdiction and that court's supreme judicial power over that application and appeal, and "refer" the whole appeal—application and motion to dismiss, if any,—to the designated justices, who thereby acquire exclusive appellate jurisdiction over same, with full power of final disposition thereof; that if they refuse the writ of error and a motion for rehearing, if any, the appeal is thereby disposed of, forever; but, if the writ be granted, the cause is thereby readmitted, for decision on its merits, to the Supreme Court, where, according to pre-existing and still continuing laws, it has been all along.

According to the scheme of said relief Act the solemn appellate jurisdiction of the court of last resort in civil cases and the exercise of its supreme judicial power thus may be made to shift back and forth, like a weaver's shuttle, in and out,

"Or like the borealis race,
That flit ere you can point their place,"

and all so gently and sweetly as to make it impossible for any lawyer in Texas to say where it is at any given instant, until after the granting of the writ of error, when it comes to rest. I, for one, do not believe it.

(d)   Of the great number of applications pending when said relief Act took effect, all except the few belonging to some one or more of said three enumerated classes of cases (sec. 5) were referable to the designated justices, and of them very many were based, wholly or partially, upon the contention that the Court of Civil Appeals "erroneously declared the substantive law of the case," as stated in subdivision 6, article 1521, as amended by Acts 1913, page 107, which amended article, in prescribing the classes of cases which may be appealed to the Supreme Court, specifies:

"(6)   Those in which, by proper application for writ of error, it is made to appear that the Court of Civil Appeals has, *in the opinion of the Supreme Court,* erroneously declared the substantive law of the case, in which case the Supreme Court shall take jurisdiction for the purpose of correcting such error."

Evidently, in all such cases, the appellate jurisdiction of the Supreme Court over the particular case depended, finally, under former laws, upon whether, in that case, "the Court of Civil Appeals has, *in the opinion of the Supreme Court,* erroneously declared the substantive law of the case," the determination of the essential fact being a duty which that statute imposes upon the Supreme Court, *as a court,* and upon it alone—a duty which, in its very nature, can not possibly be performed except by at least a majority of the members of the Supreme Court, *acting as a court.*

Nevertheless, said relief Act of 1917 imposes that duty, in a great array of referred cases already within the Supreme Court's appellate jurisdiction, upon the designated justices, thus requiring of them a mental impossibility. They can not know or say what is in the mind of the members of the Supreme Court; and many of the questions, no doubt, are entirely new. That feature of the relief Act can not possibly be enforced.

The same difficulty applies to like referred applications filed prior to the taking effect of said H. B. No. 38. By the latter Act said "subdivision" is now as follows:

"6.   In any other case in which it is made to appear that an error of law has been committed by the Court of Civil Appeals of such importance to the jurisprudence of the State, as *in the opinion of the Supreme Court* requires correction, but excluding those cases in which the jurisdiction of the Court of Civil Appeals is made final by statute. Upon the showing of such an error, the Supreme Court may, in its discretion, grant a writ of error for the purpose of revising the decision upon such question alone and of conforming its judgment to the decision thereof made by it. . . . More than one question may be

presented in the same application, all being stated in order as above stated."

It still applies only to such error "as in the opinion of the Supreme Court requires correction"; thereby perpetuating in referred applications in cases of that character, the above mentioned difficulty and impossibility.

What effect is to be given to said H. B. No. 38, and particularly to said amendatory subdivision 6 thereof, I am, of course, unable to say. However, in view of the fact that said amended subdivision provides for the granting, by the Supreme Court, of a writ of error, making no reference to said designated justices of Courts of Civil Appeals, and the related fact that the Act of which it is a part is later than said relief Act, it may possibly be held that, notwithstanding the provisions of said relief Act, the Supreme Court alone may grant a writ of error upon an application based, in whole or in part, upon said amended subdivision 6. If that construction shall be adopted, and especially in view of the above quoted provision to the effect that the same application may present questions under each of the subdivisions of article 1521, as amended by H. B. No. 38, it would seem that, in practice, the Supreme Court only, and as a court, hereafter may pass upon all questions in all such applications based even partially upon said subdivision 6, as so amended, it being hardly probable that said court will pass upon one question presented by an application and refer to the "designated justices" the other questions presented by the same application.

On the other hand, in view of the fact that said relief Act and said amendment of subdivision 6 were enacted at the same session of the Legislature, and the decision in the Cobolini case, said two Acts of 1917 may be construed as one, however that may result; and, if so, the provisions in said relief Act for referring applications to designated justices of Courts of Civil Appeals may be treated as applicable to cases in which applications for writs of error shall be grounded in whole or in part, upon said subdivision 6, as amended by H. B. No. 38. In that event the above suggested difficulty in requiring the designated justices to pass upon appeals which, by the terms of the statute, are made to depend upon the "opinion" which the Supreme Court, as a court, may hold upon questions of law involved in such appeal, will, in all probability, be a continuing difficulty, recurring in perhaps nine-tenths of all cases which shall be referred to said designated justices. Manifestly, in at least many such appeals, they can not possibly know whether an assigned "error of law" is or is not "one of such importance to the jurisprudence of the State as, *in the opinion of the Supreme Court,* requires correction."

Moreover, in cases in which applications are referred to the designated justices and by them "dismissed" or "refused," it evidently is not contemplated by said relief Act that the Supreme Court shall take and exercise "jurisdiction for the purpose of correcting such error" of substantive law, as required of that court by said Act of 1913 (art. 1521,

subd. 6), or "for the purpose of revising the decision" so "requiring correction," as required of that court by said Act of 1917. (H. B. No. 38, art. 1521, subd. 6.)

Said conflicts between said relief Act and said earlier and said later statutes, respectively, is obvious, inasmuch as said relief Act makes "the granting of an application" "a condition of obtaining a review upon writ of error by the Supreme Court," and expressly provides that such granting, by whatever named instrumentality made, "shall admit the cause into the Supreme Court to be proceeded with by that court as heretofore provided by law." So far as I know, in practice, in referring applications, no distinction has been made between cases in which applications for writs of error are, and those in which they are not, based altogether or partially upon said "subdivision 6."

The undeniable fact, therefore, is that the operation and effect of said relief Act has been, and probably will be, to divert, to said designated justices, a large share of the unquestionable and continuing jurisdiction of the Supreme Court arising from said subdivision 6, in its original and in its amended form, although that diversion, or reference, necessarily involves the exercise by the designated justices, of a very large and important share of the judicial power of the Supreme Court.

And the larger fact is that the same thing is just as true as applied to cases arising under each and every one of subdivisions 1, 2, 3, 4, and 5 of Revised Statutes, article 1521, as amended by the Act of 1913, and to cases arising under subdivision 6 of that article, as amended by H. B. No. 38 in 1917, because by the terms of the Constitution itself, and in the very nature of the powers and duties which that instrument places in the Supreme Court, as a court, it must be, and is, the sole and only court, or tribunal, or agency, or instrumentality, which may determine or decide whether, as shown by an application for a writ of error therein, any particular case does or does not fall within any one or more of the various subdivisions of article 1521 defining the appellate jurisdiction of that court. The status is just as though the expression "in the opinion of the Supreme Court," in said subdivision 6, had been employed with similar purpose and effect in each of said other subdivisions of article 1521, because the Constitution itself forces that quoted clause into each and every one of those statutory subdivisions.

The words "in the opinion of the Supreme Court," as used in said Act of 1913 and in said H. B. No. 38, are, therefore, mere surplusage, in that with those words eliminated, subdivision 6 thereof really would have precisely the same legal meaning and practical effect. Likewise, each of the other subdivisions of said article 1521, as so amended by said Acts, respectively, means precisely the same, whether with or without those quoted words, all questions involved in the appeal,—both those which are preliminary, relating solely to its regularity, and those going to its merits as presented in the application—being clearly referable to the "opinion" or judgment, and necessarily requiring exercise of judicial power, of the Supreme Court.

Before concluding my reference to article 1521, and its subdivisions, I call attention to these confusing facts: In the amendment of 1913, page 107, subdivision 3 reads: "(3) Those involving the validity of statutes." In the amendment of 1917, page 140, it reads: "3. Those involving the construction or the validity of· statutes."

Said relief Act enumerates, among the three classes of cases in which action upon an application for a writ of error is expressly restricted to the Supreme Court, *as a court*, that in which a Court of Civil Appeals "shall have declared void a statute of the State." Sec. 5. As a matter of construction, how is that complication to be adjusted?

From what has been said it is obvious that, when considered in connection with prior laws, particularly said Act of 1913, and with H. B. No. 38, now in operation, said relief Act introduces into the court practice, in Texas, an unprecedented medley of contradiction and confusion, resulting in a jurisdictional phantasmagoria.

(e) Suppose that, in a referred case in which one designated justice is disqualified because the appeal is from the court of which he is a member, the remaining two justices disagree; by whom is the application to be finally passed upon? There is no provision for designation of another justice to break such tie, although the Constitution and laws make provision for similar emergencies arising in the Supreme Court, the Court of Criminal Appeals, and Courts of Civil Appeals, and there is no provision for transferring any application back to the Supreme Court, in any event, for its action thereon. According to the relief Act, such an appeal may never be determined. The supposed instance strongly emphasizes the correctness of my hereinafter stated conclusion that the relief Act contemplates that, contrary to the views of my associates, and current practice, the designated justices shall not consider any referred application in a case appealed from a Court of Civil Appeals of which any one of them is a member, and decided during his incumbency, but that such referred cases shall await the designation of a justice from some other Court of Civil Appeals.

(f) Said relief Act apparently restricts the filing of motions for rehearing on refused or dismissed applications to those refused or dismissed by designated justices of Courts of Civil Appeals. The effect seems to be to prevent the Supreme Court from considering, as it has heretofore done, motions for rehearing on refused or dismissed applications, and also to withhold like power from justices of the Supreme Court in cases in which they, as justices only, pass upon such applications. It will be noted that section 4 expressly declares: "The refusal or dismissal of an application shall have the effect of denying admission of a cause into the Supreme Court, except that motions for rehearing may be made to such designated justices in the same way that such motions to the Supreme Court have been heretofore allowed." It seems plain (a) that the first portion of said sentence, extending down to the comma after "Supreme Court," declares a general rule applicable alike in all cases in which an application shall have been refused or dismissed,

whether by the Supreme Court, as a court, or by two justices thereof, acting in that capacity only, or by such designated justices of Courts of Civil Appeals, and (b) that the subordinate clause of said sentence, next following said comma, imposes a single exception to that general rule, thereby authorizing the making of such motions for rehearing to only "such designated justices,"—meaning, of course, designated justices of Courts of Civil Appeals.   Surely said Act does not contemplate that such motions for rehearing may be made to "such designated justices" in any case in which the application for writ of error was not referred to them, but was acted upon by the Supreme Court, as a court, or by two justices of that court, as justices only.   It seems to me that, under said Act, all such motions should be addressed to and filed with said designated justices, there being no statutory provision for referring them. .

(g)   Nor is there any provision for recording in the minutes of the Supreme Court the reference of applications.   Even if it be assumed or held that when such reference is made by order of the Supreme Court itself it has an inherent or implied right to make in its minutes a record thereof, there appears to be an utter want of authority for making in said minutes a record of references of applications when made by justices of that court and not by the court.

(h)   No record or report of any action by the designated justices is either required or mentioned.   Neither said relief Act nor any other statute carries even an intimation that all such actions are to be reported by them, through an unsigned, unauthenticated typewritten memorandum, to the Supreme Court, or that it shall be carried into its minutes, case by case, after being read by the chief justice in open court; yet that is the practice, which evidently has been devised to supplement the recognized shortcomings of said relief Act.   In my opinion such legislative power does not reside in the Supreme Court, its constitutional and statutory authority to make rules not extending to such "designated justices" or to their proceedings, under said relief Act. because they do not constitute a court.   Moreover, the Supreme Court has not formally made or promulgated any rule on the subject.

Our former Commission of Appeals did make formal reports to the Supreme Court, which were recorded in its minutes; but all that was expressly required by the Commission statute.   I regard such announcements by the Supreme Court as idle flummery, and the record thereof in its minutes as of no legal effect whatever, not even constituting duly authorized or legal evidence of the action of the designated justices; an unwarranted and improper loading down of the solemn minutes of the court with extraneous matter, the references of the application having transferred the appeal elsewhere, and such transfer being final except where the writ of error is granted, and the Act making no provision for such record even then.   And even if it ought to be held that the court has an implied right to announce, and to have noted in its minutes, the return of an appeal to its jurisdiction or control, that

reasoning can not justify announcement, and entry, in said minutes, of other orders of the designated justices, dismissing applications, refusing writs of error, and overruling motions for rehearings.

As to lack of provision for a record, see Whitener v. Belknap, 98 Texas, 280, supra; Accusi v. Furniture Co., 83 S. W., 1105, supra; and Risser v. Hoyt, 53 Mich., 185. In the last cited case, Cooley, C. J., said:

"Of the very important proceedings for which this Act provides, no record whatever is directed. They are as informal as they can well be; and the directions given are so vague and general that anything like uniformity of action, in proceeding under the Act, could not possibly be looked for. If the proceeding is before the judge at chambers, he is without a clerk; and it might be conducted with less formality and with less probability of a record on which parties could rely for the protection of their rights, than in the most insignificant action before a justice of the peace. . . . It is impossible to enforce such a law."

(i)  Neither said relief Act nor any other statute provides for enforcing any order or decree of the designated justices. Take, for illustration, a case in which a proper application for the writ of error is so "referred" and "dismissed" or "refused"; provisions of other laws for enforcing the judgment of the Court of Civil Appeals are not applicable, because there was a proper appeal therefrom, and provisions of other laws for enforcing judgments and decrees of the Supreme Court in appealed cases are not applicable, because that court rendered none.

In such instances the judgment appears, like Mahomet's coffin, suspended between earth and sky.

By what court, and how, are the orders of the "committee" to be enforced? This very condition or status illustrates the extreme length to which said relief Act goes, enforcement of final judgments and decrees in cases within the jurisdiction of the Supreme Court, being an essential ingredient or element of its constitutional supreme judicial power. Whence arises the authority of the Legislature, by means of transfer of appeals, to prevent or hamper, in hundreds of duly appealed cases, due exercise of that high power? That question stands, and long will stand, unanswered.

In my opinion my associates have given to said relief Act erroneous constructions, in the following particulars:

(a)  The designation of justices to serve under said Act has been made by the Supreme Court, *as a court,* by an order entered upon its minutes. The Act expressly requires that such designation be made by "the chief justice of the Supreme Court or any two of the justices thereof" (sec. 2), thereby withholding from the court the stated authority. Strongly supporting that conclusion is the declaration of the relief Act that it shall be done "by a writing to be recorded in the minutes of the Supreme Court" (sec. 2), meaning, I think, a writing authenticated by the signature of the chief justice or by the signature of the two justices—as the case may be—which provision is entirely

appropriate if the designations are to be so made, but distinctly inappropriate if such designations are to be made by order of the court, as a court. Ordinarily orders of court are announced, orally, from the bench, and entered thence into the minutes; but it is customary for appointments by individuals, although they be acting officially, to be made in writing duly signed by such person.

It is perfectly plain, I think, that said relief Act contemplates that the manner and form of making such designations of justices shall be the same in all instances; consequently, in ascertaining the manner in which such designation is to be made when made by the chief justice, acting alone, in that capacity, we thereby discover the manner in which such designation is to be made when made by two justices of the Supreme Court, acting together, as justices. Now, it is obvious that when the chief justice, acting alone, makes the designation, such designation is not to be made by an order of the Supreme Court, but must be "by a writing," signed by the chief justice, in that capacity, and recorded in said minutes; and, by the same token, when two justices of the Supreme Court make the designation, it can not, legally, be made by an order of the court, but must, likewise, be "by a writing," signed by such two justices of the Supreme Court, in their official capacities. In no other manner may such designations legally be made. They have not been so made. What, then, is the legal effect of the proceedings and actions of the designated justices under such illegal designations.

(b) In many instances a mere majority of said designated justices have been required to consider, and have considered and acted upon, applications in cases decided by, and appealed from, a Court of Civil Appeals of which one of such justices was a member, such decision having been rendered during his incumbency.

The relief Act declares that "no one of such justices shall participate in acting upon an application in a cause decided during his incumbency by the court of which he is a member." Sec. 4.

In the numerous instances in which, because of disqualification of one of the designated justices, the other two, only, have acted upon referred applications, such action uniformly has been recognized and upheld by the Supreme Court as valid. I think that, under the terms of said Act, in no instance can less than three designated justices legally act upon any application or motion. Said Act provides for the designation of "three of the justices of the Courts of Civil Appeals to act as hereinafter provided" (sec. 2), and upon the *three* (not two of them) certain powers are imposed and certain duties are laid. Sec. 3.

A power of attorney given to three men, jointly, can not be executed by only two; the concurrence of each is necessary, unless the instrument creating the power provides otherwise. How, then, may less than three designated justices act even though a majority may control? Nowhere in the Act, or in any other law, is there any statement or suggestion that two "designated justices" may constitute a quorum and transact

business—as is provided, elsewhere, with reference to Courts of Civil Appeals, the Court of Criminal Appeals, and the Supreme Court.

It is true that the relief Act provides that the action of the designated justices upon applications is to be "by granting, refusing, or dismissing the same in accordance with the practice of the Supreme Court heretofore prevailing," and that "such designated justices may make such orders and give such directions incidental to the consideration and disposition of applications, as are sanctioned by such practice" (sec. 3); but all that quoted language relates entirely and simply to the nature and character and quality of the work to be done by the designated justices, with a view to conforming same, in those respects, to the action heretofore taken by the Supreme Court upon such applications for writs of error, and has no relation or application whatever in determining what number of designated justices are required to act in the premises.

Section 2 provides that "the chief justice of the Supreme Court or any two of the justices thereof" may perform a certain act; section 3 provides that the "Supreme Court or any two of the justices thereof" may perform another certain act; section 5 confers a certain power upon the justices of the Supreme Court—a power never before conferred upon them—and expressly adds: "action by any two of whom shall be sufficient"; it is, therefore, reasonable to assume that if the Legislature had intended that less than the three designated justices shall perform the duties or exercise the power imposed and conferred upon them, by that same Act, it would have said so, expressly. To my mind any other assumption seems absurd.

However, if the Act contained no such side light upon the point, the rules of interpretation which generally are observed would require, here, the construction that all three such designated justices must at least participate, if not that they shall concur, in any action upon or in relation to an application for a writ of error, in order to render such action valid. Nalle v. City of Austin, supra.

In citing the Nalle case I am aware of the fact that therein the right of two members of a Court of Civil Appeals to act as a court in disposing of a case within its jurisdiction was upheld; but that decision was placed upon the grounds that a statute, which was not clearly unconstitutional expressly authorized such action by a majority of Courts of Civil Appeals, the general purpose of the Constitution in the premises being to expedite the disposition of causes in those appellate courts, and it not being clear that authorities holding that, except when otherwise provided by law, the decision of special tribunals must be by all members thereof were applicable to appellate courts.

For the Supreme Court, in the cited case, Judge Gaines said: "There are authorities which hold, as to special tribunals at least, that when a court is created composed of more than one judge, and the law creating it does not prescribe that any number less than the whole may constitute a quorum, all must act in making a decision." To that extent

that court seemed not to entertain serious doubt as to the correctness
of those authorities. However, when it came to applying the rule to
great constitutional courts, such as our Courts of Civil Appeals, the
court said, "whether this rule shall apply to superior courts may well
be doubted." But, as applied to said designated justices, the question
is unaffected by any statute declaring, as did the statute in the Nalle
case, concerning Courts of Civil Appeals, that "a majority . . .
shall constitute a quorum for the transaction of business"; and said
designated justices do not constitute any "superior court," or any court
whatever, but act merely as an aggregation of individuals, called, by
grace of the Supreme Court, a "committee"; wherefore we are thrown
back upon said authorities which support the proposition that, in the
absence of statutory provision to the contrary, said designated justices
must act together or not at all, in connection with such expressions in
the relief Act as fairly indicate the legislative design in that particular.

It is evident that, in the Nalle case, the Supreme Court attached
great importance to the fact that to uphold the Act would be to carry
out the constitutional design to expedite dispatch of business in those
courts; but said relief Act necessarily has a diametrically opposite effect
on those courts.

It is from the standpoint of those courts and of litigants therein, and
not from the standpoint of the Supreme Court and litigants therein,
that the authority of the Legislature concerning the powers and duties
and time and work of justices of Courts of Civil Appeals must be viewed
and determined. Each court, in its sphere, under the Constitution, was
designed to be, and should be left, free to perform all its functions, un-
interruptedly, whether any other court is sufficiently manned or not.

In serious derogation, therefore, of said relief Act, is the fact that
it seeks to expedite the business of one constitutional court at the
certain cost of retarding and disturbing the business of other con-
stitutional courts; wherefore there is not, as there was in the Nalle
case, grounds or occasion for indulgence of all reasonable intendments
and presumptions in favor of the validity of the statute. How, then,
can the action of only two designated justices, dismissing or refusing
an application finally dispose of an appeal, and how can their action
granting the writ of error admit the case to the Supreme Court for
decision, the third designated justice being disqualified?

(c) The Supreme Court has received from said designated justices,
and solemnly announced, unsigned reports of their proceedings, and
without any statutory authority or even formal order of court therefor,
has had such reports carried into its minutes. See, ante, in discussion
of a different question.

By the terms of said relief Act the designation of the three justices
is to be "by a writing to be recorded in the minutes of the Supreme
Court" and any change in their personnel is, likewise, "to be in writing
and recorded, as before." Sec. 2. From this it safely may be assumed
that, if the Legislature had intended that a memorandum of any and

all actions taken by such designated justices upon or in relation to referred applications or motions for rehearing thereon should be recorded in the minutes of the Supreme Court, some express declaration to that effect would have been made in said Act.

Said opinion in the Blair case, by our chief justice, which was prepared and filed after most of the foregoing statement of my views had been written, will now be considered briefly, in the light of what precedes.

Said opinion, as I understand it, disregards, to a great extent, the above mentioned distinction between powers of courts and powers of justices thereof, and also the above mentioned distinction between legislative powers and judicial powers, and also the above mentioned distinction between defining the appellate jurisdiction of the Supreme Court and exercising its judicial powers. Those distinctions being broken down, the rest comes easily.

Said opinion treats the relief Act mainly as one prescribing procedure for getting cases finally before the Supreme Court for review upon the merits of the appeal, disregarding, almost entirely, its features whereby (a) hundreds of cases already within the appellate jurisdiction of that court when that Act took effect, and (b) a vast array of cases which will come and lie within that jurisdiction, are transferred elsewhere for final disposition and decision, involving the exercise of supreme judicial power which our organic law has vested in that court alone. In support of the validity of those features of the relief Act said opinion presents no direct argument, and cites no decision in this or any other State which strongly tends to confirm my conclusions that there is no such argument to make and no such decision to cite.

Various important features of said Act are not even mentioned in said opinion. However, it says:

"The Act, as is revealed upon its face, had for its purpose relieving this court, for a season, from the necessity of reviewing the large number of petitions for writs of error. . . . The thought of its framers doubtless was that under its operation for a short period the Supreme Court could clear its docket and be in position to resume the consideration of cases on petition for writ of error. For that reason the operation of the Act is in effect limited to the time necessary for that purpose."

For aught that appears in the Act it is to stand and to operate forever. Its immediate purpose is to relieve our crowded dockets; nevertheless, it undertakes to grant "additional powers to the chief justice and the associate justices of the Supreme Court and of Courts of Civil Appeals," and, upon its face, appears to have been intended permanently to prevent the accumulation of cases upon the dockets of the Supreme Court by relieving it of the necessity for considering and acting upon the much greater portion of the five hundred or more such applications, or petitions, which are likely to be filed every year, consideration of which necessarily will consume in future, as in the past, about three-fourths of each year, whether that work be done by the Supreme Court

or by designated justices of Courts of Civil Appeals. The Act does not declare that it shall become inoperative at any future time. On the contrary, there is every reason for supposing that said Act will be worked to its limit until repealed. If that be not done the legislative purpose will not have been fully carried out.

However, that is, I think, an immaterial point, since the validity or invalidity of a statute is not to be determined by the duration or extent of its operation. A constitutional statute needs no apology from the court.

Referring to the great number of such applications, which it declares to be "in excess of five hundred" per annum, and "gradually increasing each year," said opinion says:

"To keep abreast of them practically the whole time of the court has been required throughout each term. . . . By giving the petitions for writs of error its constant attention, the court has been able to keep that docket fairly cleared. But this was true only because it had given them nearly its whole time in each term."

That picture is, I think, unconsciously somewhat overdrawn. During the more than four years of my service thereon the Supreme Court has devoted probably about three-fourths of its working time during its terms to the consideration of such applications.

However, the number to be filed, hereafter, probably will be not less, but more, under said recent legislation, and especially so because of the provision that "the refusal or dismissal of any application shall not be regarded as a precedent or authority in any other cause"; hence the probability that said relief Act will be needed and applied permanently.

Said opinion says:

"It is sometimes overlooked that with the inauguration of the Courts of Civil Appeals as a part of our judicial system, the jurisdiction of the Supreme Court was fixed in the Constitution for the review originally of causes determined by but three of such courts, and only three of those courts were originally established."

The same judiciary amendment which authorized the creation of Courts of Civil Appeals expressly authorized the Legislature to establish as many "as the increase of population and business may require," and also carried the above quoted provisions relating to the appellate jurisdiction of the Supreme Court, and also (let it be remembered), the above quoted provisions expressly vesting the "judicial power" of the State in "courts," and in effect, vesting the supreme judicial power in the Supreme Court.

However, the quoted language of said opinion carries a clear recognition by our chief justice of the vital fact that one purpose of the Constitution, in creating the Supreme Court, was to provide a tribunal "for the review" of, not merely some, but all cases within its appellate jurisdiction appealed from any Court of Civil Appeals. But the effect of the relief Act is to shift, elsewhere, and not even to another court, the ultimate review of a great majority of all cases appealed to the

Supreme Court from all Courts of Civil Appeals, in diametrical opposition to said conceded purpose of our Constitution.

Said opinion says:

"The invalidity of the Act is asserted both as it affects the duties and powers of the Courts of Civil Appeals, and as, it relates to the exercise by the Supreme Court of the jurisdiction with which it is invested by law."

The Act does not purport to define or regulate either the powers or the duties of Courts of Civil Appeals, and, so far as I know, it has not been contended by anyone that it does, although it is insisted that its operation tends to disturb the due exercise of those powers and the proper discharge of those duties. Said opinion then discusses said last mentioned features, but, it seems to me, fails to deal, unless in only very general terms, with the right and duty of the Supreme Court, *as a court,* to exercise, in each and every case within its jurisdiction, every applicable element of its supreme judicial power—involving that which, in my estimation, is the most serious and the least discussed feature or phase of said relief Act.

Taking up said first mentioned phase of said relief Act, said opinion says:

"It is claimed that the use, for the purposes of the Act, of three justices from three different Courts of Civil Appeals will leave the courts of which they are members unable to perform their functions. This question was settled in City of Austin v. Nalle, 85 Texas, 520."

As I have already indicated, I do not so understand the cited case. A very different question was there presented and decided. In that tax suit one member of the court was disqualified, *in that particular case,* because he was "the owner of taxable property in the city." After quoting the provisions of the Constitution declaring that two members of the Supreme Court or of the Court of Criminal Appeals shall constitute a quorum, etc., and denominating as "remarkable" the absence of a similar provision relative to a quorum in Courts of Civil Appeals, the Supreme Court, in said opinion by Judge Gaines, referred to the statute of similar import relating to Courts of Civil Appeals, and upheld its validity, apparently with some reluctance, pointing out the fact that such holding was calculated to effectuate the constitutional and statutory purposes in the establishment of those courts, by expediting the transaction of their business.

As already suggested, that argument can not be applied in support of said relief Act, because its operation is not calculated to aid in expediting the business of those courts in harmony with the clear constitutional and statutory purposes of their creation; but, on the contrary, necessarily and sometimes very materially interferes with the operation and business of at least three of those courts, not merely in a temporary sense, and in some one particular case wherein the emergency may be thought to justify an exception in the number of judges necessary for its decision, but over an extended period of time, possibly

an entire term or more, and necessarily in a great number and variety
of cases. Unquestionably the constitutional intent is that, except in
rare instances of actual disqualification or practical necessity, all three
members of Courts of Civil Appeals shall participate in hearing and
in deciding all cases in those courts. That purpose said relief Act
largely thwarts.

Still referring to said relief Act, said opinion says: "The Act, as it
plainly shows, does not create a court." Therein I concur; nevertheless,
although that seemed to me to be plain enough, I deemed it advisable
to try to demonstrate, herein, that the "Committee of Judges" is not
a court.

Inasmuch as the designated justices do not constitute a court, and
some of the powers which said relief Act seeks to confer upon them
concededly and demonstrably are "judicial" powers, which according to
our State Constitution can not be vested elsewhere than in a "court"—
in this instance the Supreme Court—how can said Act possibly be
valid? That question, I submit, has not been answered, and, I opine,
it can not be answered.

But, said opinion declares, "said Act simply defines and adds certain
duties to those of justices of Courts of Civil Appeals already existing.
The duties thus added are those which the justices are to discharge as
justices of such courts, and only in their capacity as such. . . . The
Constitution declares that the judicial power of the State shall be
vested in the courts named in section 1 of article 5 and in such other
courts as may be provided by law. But this does not mean that no
judge may be empowered by law to perform a judicial act having direct
and proper relation to the exercise of the jurisdiction of the court of
which he is a member."

Said Act does declare that the new duties imposed upon any two
justices of the Supreme Court, and those imposed upon designated
justices of Courts of Civil Appeals are "incidental to the offices held
by them." (Caption.)

As to members of the Supreme Court, it is sufficient to say that such
new duties may not be added by the Legislature, because they involve
the exercise of judicial powers which are vested by said article 5 in
the Supreme Court only, and because they are not among the powers
which that article confers or authorizes the Legislature to confer upon
them as justices. As to members of Courts of Civil Appeals the first
branch of this answer applies; but the other does not, since said judi-
ciary article confers upon them, *as justices,* no power whatever, and
does not authorize the Legislature to do so. Another answer, as to
justices of Courts of Civil Appeals, is found in the fact that none of
said new duties has any constitutional, statutory, or rational "direct
and proper" relation of any nature, character, or kind whatsoever to
their constitutional or former statutory duties as justices of Courts of
Civil Appeals. On the contrary, such new duties are a serious handicap
to them in the performance of their said pre-existing duties as members

of those courts, and no fulsome declaration of the relief Act can change that fact.   Facts are not creatures of either legislative or judicial fiat.

It is clear that no case in or upon which said designated justices are called upon to act is, at the time of such action thereon, within the jurisdiction of any Court of Civil Appeals (unless it be for the restricted purpose of amending its judgment during its term), all such cases, if appealable and duly carried up, being then within the jurisdiction of the Supreme Court.   And whatever may be said on that score, or with regard to the effect of the relief Act upon the future admission into that jurisdiction of cases in which the applications have been or shall be filed after the taking effect of said Act, it is perfectly clear that none of said constitutional or former statutory duties of any justice of any Court of Civil Appeals longer had, or has, or can have any such fair or "direct and proper" relation to any single one of the several hundred cases which were pending, upon the application docket, in the Supreme Court, when said relief Act took effect.   It follows that, even under the test suggested by the chief justice, the Legislature was destitute of authority to confer the stated judicial powers upon members of Courts of Civil Appeals, as in said Act attempted.

In the connection indicated said opinion quotes from article 5, section 6, supra, the provision that Courts of Civil Appeals "shall have such other jurisdiction, original or appellate, as may be prescribed by law," and says:

"If the Legislature may bestow, generally, upon Courts of Civil Appeals other jurisdiction than that specifically conferred by the Constitution, no sound reason can be advanced for denying it the right equally to impose upon the justices of them additional judicial duties which have relation simply to a method of appeal of causes determined by those courts."

To me it seems illogical, and certainly it is contrary to all antecedent authority, to say that even express constitutional permission to enlarge the jurisdiction of Courts of Civil Appeals authorizes the Legislature to confer added powers or to place additional duties upon members of those courts, *as justices* only.   Such addition does not enlarge or restrict or affect the jurisdiction of those courts, and, consequently, can not reasonably be defended as being an exercise of the power to "bestow, generally, upon the Courts of Civil Appeals other jurisdiction than that specifically conferred by the Constitution."

At most the quoted argument is one based on analogy alone; but, under Constitutions such as ours, which, in the matters of conferring judicial power and jurisdiction have always, heretofore, in Texas, and elsewhere, as above shown, been held to be restrictive in effect, legislative authority to confer jurisdiction or judicial power, or to impose judicial duties, does not arise from and can not be supported by such analogies.

In Texas, as in various other States, Constitution makers, recognizing that, in certain instances, rights might suffer if justices and judges

were deprived of all authority except as courts, have attempted to forestall many of those difficulties by vesting in certain justices and judges certain specified powers to be exercised by them in chambers or in vacation. But, under well established rules of construction which have been recognized everywhere, and declared and enforced heretofore by numerous above cited decisions of the Supreme Court of Texas, the enumeration of such powers of justices and judges has been held to exclude the exercise by them of all other judicial powers in vacation or in chambers. And, as if intending that justices of Courts of Civil Appeals, as justices only, shall not have or exercise any judicial power whatever, the Constitution did not confer, or authorize the Legislature to confer, any power upon them.

The expressed idea, so set out in said opinion, treating as negligible the distinction between the jurisdiction and judicial power of courts, as courts, and the judicial power of justices and judges, seems to me to be probably responsible, in great measure, for those portions of said relief Act which seek to confer additional judicial powers upon justices of the Supreme Court and upon justices of Courts of Civil Appeals.

So far as I have been able to find, in no prior reported case in which that issue was raised has any court in this State upheld the right of the Legislature to confer upon any chief justice or associate justice or judge of any court judicial powers in addition to those which the Constitution directly conferred or expressly authorized the Legislature to confer upon him, although in numerous Texas cases cited herein it has been held that the justice or judge finally may exercise only such powers as have been expressly conferred or authorized by the Constitution. No such decision is cited in said opinion in the Blair case—a circumstance which tends to confirm my conclusion that there is none to cite.

Moreover, the additional duties of such designated justices "which have relation simply to a method of appeal to the Supreme Court" are, primarily, legislative rather than judicial.

Have not our Constitution and statutes and former decisions, and also the uniform decisions of other States under similar Constitutions, all as hereinabove set out, sufficiently drawn and emphasized the essential distinction between the judicial powers and duties of courts and the powers and duties of judges of those courts? And has it not likewise been established that the regulation of the method of appeal to the Supreme Court, as well as the definition of the boundaries of its appellate jurisdiction, is a proper subject of legislative but not of judicial action?

Said opinion says, also: "The writ of error has always been treated by this court as but a mode of securing revision of causes as upon appeal. Lucketts v. Townsend, 3 Texas, 119; Magee. v. Chadoin, 44 Texas, 488." Precisely so; but what does that mean? In the last cited case the question was: "Can the appellate power of this court . . . be invoked and exercised by an appeal from such judgment, or may such judgment be brought to this court for review by writ of error?" It

arose on a motion "to dismiss the case for want of jurisdiction." In sustaining its jurisdiction, the court said:

"The language of the supplementary Act to which we have referred seems plainly to import that its purpose is to guard against a construction being given the previous Act which should lead to a denial of the right to correct an erroneous judgment of the District Court, and not to prescribe a particular mode by which this should be done. The writ of error has always been treated and regarded by this court as it was indeed by the Supreme Court of the Republic from its first introduction into our system of jurisprudence, as only another method of bringing up causes for revision as upon appeal. (Lucketts v. Townsend, 3 Texas, 128.) The word 'appeal,' as is said in the case of The Republic v. Smith (Dallam, 408), is often used to denote the nature of appellate jurisdiction, without regard to the particular mode by which a particular cause is transmitted from one tribunal to another. And it was, we think, thus used in the clause of the statute to which we have referred. We, therefore, hold that the judgment can be brought to this court for review by writ of error, and the motion to dismiss must be overruled."

The court then proceeded to decide the case, upon another issue, thereby asserting its appellate jurisdiction and exercising its supreme judicial power. Had that been done by a committee of district judges, under statutory direction, would not such committee thereby and likewise have asserted jurisdiction and exercised judicial power? And under the cited decisions and even the quoted statement of our chief justice, is not all of that the mere equivalent of a straight old-fashioned "appeal" and an ordinary disposition thereof? If not, what is the practical difference? I can find none.

By whichever method the appeal is allowed by statute and duly perfected, the result is the same; and in each instance the jurisdiction of the higher court attaches and its jurisdiction and its judicial power are therein exercised.

Our statute authorizes appeals to the Supreme Court by the writ of error route alone; but where the case is so appealable, and is taken up properly, its jurisdiction attaches prior to the action upon the petition (application) for a writ of error, and whether same be granted or refused. Upon this point rest many of the difficulties created by said relief Act. To test its validity, let us suppose that, all along, instead of appeals by writ of error, our statute had provided for such straight appeals to the Supreme Court; would the Legislature now have authority to require or authorize the Supreme Court to refer to such designated justices of Courts of Civil Appeals three-fourths of all cases then on its docket or to be filed thereon, and to require them irrevocably to decide and finally to dispose of such cases? Most assuredly not; yet that, in substance, is, I think, only one of the vices of said relief Act, as tested by our Constitution.

Said opinion says:

"Granting that the allowance of the writ involves the exercise of judicial power, where is the constitutional provision which denies to the justices of Courts of Civil Appeals the authority to allow an appeal from those courts to the Supreme Court?"

For answer I point to said provisions of section 3 of said judiciary article 5, declaring what the appellate jurisdiction of the Supreme Court shall be "until otherwise provided by law," meaning, evidently, a statute in fixed terms; also to section 1 of article 3 of the Constitution, which vests the legislative power of the State in the Legislature alone; and also to section 1, article 2, of that instrument, which declares that the legislative and the judicial departments of this government shall be kept separate. For further answer I point to the restrictive provisions of the Constitution conferring certain specific powers upon all justices and judges above the rank of justice of the peace, excepting only justices of Courts of Civil Appeals.

Said opinion further declares: "Not only is no inhibition to be found, but the Constitution is utterly silent as to any method to be employed for the obtaining of a review by the Supreme Court of causes determined by those courts. . . . It is the absence of any such constitutional provision that determines the validity of this Act."

To that I reply that while the Constitution does not attempt to specify any method whereby cases falling within the appellate jurisdiction of the Supreme Court may be appealed to that court from a Court of Civil Appeals, it is not silent as to how that jurisdiction is to be determined, but, on the contrary, expressly defines what it shall be until changed *by the Legislature itself,* thereby denying, by necessary implication, the authority of the Legislature to delegate the power to change that jurisdiction, as, for illustration, to authorize designated justices of Courts of Civil Appeals or any two justices of the Supreme Court, or even the Supreme Court itself, to determine, as provided by said relief Act, what cases shall and what cases shall not actually be reviewed on appeal by the Supreme Court. Incidental to the power to change that jurisdiction, and fairly within the scope of said section 3, article 5, and of general legislative authority not inhibited by the Constitution, is the authority to regulate appeals, by writ of error, or by straight appeals, all as a matter of right. But such "regulation" *must not violate other provisions of the Constitution.* Let it be remembered that the issue here is, not over the power of the Legislature to prescribe both the time and mode of appeal from Courts of Civil Appeals to the Supreme Court—a power which is questioned by no one, but is admitted by all—but over the power of the Legislature to delegate its authority to define and determine the appellate jurisdiction of the Supreme Court, and also over its authority to curtail and abridge the exercise by the Supreme Court of the full measure of its constitutional supreme judicial power over cases within its jurisdiction by transferring,

elsewhere, to members of that court, and also to members of Courts of Civil Appeals, the exercise of part or all of that exclusive power.

Continuing the thought already therein expressed, said opinion says:

"To fix any given mode for an appeal is but to prescribe a regulation by means of which jurisdiction to hear the appeal may be acquired. To vest in the appellate court itself, or in some other authority, a discretionary power of deciding whether the appeal shall lie, is equally only a regulation of the manner in which the appeal is to be taken."

According to that view the above mentioned "legislative power" of determining what cases shall be appealable to the Supreme Court may be delegated elsewhere, and even to the judicial department, by the Legislature, to which, alone, the Constitution confided it; and all under the thin veneer of *regulating appeals*. That is the very crux of the issue in so far as the first of the *dual powers* hereinabove discussed— the legislative power to fix the appellate jurisdiction of our Supreme Court—is concerned. Upon that issue my associates and I stand at opposite poles. Somebody is terribly mistaken in the premises.

Aside from all that is the separate and independent issue as to transferring to the "designated justices" a large portion of the Supreme Court's "judicial power." Said opinion says:

"The Legislature inaugurated the writ of error practice as the method whereby the appellate jurisdiction of the Supreme Court might be acquired."

In that repeated proposition I again concur; but with the explanation that never, until said relief Act was enacted, has our Legislature undertaken to make the attaching of that jurisdiction dependent, *to any extent,* or for any purpose, upon "the granting" of the writ of error. Continuing, said opinion says:

"It also lodged in the Supreme Court the authority of determining the merits of the grounds advanced for the issuance of the writ, and, hence, when it should be allowed."

Certainly so; but the purpose of granting such writ was not to admit the appeal to the Supreme Court for decision upon its merits, but to enable the court to give a fuller hearing, including oral argument, and more exhaustive research to a case which already was within its jurisdiction, and which, were it not so, would be peremptorily dismissed, upon, or even in the absence of, a motion to dismiss "for want of jurisdiction."

Is that not perfectly clear and plain? It seems so, to me; yet back to this critical phase of the argument, in so far as delegation of legislative powers is concerned, said opinion comes, from every turn, even to the practical exclusion of anything like a full discussion of the other fundamental features of said Act, which seek to impose elsewhere than upon any court the exercise of certain far-reaching "judicial power."

Said opinion says, further:

"Neither can it be doubted that it would have been competent, as a mere question of legislative power, for the Legislature to have given to

the Courts of Civil Appeals, themselves, the authority of determining when an appeal from their judgments should lie."

That proposition, obviously and concededly, is merely abstract, the Legislature not having attempted so to do. However, the declaration appears to have been intended to illustrate the views of my associates as to the broad sweep of legislative authority in the premises. It does that, finely; and therein, I think, it discloses, in great part, the basis of reasoning upon which said relief Act has been projected, and enacted, and upheld as valid. However, I must dissent from the stated conclusion.

To determine when an appeal to the Supreme Court shall lie, is, in my judgment, the exact equivalent of determining the character and extent of its appellate jurisdiction; and that function is a purely legislative one, on general principles, and unequivocally is made so, in Texas, by said provisions of article 5, section 3, which declare what that jurisdiction shall be "until otherwise provided by law." 5 Texas, 435, 87 Texas, 454.

Being thus a legislative power, its exercise is restricted to the Legislature, according to all heretofore settled rules of constitutional construction, and, more particularly, by the above quoted article 2, section 1, and article 3, section 2, of the Constitution of Texas.

In one of the cases cited in said opinion in the Blair case, it was said:

"If the jurisdiction given by the Constitution can not be exercised because the mode has not been expressly provided for in the fundamental law of their creation, it would be competent for the Legislature to regulate the manner in which it should be exercised. But if the mode had been expressed contemporaneously, and by the same authority that created the jurisdiction, it would not be competent for the Legislature to direct a different mode." Titus v. Latimer, 5 Texas, 435.

True, our Constitution does not go into details relating to changes in the appellate jurisdiction of the Supreme Court, or the mode of appeals to it, but it does declare, emphatically, that all such changes and regulations shall be made by "law," which means by the Legislature in definite statutes.

Is the appellate jurisdiction of the Supreme Court of this great State so "provided by *law*" when it is determined, not definitely, by a statute of uniform operation, but in each and every particular appealed case, separately, by said "Committee of Judges," or by any two justices of the Supreme Court, acting merely as justices, or even by the Supreme Court itself, all as provided by said relief Act? If not, that Act certainly is violative of said constitutional provisions. Titus v. Latimer, supra.

Immediately following the next preceding quotations from said opinion are these statements:

"Such an authority is not novel in the legal procedure of the country, whatever may be the divergence of views in respect to the wisdom of it. In a number of jurisdictions the right of appeal has had a like re-

striction imposed upon it.  In 3 Corpus Juris, page 1080 (notes), will be found a collection of cases instancing such a limitation upon the right as found in the legislation of different States."

The objections which I make here to said relief Act have no relation to any views of mine respecting the wisdom of it, that not being a matter for judicial determination.  It is true that in various jurisdictions, on both sides of the Atlantic, appeals have been allowed, in some classes of cases as a matter of right, and in others as a matter of grace or other than legislative permission, and sometimes the litigant has been allowed choice between a straight appeal and an appeal by writ of error, the ultimate operation of each mode of appeal being, however, simply to place the case within the jurisdiction of the higher tribunal or court; but this Texas relief Act apparently attempts to blend into one said two modes of appeal.  If that was ever before attempted, I am not aware of the fact.  But the principal feature of the Act which I consider unprecedented, under a State Constitution such as ours, is that whereby cases already within the appellate jurisdiction of the Supreme Court are transferred, without the consent of litigants, to any two justices of that court, as justices only, or to designated justices of another court, acting as an aggregation of individuals, for final decision and disposition; and that feature of the Act is not supported by the cited text, or by any of the three cases specially mentioned in said opinion.

The text to which I understand said quotation refers is as follows:

"Under some statutes, or in certain cases, an appeal, writ of error, or petition in error must be allowed by the lower court or judge.  Under other statutes it is to be allowed by the appellate court or judge thereof, or either by the lower court or a judge thereof or by a judge of the appellate court.  To give the Supreme Court of the United States jurisdiction of a writ of error to review a judgment of a State court, it should appear from the record that the writ has been allowed either by the chief justice or the presiding justice of the State court, or by a justice of the United States Supreme Court."  3 C. J., 1079-1080.

Each proposition in the text refers to a note which cites cases.  No Texas case is cited, which fact indicates that the author was of my above expressed view that under pre-existing Texas statutes an appeal by writ of error to our Supreme Court, in cases within its appellate jurisdiction, has been treated as a matter of right, and that such jurisdiction attached in the particular case prior to the grant of a writ of error, and whether the writ was granted or not.

The argument wrapped up in said quoted reference to the practice elsewhere is, upon its face, somewhat persuasive; but it is not conclusive, and is, I think, more plausible than cogent in that it fails to show that such statutes of other States and of the United States are not repugnant to our State Constitution.

Said three cases are:  Sigler v. Vaughan, 11 Lea (Tenn.), 131; Griffin v. Bank, 9 Ala., 201; Montville St. Ry. Co. v. New London, etc.,

Co., 68 Conn., 418, 36 Atl., 811. In each the question was one of statutory construction, no issue of constitutionality being raised; from which fact it is to be inferred that each State Constitution differed from ours.

In Griffin v. Bank, supra, the Supreme Court of Alabama said:

"In chancery cases, when final decrees have been pronounced, the party may have either a writ of error or an appeal, at his option (Clary's Dig., 355, sec. 64), and the only distinction made between them, in practice, is believed to be, that the appeal is prayed, and allowed in term time, and the writ of error is sued out in the clerk's office. In England the proceedings upon an appeal from the chancellor originate by petition to the House of Lords (2 Smith's Ch. Pr., 22), and in New York is specifically provided for by statute. . . . The reason why the proceedings for appeal to the House of Lords originate there, may be found in the fact that the jurisdiction of the peers was not acquiesced in by the early chancellors, and it was found necessary to enforce it by fines and imprisonment. See cases cited by Chancellor Walworth, in Hunt v. Mayor, etc., of Albany, 3 Paige, 381."

Thus, in the final analysis, and in one of the cases cited by our chief justice, is disclosed, at once the principle underlying the practice of subordinating the right of appeal to the will of the reviewing power, and the reasons which, no doubt, induced the framers of our Constitution effectually to put an end, or, rather, to try to put an end to that undemocratic practice, and to place in the law-making department, alone, the sole right to regulate the practice—the mode of taking appeals—*as a matter of right*, in a proper case, to our Supreme Court; that legislative authority being conferred, subject, however, to each and all of said above mentioned applicable restrictions and limitations of our organic law.

Said opinion says, also:

"No doubt has ever existed, as we are aware, as to the authority of the chief justice of a State Supreme Court to so allow the writ, notwithstanding the provisions of State Constitutions which vest in the State Supreme Court, as distinguished from its judges, the judicial power which they are to exercise."

That, it appears to me, assumes, first, that the power so exercised is a "judicial power"; whereas it is, I think, primarily a legislative power (Const. U. S., secs. 1 and 2); the exercise of which has been delegated to judicial officers; and, second, that said power is referable to and is derived from the State Constitution; whereas, in my judgment, it is referable solely to and is derived exclusively from Acts of Congress.

If the stated power is not derived from the State Constitution, the practice whereby it is exercised pursuant to Federal statutes constitutes no adequate or even proper standard or measure by which to determine whether said Texas relief Act does or does not conflict with the Constitution of Texas.

Even the merely persuasive force of the suggested analogy between

said Federal practice and our State practice under said relief Act is greatly broken by the twin facts that our judiciary article differs materially from that of the Federal Constitution, and the petition for the writ of error and the purpose in granting that writ, as heretofore known to our State laws and practice, under statutes which stand today not expressly repealed, differ essentially from the petition for the writ of error, and the purpose in granting it, under said Acts of Congress.

Under said Federal statutes and practice they, together, comprise, indeed, a mere *mode of appeal,* a plan or method of getting appealable cases, to which it is applicable—whether from Federal or State courts—into the appellate jurisdiction of the Supreme Court of the United States, the effect upon cases from State courts being merely to bring such cases upon an equality, thenceforth, with cases tried in Federal courts, and entitling such cases from State courts, likewise, after, *but not before, the granting of the writ of error,* to final review by that great tribunal.    But, under our State laws and practice, prior to said relief Act, as hereinabove shown, the appeal to our State Supreme Court, in a proper case, although by writ of error, has been treated *as a matter of right,* and the appellate jurisdiction of that court has been held to attach *prior* to the granting of the writ, and all applicable exclusive constitutional supreme judicial power of that court has been exerted in and over the case, by that court as a court, in about eighty per cent of all such appealed cases, *without the writ of error being granted therein at any stage.*

Under the Federal practice the petition for writ of error appears really to be what said opinion seems to treat it as having been, all along, under our State practice—a mere ladder upon which to climb up, an elevator—and is never treated or considered by the Supreme Court of the United States as a part of the record upon which the court decides the appeal.    Butler v. Gage, 138 U. S., 56, and cases cited.    But, under our Texas statutes and rules of court and uniform practice, heretofore, the petition for the writ of error has formed the backbone of the appeal, and said writ has been granted, if at all, not, as under said Federal practice, merely as a means of getting the case up for review, but simply as a matter of procedure, for the convenience of the Supreme Court, in a cause then already within its jurisdiction, and, particularly, in order that the case may be set down for a more formal hearing and further study and a written opinion on the law of the case, our practice, with comparatively few exceptions, being not to write when the writ of error is refused.

Moreover, under the Federal statutes and practice, the writ of error is granted regardless of the merits of the appeal, and upon the mere showing that some issue bringing the case within the appellate jurisdiction of the Supreme Court of the United States was raised in the State court of last resort; whereas, under our State statutes, rules and practice, the writ of error is not granted except because of error, or probable error, in the decision of the Court of Civil Appeals.    In other

words, under said Federal practice consideration of the merits of the appeal *follows* the granting of the writ of error, but under our State practice, at least heretofore, final consideration of the merits of the appeal has *preceded* the granting of the writ, in all except about twenty per cent of all cases appealed to the Supreme Court. But under said relief Act the appeal in about seventy per cent of all such appealed cases will be finally acted upon and disposed of without the slightest consideration, by our Supreme Court, of the merits of such appeal.

Has Congress ever attempted, directly or indirectly, to transfer from the docket of the Supreme Court of the United States elsewhere, for final adjudication, several hundred cases then within the appellate jurisdiction of that court? Has a like feat ever before been attempted by the Legislature of any State having a Constitution substantially like ours? If so, let that be presented as a real analogy to our relief Act, for whatever it may be worth.

Continuing, with reference to the grant of the writ of error, under said Federal practice, by the chief justice of a State Supreme Court, said opinion says:

"His act in such instances is valid simply for the reason that it is the exertion of a part of the judicial power reposed in the court, by a constituent member of the court acting for that purpose in a capacity not forbidden by the organic law of the State. If such a power may be constitutionally exercised by a judge of the Supreme Court of a State as applied to causes reviewable by the United States Supreme Court, it is difficult to perceive why it may not be also validly exerted by justices of the Courts of Civil Appeals as applied to causes not final in those courts."

To me it seems clear that such act is the exercise of a power reposed, *not in any court,* but in the chief justice, in that capacity only; and the fact that such act is not expressly forbidden by the State Constitution is immaterial, his power to perform it arising under a wholly different government and from an entirely distinct source. Our said relief Act involves the exercise of supreme judicial power which our organic law certainly vests in our Supreme Court, to be exercised *as a court.* Consequently, as applied to the duties of designated justices of Courts of Civil Appeals under our relief Act, the assumed analogy breaks down. In this connection I call attention to comparatively recent changes made by Acts of Congress relative to appeals from State courts.

However, and whatever may or may not be the legal effect of the above mentioned differences in Constitutions and practices relative to the writ of error, I do not believe that said Federal practice or the practice of certain other States, in adherence to the ancient common law theory of subordinating to the will of the House of Lords the right of obtaining from the highest tribunal in the land review of a cause which is appealable to it should be given controlling effect in the construction and application of the Constitution of Texas. That feature

of the common law was never before adopted in this State, and the proposed change in our practice, if that be, indeed, one of the effects of said relief Act, is, in my estimation, plainly violative of above quoted provisions of our State Constitution. Bullock v. McGerr (Colo., 1890), 23 Pac., 981, citing State v. Noble, People v. Hayne, and, also, Railroad Co. v. Abilene (Kan.), supra.

Upon the whole, I respectfully submit that the constructions which, herein, I have placed upon the quoted provisions of the Constitution of Texas are strongly supported by both reason and authority, including a heretofore unbroken line of decisions of this court extending over the last quarter of a century or more; and these constructions should, I think, be followed now, regardless of the effect upon said relief Act and our dockets.

However unique and without a prototype among statutes, forgetful of the uniform decisions of the Supreme Court of Texas and many similar ones giving a *restrictive* effect to the various above quoted sections of our social compact, regardless of the requirement that legislative power shall repose in and be exercised by only the law-making department, violative of the mandate that the powers of government shall be divided into distinct and co-ordinate departments and confided to separate magistracies, openly defiant of the declaration expressly vesting the judicial power of this State in "courts," ignoring the fact that our organic law reposes the supreme judicial power of this State in one Supreme Court of only three members, and unsupported, in so far as the attempted transfer elsewhere of the major portion of that court's judicial power is concerned, by the citation of even one single decision from any court in Christendom, and logically and inexorably usurpive and destructive, in principle, of the independence and constitutional powers and functions of every court of this State, said relief Act stands approved, by a majority of our Supreme Court, as a valid statute. The entire chapter is the most remarkable one in the annals of our court, and is without a parallel in history.

With becoming respect, though with a sad heart, I can do no more than to record here this my dissent and solemn protest.

Opinion filed August 18, 1917.